
Exhibit 5



# Expert Rebuttal Report

## RMTA Toll System Replacement Project

**Dr. Harold W. Worrall, PhD, P.E.[1]**
**8/24/2020**

---

[1]     The Expert Report served on July 15, 2020, is fully incorporated herein. There have been no changes to my qualifications, prior testimony or compensation.



# Table of Contents

Table of Contents ............................................................................................................. 1

Introduction ..................................................................................................................... 1

   Nature of Project ......................................................................................................... 1

     RFP Description of Project Control ......................................................................... 1

      Technical Specifications ...................................................................................... 1

       TS-01 Project management, documentation and testing ............................. 2

       TS – 02 Operations and Maintenance Work ............................................... 2

       TS – 03 hardware and installation ............................................................... 2

       Remaining Technical Specifications TS – 04, 05 and 06 ............................. 2

     TransCore Proposal .............................................................................................. 2

Comment Analysis ........................................................................................................... 2

   Introduction ............................................................................................................... 2

     Subjective and Reasonable .................................................................................... 2

     Industry Standards ................................................................................................ 3

   Expert Opinions .......................................................................................................... 3

     Lober-TransCore Master Scheduler ...................................................................... 3

      Item 1, page 2 ..................................................................................................... 3

      Item 2, page 2-3 .................................................................................................. 4

      Item 3, page 3 ..................................................................................................... 4

      Item 3, page 3 continued .................................................................................... 4

      Item 3, page 3 additional .................................................................................... 5

      Item 4, page 4 ..................................................................................................... 5

      Item 5, page 4-5 .................................................................................................. 5

      Item 6, page 5 ..................................................................................................... 6

     Mickle – TransCore's Project Manager ................................................................. 6


Item 1, page 6. .................................................................................................................... 6

Item 1, page 6 continued ................................................................................................... 6

Item 2, page 7. .................................................................................................................... 7

Item 2, page 7 continued ................................................................................................... 7

Item 3, page 8. .................................................................................................................... 7

Item 3, page 8 continued ................................................................................................... 8

Item 3, page 8 additional ................................................................................................... 8

Item 4, page 8. .................................................................................................................... 8

Item 4, page 8 continued ................................................................................................... 9

Item 4, page 9. .................................................................................................................... 9

Item 6, page 10. ................................................................................................................ 10

Item 6, page11. ................................................................................................................. 10

Item 6, page11, continued. .............................................................................................. 10

Item 6, page11, additional ............................................................................................... 10

Item 7, page12. ................................................................................................................ 10

Item 7, page12. ................................................................................................................ 11

Allegretto – Expert Witness ...................................................................................................... 11

Design-build ............................................................................................................................ 11

Item 3, page 2 of 24. ........................................................................................................ 11

Item 4a, page 3 of 24. ...................................................................................................... 11

Equipment Purchases ............................................................................................................ 12

Item 4c, page 3 of 24. ...................................................................................................... 12

Item 4e, page 3 of 24. ...................................................................................................... 12

Item 4g, page 3 of 24. ...................................................................................................... 12

Item 4h, page 3 of 24. ...................................................................................................... 12

Item 4i, page 3 of 24. ....................................................................................................... 13

Midpoint Design Review ........................................................................................................ 13

Item 5a, page 3-4 of 24. ................................................................................................... 13

Item 5b, page 4 of 24. ...................................................................................................... 13

Item 5c, page 4 of 24. ...................................................................................................... 14

Item 5d, page 4 of 24. ...................................................................................................... 14

RMTA Competency ................................................................................................................. 14


Item 5e, page 4 of 24 .................................................................................................... 14

Item 5g, page 4 of 24 .................................................................................................... 15

Item 5h, page 4 of 24 .................................................................................................... 15

Conduit ................................................................................................................................ 15

Item 6b, page 4 of 24 .................................................................................................... 15

Item 6c, page 4 of 24 .................................................................................................... 15

Item 6d, page 5 of 24 .................................................................................................... 16

Item 6d, page 5 of 24 .................................................................................................... 16

Detail Design Drawings ....................................................................................................... 16

Item 7c, page 5 of 24 .................................................................................................... 16

Item 7d, page 5 of 24 .................................................................................................... 16

Item 7e, page 5 of 24 .................................................................................................... 17

VDOT Demonstration .......................................................................................................... 17

Item 8a, page 5 of 24 .................................................................................................... 17

Item 8b, page 5 of 24 .................................................................................................... 17

Item 8c, page 6 of 24 .................................................................................................... 18

Factory Acceptance Test ..................................................................................................... 18

Item 9c, page 6 of 24 .................................................................................................... 18

Delays .................................................................................................................................. 18

Item 10a, page 6 of 24 .................................................................................................. 18

Item 10a, page 6 of 24 .................................................................................................. 19

RMTA's Contract Approach ................................................................................................. 19

Item 10d, page 6 of 24 .................................................................................................. 19

Item 1e, page 7 of 24 .................................................................................................... 19

Item 1f, page 7 of 24 ..................................................................................................... 20

Item 1h, page 7 of 24 .................................................................................................... 20

Item 1i, page 7 of 24 ..................................................................................................... 20

Item 1j, page 7 of 24 ..................................................................................................... 20

Summary .................................................................................................................................. 21


# Introduction

### Nature of Project

Throughout the TransCore Expert Disclosures, references are made to the Project as a design-build project, thereby confusing the issue of project type with project control. Design-build, as a project type, originates in the construction industry and is in contrast to design-bid-build. A design-bid-build project is one in which a vendor is selected to perform "design" and a separate vendor is selected to perform the "build". The designer is responsible for preparing detailed Technical Specifications of exactly what is to be constructed and materials to be used. The builder then uses those specifications to construct the project from the design plans. A design-build project uses one contractor to do both the design and build functions. It is common for project owners to have an engineering firm develop a project to the 30% stage and then contract with the design-build firm to do the remaining design and construction. This does not mean there are no approvals by the owner nor does it mean the design process is less significant than the construction process.

The contracting process of design-build is distinctly different from the subject of project control and approval. Project control on the part of the owner is not and should not be any less on a design-build project that it is for a design-bid-build project. The Project may be design-build but the Project control approach is a separate issue. On the RMTA Project, the project control process is clearly defined in Technical Specification TS-01 of the RFP and was acknowledged and supported in TransCore's Proposal. The RFP and Technical Specifications clearly anticipate that the integrator would design the Project first and then construct the approved design.

It is obfuscatory to imply limited project control by repeatedly defining the Project as design-build in nature. The RMTA Project is in fact a design-build project since one contractor is responsible for both the design and construction. However, design-build, as a project type, does not imply limited or less project control.

### RFP Description of Project Control

The RFP defined the approach to project control in Technical Specification TS-01 and included detail concerning the types of documents to be produced, the expected content of the documents, key staff, progress schedule updates, the expected management approach etc. The RFP project control was centered around the 14 milestones that were to be accomplished on the Project. Each of those milestones represented project progression points for which the contractor was to be paid. These project control mechanisms were acknowledged and supported by TransCore in its Proposal.

### Technical Specifications

The parties agreed to a milestone controlled project approach. The major sections of the Technical Specifications are as follows:



TS-01 Project management, documentation and testing

There is an expectation of a progressively defined system design; initial design, midpoint design and 100% design. Subsequent to the approval of the design milestones, Factory Acceptance Testing is is to be conducted and then installation can begin. The project control process is used to reduce the risk to RMTA and TransCore.

TS – 02 Operations and Maintenance Work

TS-02 of the Technical Specifications emphasizes project control once again highlighting documentation, methods of communication, maintenance of traffic, equipment tuning, software configuration management and other operational aspects.

TS – 03 hardware and installation

TS-03 emphasizes equipment definition (Bill of Materials), power requirements, environmental aspects and existing physical facility attributes. This section specifically addresses where equipment would be installed and what existing equipment would require removal and/or reuse. Timing and methods of installation and transition also are addressed.

Remaining Technical Specifications TS – 04, 05 and 06

The remaining Technical Specifications for the host, ORT lanes and manual lanes respectively are less related to project control and specifically cover the definition of subsystems, commercial software, complete systems specifications and demonstrations of key component systems.

TransCore Proposal

TransCore's Proposal includes considerable references to similar projects, skilled Project staff and generally describes the Infinity system which TransCore uses to operate client systems. In section 4 of TransCore's Proposal, a required Proposal Criteria Information Index is presented that cross-references the major sections of the Technical Specifications to specific sections and pages of the TransCore Proposal, demonstrating that TransCore intended to develop the RMTA system in accordance with the Technical Specifications. The TransCore Proposal reveals that TransCore fully understood the task nature of the undertaking and the expectations of RMTA for project control. In fact, TransCore's Proposal endorses such an approach as being consistent with their Systems Engineering V Process.


# Comment Analysis

## Introduction

### Subjective and Reasonable

Throughout TransCore's Expert Disclosure frequent reference is made to subjective judgment and lack of reasonableness on the part of RMTA. Judging a decision as subjective is in itself subjective. Objective data should be used as the basis for decisions and considerable documentation exists to confirm how RMTA made its decisions and why.



As an example, consider the issue of information required in the detailed design drawings. It should be expected that RMTA would require the documentation of existing systems and physical features in detail design drawings to ensure that the new equipment would not conflict the physical features of the roadway, plaza and gantries that are in place. Technical Specification TS-01, section 11.3.3.7 states *"The Detailed Design Drawings shall identify all items furnished by the Contractor, all existing items to be removed by the Contractor and all existing items to be re-used by the Contractor"* and yet the position of TransCore's expert witness is *"The Detailed Design Drawings .... submitted November 2018 and resubmitted March 2019 is at least 80% complete and complies with industry standards for completeness of drawings at the MDR Milestone."*

It is difficult to understand why an integration contractor, especially one as experienced as TransCore, would design a system without considering the environment into which it is to be installed. Considering the complexity of installing numerous equipment components in existing infrastructure with hardware to remove and/or reuse and to do it under traffic conditions and the on-going collection of revenue, requires a thorough definition of what is to happen before proceeding. It is not subjective but rather a requirement that is well documented.

### Industry Standards
Several aspects of the Project are industry standard.

The approach to the procurement and RFP are industry standard and would be acknowledged by toll authorities and consulting engineers nationwide. The use of Technical Specifications and Milestones and the link between payment and Milestone accomplishment is common in similar toll systems RFPs. The occurrence of weekly Project meetings in which issues are discussed and documented by the consulting engineer is standard in the industry. In short, the Project conforms to most if not all of the standards in the industry. Standards in the industry are not subjective statements that favor the opinion of one party or the other. These standards exist and can be objectively reviewed.

### Expert Opinions
The following comments are excerpts from the TransCore Expert Disclosures served on RMTA. Each reference below is designated with the item and page number. A response is attached to each statement. The following comments are not intended to be exhaustive, as the opinions set forth in TranCore's Expert Disclosures are disputed fully in Transportation Innovation's opening report.

### Lober-TransCore Master Scheduler

*Item 1, page 2.*
*"...leading up to the TransCore's submittal of the Initial Design Review (IDR) Milestone, as of November 29, 2018, Transcore had recovered all but 56 days of the delay"*



**Response**: IDR is the first step in system definition and was not accepted until November 2018 when the IDR was to be delivered Jan 2018 in the original Milestone schedule, 10 months prior. To reach the conclusion that "*TransCore had recovered all but 56 days of the delay*", is first confusing because upon submission of the progress schedule, not a single day has been recovered. A proposed schedule purporting to recover close to 250 days is not a reasonable assumption regarding when future Milestones would be accomplished as shown in the following comment. Such a recovery was not realized.

*Item 2, page 2-3.*
"*expediting the submittals for the Midpoint Design Review (MDR) Milestone and 100% Design Review and promptly completing FAT was reasonable and would have enabled TransCore to pass Revenue Service Acceptance Test (RSAT) Milestone by the September 27, 2019 contractual deadline*"

**Response:** The IDR was completed and approved in November of 2018 and was scheduled originally by TransCore to be completed in January of 2018, 10 months earlier. The MDR had not been completed when TransCore suspended work in June of 2019. This statement assumes that had the MDR had been approved in November of 2018, just days following the submission of IDR, and that between November of 2018 and September 2019 (10 months), the 100% Design Review, the Factory Acceptance Test and the Installation Ready Design Review could have been completed followed by the Revenue Acceptance Test on September 27, 2019. This is an extraordinary projection considering TransCore's performance history on this Project. Again, such recovery was not realized.

*Item 3, page 3.*
"*RMTA's failure to promptly review and approve the MDR drawings package caused unreasonable delay in the critical path of the Project.*"

**Response:** RMTA did not approve the MDR drawings because there were no drawings showing the existing facilities, equipment (to be removed or reused). In essence, the drawings had no consideration of existing treadles, loops, cabling, conduit, existing toll equipment etc. This led to confusion about whether treadles needed to be removed, whether the southbound 8 foot shoulder at Powhite needed instrumentation etc.

*Item 3, page 3 continued.*
"*The delay RMTA has caused is a critical path delay because of the Project's gated milestone approach and prevents TransCore from making submittals for additional milestones. Although as of November 16, 2018 TransCore had not yet made all of the MDR submittals, RMTA's insistence that the MDR drawings package would not be approved caused the MDR drawings package to become the critical-path of the Project.*"

**Response:** The statement that "TransCore had not yet made all of the MDR submittals" conflicts with other expert statements that the MDR materials submitted in November of 2018 would have met industry standards for approval.



RMTA did not restrict TransCore from working on activities in future milestones and stated that position in various communications with TransCore. RMTA's position, appropriately, was that such work would be carried out a TransCore's risk. In the May 1, 2018 letter to TransCore, RMTA recognized that "*TransCore is proceeding with as much work as possible at risk*".

*Item 3, page 3 additional.*
"*TransCore has not contributed to the delay in reviewing and approving the MDR drawings package, and therefore TransCore has not contributed to the delay.*"

**Response:** TransCore did not contribute to delay in reviewing drawings because their responsibility is to produce the drawings, not review them. To conclude from this that "*TransCore has not contributed to the delay*" is extraordinarily convoluted logic. However, TransCore did contribute to and is responsible for the delay by not producing drawings that showed existing infrastructure into which the new equipment would be installed and citing the equipment to be removed and or reused.

*Item 4, page 4.*
"*the delay commenced by at least June 12, 2019, when TransCore had completed the entirety of the submittals for the MDR Milestone……. Project's gated milestone approach and prevents TransCore from making submittals for additional milestones. TransCore has not contributed to the delay*"

**Response:** The delay commenced at the outset of this Project and is documented thoroughly and was communicated repeatedly to TransCore, beginning as early as December 12, 2017.[2] RMTA's letter of May 23, 2018 also included the following statements: "*TransCore staffing of the Project has continued to be inadequate and additional delay continues to accumulate*" and "*learning on Wednesday that the Project will receive its third Deputy Project Manager*". To conclude that "*TransCore has not contributed to the delay*" is not a reasonable conclusion.

Further, it is well documented that Delay on the MDR resulted from the lack of detail in the submission of the MDR.

*Item 5, page 4-5.*
"*If RMTA had approved MDR on June 12, 2019, and assuming RMTA did not further delay the Project, a reasonable estimation of the dates TransCore would have completed the remaining Payment Milestones is as follows:*"

**Response:** This statement presumes, and the TransCore suggested schedule prepared by the Master Scheduler below demonstrates, that all submissions by TransCore would be approved. It also implies that if RMTA would approve contents of the documents, without corrective comment, that TransCore would be able to accomplish the projected schedule. In essence, it suggests that RMTA would forgo the management approach defined in the RFP in TS-01 of the

---

[2] Letters to TransCore dated December 12, 2017; February 9, 2018; march 23, 2018, May 1, 2018.



Technical Specifications and relinquish project control exclusively to TransCore. Such an approach would be unacceptable to RMTA because the risk of failure would be shifted from TransCore to RMTA and the risk is appropriately placed with TransCore by contract.

| Number | Milestone | Completion |
|--------|-----------|------------|
| 5 | 100% Design Review Milestone | 8/9/2019 |
| 6 | Factory Acceptance Test Milestone | 12/12/2019 |
| 7 | Installation-Ready Design Review Milestone | 1/21/2020 |
| 8 | RSAT - Host Subsystem Milestone | 3/25/2020 |
| 8a | RSAT - ORT Zones Milestone | 5/1/2020 |
| 8b | RSAT - Mainline Traditional Lanes Zones Milestone | 6/26/2020 |
| 8c | RSAT- Traditional Lanes Zone (Bridges & Ramps) Milestone | 7/24/2020 |
| 9 | Project Acceptance Test Milestone | 1/29/2021 |
| 10 | As-Built Review Milestone | 3/22/2021 |
| 11 | Capital Project Close-out Milestone | 3/23/2021 |

*Item 6, page 5.*
*"Assuming a remobilization beginning on January 4, 2021, and assuming RMTA does not further delay the Project, TransCore will likely complete the Project by September 3, 2022."*

**Response:** This, once again, supposes that RMTA would relinquish Project control to TransCore. In other words, if TransCore re-mobilized on January 4, 2021 and RMTA would simply approve all submissions, TransCore could complete the Project by September 3, 2022.

Mickle – TransCore's Project Manager

*Item 1, page 6.*
*"It is standard in the industry that as the Project progresses adjustments are made to the Bill of Materials (BOM) submitted with a proposal to account for changes needed as the design progresses."*

**Response:** It is common to make some minor adjustments as the design progresses but TransCore has not progressed the design beyond the IDR, which is the conceptual stage of design, let alone the 100% Design Review. Considering the meager degree to which the design has advanced, it is difficult to have confidence in the Bill of Materials.

*Item 1, page 6 continued.*
*"It has become a standard in the industry and it was a requirement of RMTA's RFP, for the contractor to be responsible to meet Key Performance Indicators and RSAT/Final Acceptance deadlines, and to owe damages if not achieved, and therefore to accept the risk of late equipment*



*deliveries. KPIs and RSAT acceptance is standard and TransCore would owe damages if not achieved, and therefore to accept the risk of late equipment deliveries.*"

**Response:** RMTA does expect TransCore to be responsible for achieving the KPIs and RSAT Acceptance. RMTA also expected TransCore to be responsible for accomplishing the design as specified in the RFP and acknowledged in their proposal. To rely solely on TransCore to accomplish the KPIs would put RMTA at enormous risk and by the time the RSAT occurred RMTA would have paid the bulk of the contract value to TransCore. Such a statement suggests that RMTA give approval to each Milestone in the design regardless of adequacy and depend upon the KPIs and the RSAT to ensure that the system will work. Further, a system that achieves KPIs may do so with high operations and maintenance costs, costs that TransCore would bill under the maintenance portion of the contract agreement.

*Item 2, page 7.*
"*TransCore's MDR submittal is sufficient to require RMTA to permit TransCore to bill for the MDR milestone payment.*"

**Response:** This is a broad "subjective" statement. RMTA has documented and communicated to TransCore the shortcomings of the last MDR submission. TransCore has admitted that the November 2018 MDR submission was incomplete.

*Item 2, page 7 continued.*
"*RMTA's failure to send TransCore a formal written document expressly denying MDR and stating the specific reasons for the denial is inconsistent with industry standards.*"

**Response:** Numerous communications were sent to TransCore outlining the shortcomings of the MDR. Numerous meetings occurred between RMTA and TransCore during the dispute resolution process and the parties reached resolution on a number of issues which would have allowed TransCore the ability to exit MDR.  TransCore did not comply with the terms of these resolutions. RMTA's letter of September 12, 2019, section 1. Midpoint Design Review Delays clearly enumerates the reasons for not accepting the MDR.

*Item 3, page 8.*
"*It is standard in the industry for the Contractor, during installation and as the conduit is physically tested by running wiring through it, to revise as needed its determination of adequacy regarding existing condui*t."

**Response:** TransCore was required by the RFP and Technical Specifications to determine conduit and other equipment adequacy prior to installation. It is not standard in the industry to try to install wiring during installation and then determine that the conduit is inadequate and only then to add new conduit and remove the old.

The following excerpts from TransCore's Proposal patently contrast with the ad hoc approach TransCore suggests is industry standard.



*"TransCore will conduct any necessary field surveys required to determine the condition and suitability for reuse of existing conduit, pull boxes, work boxes, gantries, power distribution, pavement, and any other items provided by other contractors. If any of the above items are deemed inadequate to support the TransCore tolling equipment install, TransCore will work with the Engineer of Record to resolve the issue(s)[3]."*

*"At the same time as the saw cutting work is underway the existing equipment and conduit would be removed from the gantry....any unused conduit would be cut off at ground level and filled with the appropriate sealant to prevent water intrusion into the tunnel[4]"*

*Item 3, page 8 continued.*
*"RMTA clarified in RFP Addendum 4 answer to question 86 that only exposed conduit must be replaced."*

**Response:** The requirement to replace all exposed conduit is clearly stated in the Technical Specifications and requires the new equipment to be warranted.

This issue is addressed in the Technical Specifications.[5] It states *"Re-use of any host element from the existing toll system is not allowed and the Contractor shall remove, scrap for zero value and dispose of all existing toll system equipment, cabling, exposed conduit, mounting hardware and enclosures at each of the locations described in section 2 above."*

If TransCore concludes that conduit should be reused, the conduit should be in sufficient condition to warrant its condition or else replace it.

*Item 3, page 8 additional.*
*"TransCore's replacement of re-used conduit needed for TransCore to achieve the KPIs related to system availability is governed by the parties' maintenance agreement."*

**Response**: Meeting KPIs is distinctly different from warranting the life of equipment. Certainly all equipment must be working properly to meet KPIs but if a piece of equipment fails that is not warranted, RMTA has to pay for the cost of replacement. That is why the Technical Specifications require that all new equipment be used. It would seem that TransCore's position is that RMTA would have to pay for equipment repair under the maintenance agreement regardless of whether the equipment is warranted or not.

*Item 4, page 8.*
*"Whether a drawing package as a whole is approximately 80% complete is subjective"*

---

[3] RMTA Toll System & Services | TSS - 2017, Section 4.3.1 Existing Conditions, Infrastructure, page 4-39 of 146
[4] RMTA Toll System & Services | TSS - 2017, Section 4.3.2 Power, Installation Sequence, page 4-86 of 146
[5] Section 5.1 of TS-04 and TS-05 and Section 3.6 of TS-06



**Response:** The Technical Specifications[6] require identification of what components are to be removed, reused or replaced. The drawing package should identify those existing physical elements such as existing loops, treadles, pavement structure (rebar where you want to place a loop) etc.

*Item 4, page 8 continued.*
*"The detailed design drawings can be approximately 80% complete without TransCore's completing at the MDR Milestone TS-01 #11.3.3-8's requirement to identify all items furnished by the Contractor, all existing items to be removed by the Contractor and all existing items to be reused by the Contractor"*

**Response:** This statement is not consistent with the specification cited. TS-01, section 11.3.3.8 addresses temporary lighting. The requirement TS-01, section 11.3.3.7 states *"The Detailed Design Drawings shall identify all items furnished by the Contractor, all existing items to be removed by the Contractor and all existing items to be re-used by the Contractor."* The Technical Specifications are an integral part of the RFP as acknowledged by TransCore's Proposal. At the 80% completion stage, drawings should contain those elements that are new, reused etc. so that corrections can be made at the next stage, the 100% Design Review.

*Item 4, page 9.*
*"Detailed Design Drawings package TransCore submitted in November of 2018 goes beyond industry standards for completeness of drawings at the MDR Milestone."*

**Response:** This statement represents subjective judgment. Detailed drawings at the 80% level should include consideration of existing physical features of the infrastructure. Industry standards would expect a definition of the total physical equipment solution not just the new equipment that is to be installed. If existing features are not considered, existing loops may be located near the location that new loops are to be cut, treadles and treadle frame locations may conflict with loop placement, concrete steel reinforcement may conflict with loop placement etc.

TS-03, 13.1 states *"The Detailed Design Drawings shall show and specifically call out each item of existing toll equipment, cabling, conduit and mounting hardware and describe whether it is to be removed or (where allowable) abandoned in place or re-used."*

TS-01,11.3.3-8 states *"The Detailed Design Drawings shall identify all items furnished by the Contractor, all existing items to be removed by the Contractor and all existing items to be re-used by the Contractor."*

The TransCore Proposal states *"TransCore will develop detailed design drawings....items will include...pavement mounted sensor locations with associated cabling and conduit...installation of other equipment, conduit, mounting hardware and cabling[7]"*

---

[6] TS-03, section 13.1
[7] RMTA Toll System & Services | TSS - 2017, Section 4.5.5 Infrastructure Documentation, page 4-87 of 146


*Item 6, page 10.*
"*It is not industry standard for an owner to require a contractor to demonstrate functional aspects of the toll system at the owner's site until after the toll system is fully designed and Factory Acceptance Testing has been completed.*"

**Response:** The Interface Demonstration is in the Technical Specifications, no questions regarding the requirement arose and, in fact, TransCore was working with RMTA to determine how this might be done. The interface demonstration is industry standard and TransCore never suggested otherwise.

*Item 6, page 11.*
"*None of the specifications require TransCore to construct a FAT location to be identical to RMTA's installed locations.*"

**Response:** TS-01, section 4.2.6.1 requires the 100% Design Milestone Review to be completed prior to commencing a Factory Acceptance Test. Section 4.2.6.2 states that "*the Contractor shall confirm that the test configurations used in Factory Acceptance Test shall be the same as those described in the Detailed Test Procedures or report any proposed exceptions. Acceptance of such proposed exceptions shall be at the sole discretion of the Authority.*"

None of these requirements were questioned in the RFP stage or at any time prior to June 12, 2019, when TransCore asked for a time extension.

*Item 6, page 11, continued.*
"*Industry standards for FAT do not require TransCore to perform separate FATs for all lanes that have a differing geometry*"

**Response:** Response to previous question applies. However, FAT configuration discussions would be premature until the 100% Design Review stage was accomplished and the detail test procedures defined. To date, TransCore remains in the Midpoint Design Review phase.

*Item 6, page 11, additional.*
"*RMTA's attempt to make TransCore perform two FATs, one for each host, is unreasonable and inconsistent with industry standards*"

**Response:** It is not clear whether TransCore is confused between a Factory Acceptance Test and the CSC Interface Demonstration. The Factory Acceptance Test would occur at a later date and the Interface Demonstration is a part of the Midpoint Design Review process. The Interface Demonstration requires a demonstration of how TransCore would resolve the network issue at the James River.

*Item 7, page 12.*
"*RMTA's failure to adequately manage the Project caused delay.*"



**Response:** Delay is well-documented and TransCore failed from the beginning of the Project to stay on schedule. The baseline schedule was to be delivered on October 11, 2017 and was finally delivered on February 2, 2018. The management plan review milestone was to be accomplished November 9, 2017 and was not accomplished until May 8, 2018, six months late. The Initial Design Review was to be completed in January 22, 2018 and was not completed until November 20 of 2018, 10 months late. Those are the only three milestones approved to date. Further, TransCore replaced its Project Manager after the first six months of the contract. Clearly, it was not RMTA's failure to adequately manage but rather TransCore's performance that resulted in delay.

*Item 7, page12.*
*"This delay will likely increase the costs of the Maintenance Work, increase the costs of licenses, and increase the cost of equipment warranties, as calculated"*

**Response:** TransCore ordered $6.9 million worth of equipment before the design was well-developed which required them to arrange warehouse space. TransCore's delay also may have caused unexpected subcontractor costs. As previously described, the delay was caused by and the result of TransCore's performance.

*Allegretto – Expert Witness*

*Design-build*

Item 3, page 2 of 24.
*"The Project, by its very nature, is a traditional design-build program"*

**Response:** Design-build as a contracting methodology does not mean that project control is passed to the contractor. While collaboration and partnership are important, project control for this Project was clearly defined in a detailed set of Technical Specifications, including the Project development process. The Technical Specifications are quite detailed and specific about how the Project was to be undertaken. Many toll authorities use the same Technical Specifications process and expect a system implementation specific to their needs and their existing infrastructure. If the contractor does not comply with the Technical Specifications, delay will be the ultimate result and if the design is not rigidly developed with sufficient specificity to order equipment, developed software and plan installation, the agency is left with great risk that the system may not fulfill the needs of the agency.

Item 4a, page 3 of 24.
*"TransCore submitted a fully compliant Bill of Materials (BOM) based on requirements set forth in the RFP."*

**Response:** Ordering equipment based on the RFP prior to completing the MDR is a highly risky approach. The design materials would have included detail information on software design, installation placement, existing facility features etc.



Item 4c, page 3 of 24.
*"Equipment advance deliveries are typical for a project of this size and scope"*

**Response:** Equipment advance deliveries are typical for long lead time elements. However, the contractor and the agency must be sure that the specific equipment ordered will satisfy the requirements of the Project. For this to occur, the design of the system must be advanced to the point where there is certainty that the correct equipment is being purchased. TransCore completed the Initial Design Review 10 months after it was originally scheduled to be completed and never completed the Midpoint Design Review, let alone the 100% Design Review. Although TransCore assumed the risk of loss of all equipment until delivery and installation, once RMTA has paid for the equipment, it would have to seek affirmative relief for reimbursement.[8] RMTA then becomes at risk.

Despite TransCore's action item deliverable to present to RMTA lead time information when equipment needed to be ordered, outstanding since Feburary 2018, and discussed consistently in weekly working meetings, there was no coordination with RMTA on hardware purchased, there was no authorization given by RMTA for the majority of purchases and there was no documentation given to RMTA concerning the lead time requirements for purchases made.[9]

Item 4e, page 3 of 24.
*"TransCore's interpretation that the Letter Agreement amended the Agreement... is a reasonable interpretation of the letter agreement."*

**Response:** The Letter of Agreement amends the Agreement. However, it was not a blanket approval to pay for any equipment ordered by TransCore but rather to purchase equipment under the terms of the Agreement, authorized and necessary and compliant with the system design, a design that has not been approved through Midpoint Design.

Item 4g, page 3 of 24.
*"RMTA's opinion that equipment was ordered too early is unreasonable and ill-conceived."*

**Response:** The issue is not that the equipment was ordered too early. It was ordered in a manner contrary to the Agreement and without adequate assurance that it would be compliant with the system design, which had not been completed, and was without specific authorization by RMTA.

Item 4h, page 3 of 24.
*"RMTA ignored …. negative impact their decision to reject the $6.38m equipment invoice would have on the Project…., solely on an unfounded notion that prior authorization was not obtained"*

---

[8] Toll System and Services Agreement, § 12.4; E-mail from Whitt Hall dated 9/25/17.
[9] Action Item Log, Items 2a and 2b.



**Response:** RMTA specifically notified TransCore that it was not to order equipment.[10] TranCore committed to presenting to RMTA the schedule for equipment purchase, which it failed to do. Authorization for equipment purchases were to be based upon system design which was previously shown to be inordinately late and incomplete, hence RMTA could not authorize payment for equipment that could not be shown to be compliant with the system design.

Item 4i, page 3 of 24.
*"TransCore bore the risk of late equipment deliveries and of not achieving the Key Performance Indicators (KPIs) identified in the specifications."*

**Response:** TransCore bears the risk for equipment deliveries and achieving Key Performance Indicators. The system design was not completed confirming equipment needed and RMTA authorization for the equipment was not requested or provided. If this had occurred, the invoice would not have been an issue. However, ordering equipment that could easily be procured locally and without regard to authorization processes contained in the contractual documents, if paid, leaves RMTA with the risk. The performance to date by TransCore has shown excessive delay in completing Milestone documents that would have described the needed equipment in sufficient detail.

*Midpoint Design Review*

Item 5a, page 3-4 of 24.
*"Such interpretation is frequently employed in a design-build process as the RFP and Proposal together, are generally performance-based in nature leading toward certain functional outcomes, not detailed design requirements or specifications."*

**Response:** The Project is performance-based in the sense of achieving KPIs; however the entire Project is not "performance-based". The Project was based on detailed design requirements and specifications and was clearly described in the RFP as such. The Technical Specifications are incorporated in the Agreement, were a part of the RFP and were acknowledged by TransCore in its Proposal and not objected to at any point to date. To define the Project as totally performance-based attempts to put aside requirements which TransCore is unable or unwilling to perform. For RMTA to wait until the system has been installed and meeting KPIs, leaves them at risk for all payments to that point in time.

Item 5b, page 4 of 24.
*"Subjective input from either party is generally not productive and serves to delay rather than advance progress."*

**Response:** To define this Project as a performance-based design-build project rather than a project based on Technical Specifications is a subjective argument and obfuscates the fact that the Project was to be based on Technical Specifications. The approach to the Project

---

[10] Letters dated February 9, 2018; March 23, 2018



development is clearly described in the RFP. At no time during the Project or during the RFP period did TransCore question the use of the Technical Specifications. Rather, in TransCore's Proposal a matrix[11] was provided that related sections of the Proposal to specific Technical Specifications in the RFP.

Item 5c, page 4 of 24.
*"TransCore's MDR submittal satisfied a reasonable interpretation of the specifications in accordance with industry standards."*

**Response:** The statement is subjective. The MDR submittal was not accepted by RMTA for a number of insufficiencies, many of which are referred to in other parts of this response. One of the most striking is the lack of detail concerning existing physical features and equipment and how the new equipment would be placed into that environment. Which equipment would be removed and which equipment would be replaced was a major consideration that was not addressed. How might existing loops, treadles, cables etc. restrict the installation of the new equipment? How would the transition from the old equipment to the new take place under traffic while collecting revenue. These are just a few of the considerations that make the MDR submission inadequate. In addition to civil, electrical and structural Detail Design Drawings there were numerous unresolved issues concerning the Management Plan, the Systems Detail Design Document, FAT Procedures, RSAT Procedures, KPI Calculation Procedures and Audit provisions.

Item 5d, page 4 of 24.
*"RMTA's refusal of MDR is unreasonable and contrary to industry* standards."

**Response:** Refusal of the MDR was based on the response to the previous question and as such was anything but contrary to industry standards.

*RMTA Competency*

Item 5e, page 4 of 24.
*"RMTA...do not have a working knowledge of design-build methodology and implementation, or of their responsibility as a functional and objective partner in the Project."*

**Response:** The issue is not the RMTA working knowledge of design-build methodologies. The Director of Operations and Project Manager is a licensed Professional Engineer in Virginia and is most certainly aware of design-build methodologies. As stated before, it is erroneous to assume that this Project is a complete performance-based design-build project. To rely solely on the TransCore's experience through the Project stages to completion and depend upon their ability to pass KPIs would be unacceptable to RMTA. The Technical Specifications determine the obligations of the parties.

---



Item 5g, page 4 of 24.
*"RMTA's comments were often too general to constitute effective communication with TransCore."*

**Response**: Written communications have been very specific and are thoroughly documented in the minutes to the weekly meetings and various letters and e-mails between the two parties. Written communications are the basis for responses contained in this report.

Item 5h, page 4 of 24.
*"RMTA did not provide clear, reasonable, and objective feedback to TransCore regarding their justification for rejecting preliminary design submissions."*

**Response:** It is unclear what is meant by preliminary design submissions. If the reference is to the Initial Design Review, it was accepted in November 2018. If the reference is to the Midpoint Design Review, then the term "preliminary design" would be inaccurate. The MDR requires 80% plans, calculations and numerous other well developed documents that demonstrate that Project design is nearing completion, the 100% Design Review.

*Conduit*

Item 6b, page 4 of 24
*"no specific timing for schedule of conduit inspections is cited in the RFP or agreement."*

**Response:** The RFP made visual inspection of the facilities mandatory and offered access to existing design drawings as well as the opportunity to photograph and/or visit any of the facilities. TransCore is currently the maintenance contractor in the ORT lanes and therefore had an existing relationship with RMTA staff to arrange whatever inspections necessary. The Technical Specifications specifically requested the contractor to inspect existing equipment and determine adequacy for reuse. The RFP stated *"All Proposers are required to contact the Pre-Proposal Conference/Site Tour Coordinator prior to the meetings and site visits described below to confirm their attendance at the Mandatory Pre-Proposal Conference/Site Tour"*.[12]

Item 6c, page 4 of 24
*"unforeseen circumstances may arise during the removal replacement and installation of cables in existing underground conduits. When such unforeseen circumstances occur, it is incumbent upon the contractor to propose an acceptable remedy, which may require scope modification via the contract change order process."*

**Response:** Unforeseen circumstances often do arise during the removal and installation of cables in existing conduits. The purpose of the survey of conduits on the part of TransCore was to determine if there were issues with reuse. To assume scope modification and contract change orders in the event of any unforeseen circumstances is not consistent with Technical Specifications which require new equipment be placed and old equipment removed. Some

---

[12] Request for Proposal No. TSS-2017, section 3.1, page RFP-8.


unforeseen circumstances might be a result of a poor survey by the contractor or poor construction practices and would therefore not be a responsibility of RMTA.

Item 6d, page 5 of 24
*"warranty only applies to new materials."*

**Response:** Warranty applies to the Project as a whole in terms of providing the capability to thoroughly and accurately collect RMTA revenue. It is not a warranty to materials only. RMTA expected new equipment to be installed. TS-04, 5.1 states *"Re-use of any host element from the existing toll system is not allowed and the Contractor shall remove, scrap for zero value and dispose of all existing toll system equipment, cabling, exposed conduit, mounting hardware and enclosures at each of the locations described in section 2 above."*

Item 6d, page 5 of 24
*"The replacement of all existing underground conduit was outside the scope of the Project."*

**Response:** Though "exposed conduit" was called out in the Technical Specifications, the replacement of underground conduit would be less likely to need replacement. RMTA's concern is that the "system" as a whole meets the KPIs and serves to thoroughly and accurately collect the toll revenue over the life of the maintenance agreement without replacement of equipment, whether reused or not leading to high maintenance costs. Further, ORT and host system components are specifically excluded from reuse and require replacement.

*Detail Design Drawings*

Item 7c, page 5 of 24
*"Industry standards recognize that some parallel development of various design documents is Appropriate."*

**Response:** Parallel development was specifically not precluded and is documented in the written communications between the two parties. However, advancing design elements in later stages would appropriately be at TransCore's risk since changes may be required in the design components as the design advances.

Item 7d, page 5 of 24
*"RMTA routinely demonstrates behavior that employs a tightly controlled serial development process, which introduces undue strain and delays and is uncharacteristic of recognized design-build and industry standards."*

**Response:** This issue has been addressed previously. RMTA's approach was consistent with the Agreement, inclusive of the Technical Specifications.


Item 7e, page 5 of 24
*"The Detailed Design Drawings .... submitted November 2018 and resubmitted March 2019 is at least 80% complete and complies with industry standards for completeness of drawings at the MDR Milestone."*

**Response:** Detailed design drawings 80% complete and to industry standards should include existing features in the facility that might affect the design. Items such as existing loops, treadles, placement of reinforcing steel and other items could affect the detailed design.

With regard to treadles, TransCore's Proposal stated *"There are 12 lanes that still contain treadles. In these lanes we would remove the treadle, frame and a 12 foot section of the surrounding concrete. We will clean up and dispose of the spoils and then pour a new concrete section[13]"*

*VDOT Demonstration*

Item 8a, page 5 of 24
*"TransCore's offer to demonstrate a comparable back office interface... was reasonable and meaningful as a means of "examining" a fully operational system"*

**Response:** Technical Specification TS-01, section 4.2.4.22 states *"prior to successful completion of the MDR Milestone, the contractor shall demonstrate the toll system's use of the complete interface with the VDOT's EZpass Customer Service Center."* Demonstrating a back office interface developed for another agency does not provide the means of "demonstrating the toll system's use of the complete interface." The requirement is not "examining a fully operational system". There are unique circumstances involved in the interface with the VDOT CSC and TransCore is aware of that. Further, TransCore had conversations with RMTA of how to perform the demonstration and was preparing a solution, as documented in the weekly minutes. Only when TransCore fell significantly behind in the schedule did they conclude that "examining" an interface operating at another agency would suffice.

Item 8b, page 5 of 24
*"TransCore is not required at the MDR Milestone to physically install equipment at RMTA's Project site to demonstrate the VDOT interface."*

**Response:** TransCore is required to do whatever is necessary to meet the Technical Specifications in the RFP to demonstrate an interface with the VDOT CSC, whether that involves installing equipment or not. At no time was this requirement called into question during the procurement process or during the Project development until the contractor realized that time lost had to be recovered.

---

[13] RMTA Toll System & Services | TSS - 2017, Section 4.6.3, Hardware and Installation, page 4-106 of 146


Item 8c, page 6 of 24
*"TransCore did not intend for their offer to demonstrate a comparable back office interface at the Dulles toll Road to replace its subsequent demonstration of the interface at an appropriate time. "*

**Response:** If the Dulles Toll Road demonstration had been accepted, which would not have resolved the unique issues of the RMTA interface, the final demonstration would not have occurred until after Revenue Service Acceptance Testing. Essentially, there would have been no demonstration until the system was fully designed, built, tested, installed and had passed the RSAT to ensure that revenue could be collected.

*Factory Acceptance Test*

Item 9c, page 6 of 24
*"To meet industry standards for FAT, TransCore does not need to conduct FAT in a testing environment with the exact dimensions as the final installed dimensions at the Project site or perform separate FATs for all lanes having different geometry."*

**Response:** TransCore's own proposal states the need to perform a FAT for mixed- mode lanes as stated in their proposal. *"A traditional mixed-mode toll lane will be simulated using equipment installed in the RMTA production configuration at this test facility"[14]*

A Factory Acceptance Test is intended to demonstrate that the system will accurately collect toll revenue before considerable resources are expended to install the system. The lane configuration was to be consistent with the test procedures defined in the 100% Design Review Milestone[15]. To the extent that dimensional differences may affect the ability to collect revenue, RMTA must be assured of the adequacy of the design. The simple assurance that dimensional differences would not affect the outcome is not sufficient. It must be demonstrated either through a physical demonstration or calculations to support the assurance. It is extremely important however to demonstrate all Lane types. ORT lanes, ACM lanes and manual collection lanes are significantly different and TransCore's proposal identified where the Factory Acceptance Test sites would be for each. ACM lanes and manual collection lanes with or without barriers would also affect the logic that would need to be tested.

*Delays*

Item 10a, page 6 of 24
*"Early program management delays caused by TransCore were effectively identified and corrected by TransCore. TransCore assigned Barry Mickle to the Project in June 2018."*

---

[14] RMTA Toll System & Services | TSS – 2017, Page 4-4 and 4-20 of 146
[15] TS-01, section 4.2.6.2, *"shall be the same as those described in the Detailed Test Procedures"*



**Response:** The Project began in September 2017 and the original Project Manager remained in place for nine months. The Deputy Project Manager was changed three times. By June 2018 the Initial Design Review Milestone had not been reached but in TransCore's baseline schedule was to be completed in January of 2018. The Midpoint Design Review scheduled completion date was passed in April 2018 and the 100% Design Review scheduled completion was June 2018. All three of the major design phases were to have been completed by June of 2018 and yet the Initial Design Review and not been completed. All three phases of the design were past due before TransCore acted to replace the Project Manager. TransCore's assignment of a new Project Manager did not rehabilitate the schedule.

Item 10a, page 6 of 24
*"The purpose of the Project was not to meet interim milestones. The purpose was to design and implement a system compliant with the specifications."*

**Response:** The purpose of the Project was to design and implement a system but it was specifically required to be accomplished in orderly fashion by accomplishing design and testing milestones that would provide RMTA assurances of progress and adequacy of design. Payments to the contractor were to be made based upon these milestone accomplishments.

*RMTA's Contract Approach*

Item 10d, page 6 of 24
*"RMTA did not consider their responsibility to cooperate objectively as a Project partner and facilitate Project progress."*

**Response:** RMTA made numerous concessions to TransCore to keep the Project moving forward. Only through these concessions was TransCore able to complete the first of three stages of design, the Initial Design Review. RMTA again cooperated fully with TransCore for the completion of MDR, agreeing to allow many deliverables be moved to the 100% design. This is written evidence of RMTA's willingness to "cooperate effectively".

Item 1e, page 7 of 24
*"RMTA routinely did not deliver submission review comments in a manner considered timely under industry standards"*

**Response:** RMTA and TransCore agreed to adhere to a minimum 21-day review response cycle for submittals. By providing the Authority at least 21 days to review submissions, the Agreement prevents the scenario where Project documents are held until the last minute and then dumped on the Authority. TransCore was encouraged to make partial deliveries of each submittal to avoid creating a backlog in RMTA's review and comment process. TransCore conceded that, but for a few discrete issues (which were caused by TransCore), any comment period over 21 days was immaterial.



Item 1f, page 7 of 24

*"Industry standards applicable to projects like the Project require the Owner to review and return comments on, or approval, submittals promptly and no more than 10 business days after submittal."*

**Response:** The contract specifications[16] and the written agreement between RMTA and the contractor specified that design review materials were to be delivered to RMTA 21 days prior to planned completion of the Milestone. This would allow RMTA a minimum of 21 days for response.

Item 1h, page 7 of 24

*"customary for the person managing the Project for RMTA to have considerable experience with similar projects......for effective management that RMTA's director of operations and consulting engineer HNTB work together effectively."*

**Response:** The Project Manager for RMTA is a registered professional engineer in Virginia, has been with RMTA for 10 years and Director of Operations for 7 years. The RMTA Project Manager understands the need for Technical Specifications on a complex project such as this and understands design-build concepts. Further, the Project Manager is very familiar with the nuances of the RMTA operating environment. The Project Manager was supported by a preeminent firm in the area of toll systems implementations and represents the majority of agencies in the US on similar projects.

Item 1i, page 7 of 24

*"RMTA's unreasonable interpretation of the Agreement, violation of industry standards, and subjective demands of the Agreement caused additional and unnecessary effort"*

**Response:** This statement is unfounded and subjective in nature. RMTA's interpretation of the agreement is consistent with the RFP and TransCore's Proposal. Further, it is clear that delay was not the result of subjective interpretation but rather the clearly documented performance of TransCore.

Item 1j, page 7 of 24

*"RMTA employed a one-sided and biased control of contractor performance and demonstrated a lack of experience as project owner"*

**Response:** RMTA employed an approach that was clearly defined in the Technical Specification TS–01. The approach was explicitly described in the RFP and was unquestioned by TransCore until the Project suffered extraordinary delay. To suggest that RMTA lacks experience as a project owner is unsubstantiated camouflage for the extraordinary poor performance of TransCore on this Project.

---

[16] TS-01, sections 4.2.3.2, 4.2.4.2, 4.2.5.2, 4.2.7.2


## Summary

TransCore's own Proposal is evidence that they knew precisely what was expected on the RMTA Project. The specific cross reference of the Technical Specifications to the various sections of TransCore's Proposal highlights the specificity with which TransCore understood the Project, the tasks to be accomplished and the approach to project control.

TransCore fell behind schedule almost immediately and did not address their management issues and adequate staffing until 9 months after the notice to proceed. As of June 2018, when management changes were instituted, all three of the design stages, IDR, MDR and 100% Design Review, were to be completed by TransCore's own baseline schedule. As of June 2018 none of the design stages had been completed and the first, IDR, was not accepted until November 2018 after numerous concessions were given by RMTA in the interest of keeping the Project going. The MDR has not been accomplished to date, let alone the 100% Design Review.

Rather than regaining lost schedule time and bringing several outstanding issues to conclusion, TransCore proceeded to purchase nearly $7 MM of equipment without justification or approval from RMTA. That figure amounts to approximately 39% of the total value of the contract. TransCore accomplished the first two Milestones and was compensated 10% of the contract value. An additional 39% payment would be the equivalent of approving Milestones through the Revenue Acceptance Test of the Host subsystem. 50% of the contract value would have been paid to TransCore though they have not yet accomplished the Midpoint Design Review. RMTA would be irretrievably committed to a contract that has experienced documented dismal performance.


The opinions in this report are my own, based on my training, experiences, education and review of the documentation sent to me. As additional material and evidence is brought forward and made available to me, I may add to and amend my opinions.

Harold W. Worrall, P.E., PhD.