**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **TRANSCORE, LP,** | ) | |
| | ) | |
| *Plaintiff/Counterclaim Defendant,* | ) | |
| | ) | |
| **v.** | ) | **Case No.: 3:19-cv-820-REP** |
| | ) | |
| **RICHMOND METROPOLITAN** | ) | |
| **TRANSPORTATION AUTHORITY** | ) | |
| | ) | |
| *Defendant/Counterclaim Plaintiff.* | ) | |

<u>**RICHMOND METROPOLITAN TRANSPORTATION AUTHORITY'S
MEMORANDUM IN OPPOSITION TO TRANSCORE LP'S
MOTION IN LIMINE TO EXCLUDE TESTIMONY OF HAROLD WORRALL**</u>

Defendant and Counterclaim Plaintiff Richmond Metropolitan Transportation Authority ("RMTA"), by counsel and pursuant to Local Civil Rules 7(f) and this Court's Order dated December 28, 2020 [ECF No. 131], submits this Memorandum in Opposition to TransCore LP's ("TransCore") Motion in Limine to Exclude Testimony of Harold Worrall [ECF No. 122] and in response to TransCore's Memorandum in Support of Motion in Limine to Exclude Testimony of Harold Worrall [ECF No. 123] ("TC Mem. In Supp.").

**I.      INTRODUCTION**

Dr. Worrall is a licensed engineer and a seasoned professional in the transportation industry with a career spanning over 50 years. He holds a Bachelor of Science in Civil Engineering and a MBA from the University of Illinois Champaign-Urbana. Dr. Worrall earned his PhD in Public Policy at Virginia Commonwealth University. He has spent a combined fifteen years working with the Departments of Transportation for the states of Illinois, Utah and Florida and the Commonwealth of Virginia. For twelve years, Dr. Worrall served as the Executive Director of the

Orlando-Orange County Expressway Authority, during which time he was responsible for the operations of the Authority including the toll system replacement. Since 2004, he has consulted and advised numerous public and private agencies on toll and intelligent transportation systems.

Dr. Worrall is an experiential expert basing his reasoned opinions on his over fifty years of industry experience and training as a professional engineer in the transportation industry. "[T]he purpose of a court's gatekeeping function is simply 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in a courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Benedict v. Hankook Tire Co.,* 290 F. Supp. 3d 488, 496 (E.D. Va. 2018). As it relates to experiential experts, district courts must consider how an expert's experience leads to the conclusions reached, why that experience is a sufficient basis for the expert's opinions and how that experience applies to the facts of the case. *Id.* Dr. Worrall's engineering and transportation background and his experience in management and consultation to public authorities, including toll system replacements, renders him qualified to offer opinions that are reliable and helpful to the jury. Dr. Worrall's opinions are set forth in his Consultant Expert Report, attached as Exhibit 1 ("Expert Report"); Rebuttal Expert Report, attached as Exhibit 2 ("Rebuttal Report"); and Supplemental Expert Consultant Report, attached as Exhibit 3 ("Supplemental Report").

In sum, TransCore seeks to exclude the testimony of Dr. Worrall, the only engineer to serve as an expert for either party, so that the jury is not confronted with his inherently logical conclusions; namely, that TransCore understaffed and underperformed in its first fourteen months of the Project, accumulating a delay of over 300 days that could not be recovered, ultimately derailing the Project.

## II. DR. WORRALL MAY TESTIFY AS TO REASONABLENESS OF RMTA'S DIRECT DAMAGES

### A. Dr. Worrall Appropriately Will Testify that the Direct Damages Suffered by RMTA Were Costs Necessary to the Project and to Maintain the Current Toll System

RMTA, through the testimony of members of its executive team, will testify regarding the costs incurred and direct damages suffered as a result of TransCore's breach of the Agreement and Project delay. Fed. R. Evid. 602, 701; *see also MCI Telecommunications Corp. v. Wanzer,* 897 F.2d 703, 706 (4th Cir. 1990) ("The modern trend favors the admission of opinion testimony, provided that it is well founded on personal knowledge [as distinguished from hypothetical facts] and susceptible to specific cross-examination") (citing J. Weinstein, Evidence, para. 701[02] at 701-9 and 701-17 (1978)); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16CV545, 2018 WL 359479, at *2 (E.D. Va. Jan. 10, 2018).

Dr. Worrall will testify that RMTA: (i) has incurred, and continues to incur, direct damages as a result of TransCore' s delay and refusal to continue work under the Agreement, including operational and maintenance costs, as well as mitigation costs, as shown by the records of, and testified to by, RMTA; (ii) the direct costs incurred by RMTA would not otherwise have been incurred had the Project been completed timely; (iii) as equipment ages, maintenance costs rise as components wear out and have to be replaced assuming availability of parts; (iv) RMTA necessarily expended mitigation costs including an open road tolling solution and recommissioned ACM lanes so that current ACMs can be cannibalized for spare parts. (Expert Report, Ex. 1 at pp. 28-29). In the event the Agreement is terminated, Dr. Worrall will testify that RMTA necessarily incurred and will incur procurement costs for the replacement of the toll system and costs of the Project, including consulting fees and the $1.4 million paid to TransCore under the Agreement for which it has received no value. *Id.; see SMD Software, Inc. v. EMove, Inc.* 945 F. Supp. 2d 628,

640-642 (E.D.N.C. 2013) (finding expert qualified to opine on damages based upon "specialized skill, experience, or training").

## B. The Agreement Contemplates RMTA's Recovery of Direct Damages

TransCore does not take issue with Dr. Worrall's qualifications nor could it given his work in the transportation industry spanning over 52 years and his 12-year tenure as the Executive Director of the Orlando-Orange County Expressway Authority. (Worrall Curriculum Vitae, Ex. 1 at pp. 30-33). Instead, as it already argued unsuccessfully at summary judgment, TransCore asserts that Dr. Worrall cannot testify regarding the necessity of costs expended by RMTA "because the Agreement's liquidated damages provision, §17.1, provides the exclusive remedy for RMTA's injuries." (TC Mem. in Supp. [ECF No. 123] at p. 3). As RMTA argued in opposition to summary judgment and reasserts herein, under Virginia law there is a "presumption against exclusivity" relating to remedies. *Ndeh v. Midtown Alexandria, L.L.C.*, 300 F. App'x 203, 207 (4th Cir. 2008). As such, "parties to a contract may provide the remedy that will be available to them in case a breach occurs. . . However, . . . the remedy provided will be exclusive of other possible remedies only where the language employed in the contract clearly shows an intent that the remedy be exclusive." *Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d 709, 713 (4th Cir. 1993) (citing *Bender-Miller Co. v. Thomwood Farms, Inc.*, 179 S.E.2d 636, 638 (Va. 1971)) (emphasis added). Virginia courts interpret contracts so that, "[n]o word or phrase employed in a contract will be treated as meaningless if a reasonable meaning can be assigned to it, and there is a presumption that the contracting parties have not used words needlessly." *Pocahontas Min. Liab. Co. v. CNX Gas Co., LLC*, 666 S.E.2d 527, 531 (Va. 2008). Indeed, "[t]he guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va. 1984).

Here, the liquidated damages provision in the Agreement, is reproduced in full below:

> Contractor agrees that liquidated damages shall be imposed by this Agreement. **The terms below shall in no way be considered exclusive and shall not limit the Authority or Authority's right to pursue any other additional remedy which the Authority may be entitled to pursue.**

> Contractor shall pay to the Authority liquidated damages as follows:

| Requirement | Associated Liquidated Damages |
|---|---|
| Contractor shall successfully complete in accordance with the terms of this Agreement the Revenue Acceptance Test for all material parts of the Base Work by **September 27, 2019** | Where Contractor does not successfully complete Revenue Service Acceptance Test of all material parts of the Base Work in accordance with the terms of this Agreement by **September 27, 2019**, Contractor shall pay $3,100 for each day of delay or portion thereof |

> The total amount of liquidated damages under this section shall not exceed $1,131,500 in the aggregate.

(Agreement, Ex. 4 at § 17.1) (emphasis added). By its unambiguous terms, liquidated damages are in addition to other remedies permitted by the Agreement. *Id.; see also Nenr Investments, LLC v. Starbucks Corp.*, No. CIV.A. 1:08CV00047, 2009 WL 1404732, at *4-5 (W.D. Va. May 18, 2009), *report and recommendation adopted*, No. CIV A 1:08CV00047, 2009 WL 1605603 (W.D. Va. June 8, 2009) ("In construing Section 14.2 of the Lease with a presumption against exclusivity, the undersigned does not find anywhere in the plain language of the contract that such a remedy for an uncured default is exclusive."); *Arban v. Kyle*, No. AT LAW NUMBERS 10987, 1992 WL 884881, at *3 (Va. Cir. Ct. Aug. 18, 1992) ("This Court may not simply disregard the explicit language in the Security Agreement specifically granting the plaintiff additional remedies and must therefore conclude that the parties agreed to make these remedies available to the plaintiff.").

Moreover, the parties agreed to limit certain damages as set forth in Section 20 of the Agreement:

> In no event shall either Contractor or RMTA be liable to the other for any special, indirect, incidental or consequential damages (including, but not limited to lost

revenues, loss of transactions, profits and lost business opportunity), regardless of the legal theory under which such damages are sought, and even if the parties have been advised of the possibility of such damages. Contractor's total liability to RMTA and its officers, employees, representatives, and members of RMTA's board for any and all liabilities arising out of or related to this Agreement, from any cause or causes, and regardless of the legal theory, including breach of contract, warranty, negligence, strict liability, statutory liability, or any indemnification obligations, shall not in the aggregate exceed two times the value of this Agreement, provided, however that such limitation shall not be inclusive of any amount assessed against or paid by Contractor for liquidated damages or price adjustments under Section 17.

(Agreement, Ex. 4 at § 20). According to Section 20, the categories of damages prohibited are special, indirect, incidental or consequential damages. Put another way, the parties agreed that RMTA can obtain direct damages from TransCore, as long as such amount does not exceed two times the value of the Agreement, expressly <u>excluding</u> any liquidated damages assessed against or paid by TransCore. (*Id.*) Accepting TransCore's argument that RMTA is limited in its recovery to liquidated damages would render Section 20 of the Agreement meaningless. *See Lynnhaven Beach & Park Co. v. Moore*, 158 S.E. 896, 899 (Va. 1931) ("To hold that the plaintiffs are not obligated to pay to the defendant interest on the deferred payments would be to render meaningless and of no effect the plain and patent language of the contract."); *Guan v. Ran*, No. 0968-16-4, 2017 WL 487100, at *16 (Va. Ct. App. Feb. 7, 2017) ("Such an interpretation of that agreement would render other contract terms meaningless, and ignore the parties' own interpretation of the amendment.").

## III. DR. WORRALL APPROPRIATELY OPINES THAT TRANSCORE CAUSED THE PROJECT DELAY

### A. Dr. Worrall's Opinion that TransCore Caused the Project Delay From Its Inception is Substantiated by the Factual Record

Dr. Worrall relies upon the Agreement milestones and TransCore's Baseline Schedule, the only approved schedule for the Project in which TransCore agreed to dates of completion of those

milestones, to determine that TransCore caused over 302 days of uncontested delay at the completion of the Initial Design Review ("IDR") milestone and failed to recover a single day of that delay in the Midpoint Design Review ("MDR") milestone. (Expert Report, Ex. 1 at pp. 19-26). TransCore, unable to defend its utter failure to meet the Baseline Schedule, purports to rely on a scheduling software calculation, which TransCore itself did not utilize or follow during the course of the Project, and then complains that RMTA failed to adopt the same useless calculation—having no relevance whatsoever to a milestone-based contract. Absurdly, TransCore further argues that RMTA, through Dr. Worrall or otherwise, cannot introduce evidence of TransCore's failure to staff the Project or meet the Project's milestones, apparently wishing away its obvious breaches of the Agreement, breaches supported fully by admissions of TransCore throughout the factual record. (TC Mem. in Supp. [ECF No. 123] at pp. 7-9, 11.)

As it relates to causation, Dr. Worrall reviewed the Project documents and is prepared to offer detailed testimony that:

(a) The Agreement specifically requires a Systems Engineering V Process (*See e.g.,* Expert Report, Ex. 1, pp. 5-6; Supplemental Report, Ex. 3, pp. 2-3);

(b) The Agreement is a "gated contract" consisting of milestones, each of which must be met and approved prior to moving to the next milestone (*See e.g.,* Expert Report, Ex. 1, pp. 10-11, 19; Supplemental Report, Ex. 3 pp. 2-3);

(c) TransCore created a Baseline Schedule that set forth the dates for its completion of each milestone (*See e.g.,* Expert Report, Ex. 1, pp 10-11, 13, 19-26; Supplemental Report, Ex. 3, pp. 2-3);

(d) TransCore failed to meet the Baseline Schedule at every milestone, accumulating over 300 days of delay after completion of IDR, the third milestone.  (*See e.g.,* Expert Report, Ex. 1, pp. 19-26; Supplemental Report, Ex. 3, pp. 6-9); and

(e) TransCore's recovery schedules could not and did not result in Project recovery, as TransCore did not satisfy the requirements for MDR and failed to recover any delay.  (*See e.g.,* Expert Report, Ex. 1, pp. 13-26; Rebuttal Report, Ex. 2, pp. 3, 5, 9, 17).

In order to defend against liability, TransCore bears the burden to establish that it recovered all 302 days from the first three milestones **and** that no further delay occurred or any further delay was concurrent.  *See E. Coast Repair & Fabrication, LLC v. United States,* 199 F. Supp. 3d 1006, 1092 (E.D. Va. 2016) ("[T]he burden then shifts to ECR to demonstrate that any proven delay was excusable."); *see Comstock Potomac Yard, L.C. v. Balfour Beatty Const., LLC*, 694 F. Supp. 2d 468, 477-81 (E.D. Va. 2010), *vacated* (Sept. 2, 2011).  As established in RMTA's memoranda in support of its motions to exclude TransCore's designated experts Heather Lober, Barry Mickle, and Alan Allegretto (the "RMTA Memoranda") [ECF Nos. 93, 95, 98], TransCore not only failed to recover any delay, but the days of delay continued.  TransCore's contention otherwise rests on its creation of a recovery schedule dated November 29, 2018 (the "November 2018 Recovery Schedule").  For all of the reasons fully briefed in the RMTA Memoranda, the November 2018 Recovery Schedule is not based on reliable methods or principles.  Furthermore, subsequent schedules proposed by TransCore after the November 2018 Recovery Schedule establish that TransCore realized no recovery.

TransCore further cannot satisfy its burden that RMTA caused concurrent delay. *See E. Coast Repair & Fabrication, LLC,* 199 F. Supp. 3d at 1092; *see also Comstock Potomac Yard,* 694 F. Supp. 2d at 477-81.  Not one of TransCore's experts reviewed any correspondence or

Project documents related to the "delay resulting from certain Requests for Information" that TransCore hopes to pin on RMTA.  (*See* [ECF No. 93] at pp. 14-15; [ECF No. 95] at pp. 18-19; [ECF No. 98] at pp. 18-19).  In fact, TransCore itself conceded that it has no evidence to support these alleged delays:

> RMTA also argues that Mickle should not be allowed to opine that RTMA delayed its consideration of "RFIs"[7] relating to modifications of the Powhite SB shoulder, hardware solutions to insufficient funds situations, and training simulators for manual lane terminals.  [ECF No. 95, at 19.] These arguments are irrelevant because TransCore does not seek damages for any such delays and does not propose to have Mickle offer expert testimony on any of these issues.

(TC Opp. [ECF No. 106] at p. 16; *see also* TC Opp. [ECF No. 107] at pp. 16-17).  Although TransCore has stated it is not seeking damages related to these alleged delays, in its pending motion to exclude Dr. Worrall, TransCore unpersuasively argues that Dr. Worrall may not opine that RMTA maintains no responsibility for such delays.  (TC Mem. in Supp. [ECF No. 123] at pp. 9-10).  Given the irreconcilable positions taken by TransCore, RMTA asserts that Dr. Worrall is qualified to rebut and his rebuttal opinions are reliable should TransCore introduce evidence of purported Project delays by RMTA.

**B.**      **TransCore Did Not Perform a "Critical Path" Analysis and RMTA Does Not Need to Perform Such Analysis to Establish Causation**

Any adoption of TransCore's "critical path" approach would be inaccurate and useless, as the critical path is necessarily defined by the Agreement's milestones.  As testified to by TransCore's master scheduler, TransCore's so-called "critical path" technique was a calculation, not performed by any expert in this case, but a scheduling software tool available to TransCore, which TransCore only relied upon when convenient and ignored when contrary to its narrative. (Lober Dep., Ex. 5 at 56:2-15; 199:24-200:3, 203:18-204:24).

As the Court is aware, the Project consists of fourteen milestones, each of which has to be completed and accepted prior to RMTA being able to consider TransCore's submission for the next milestone. (Expert Report, Ex. 1, pp. 10-11; Supplemental Report, Ex. 3, pp. 2-3; Agreement, Ex. 4 at § 7.2; Lober Dep., Ex. 5 at 217:17-24). As it pertains to the first three milestones, for which TransCore was delayed 302 days, TransCore conveniently takes the position that those milestones do not define the critical path. (Lober Dep., Ex. 5 at 56:2-15). TransCore's "expert" scheduler testified:

> MS. JONES: So what is the -- in a gated contract, the milestones define the critical path; is that correct?
>
> MR. ROBB: Object to the form.
>
> THE WITNESS: That's not a correct statement, ma'am.
>
> BY MS. JONES: Okay. What is incorrect about that statement?
>
> MR. ROBB: Same objection.
>
> THE WITNESS: Critical path is a defined project management scheduling technique and process based on calculations.

(Lober Dep., Ex. 5 at 56:2-15). However, when asked about MDR, for which TransCore attempts to attribute all delay to RMTA, TransCore switches course, and its same "expert" scheduler testified that the MDR milestone itself defined the critical path. (Lober Dep., Ex. 5 at 199:24-200:3, 203:18-204:24).

> MS. JONES: Right. And the MDR milestone review, in your opinion, was the critical path as of this schedule?
>
> THE WITNESS: That is correct.
>
> MS. JONES: And in your opinion, the drawings package would also be on the critical path because it's a component of the MDR milestone?

THE WITNESS: That is correct.

(*Id.* at 204:17-24).   In line with TransCore's position regarding MDR, the only way to calculate delay is to perform the analysis performed by Dr. Worrall--compare the dates that TransCore committed to completing milestones in its Baseline Schedule to the dates that TransCore actually completed those milestones.

## IV.   Dr. WORRALL PERMISSIBLY SUPPLEMENTED HIS EXPERT REPORT IN ACCORDANCE WITH RULE 26(e)

Dr. Worrall timely submitted his Expert Report in accordance with the Court's Scheduling Order [ECF No. 27] on July 15, 2020.   At the time of submission of his Expert Report, the parties had neither produced documents nor conducted a single deposition.   On August 24, 2020, Dr. Worrall timely served his Rebuttal Report.[1]   At the time of submission of his Rebuttal Report, TransCore had not completed its production of documents and none of TransCore's witnesses or its four "expert witnesses" had been deposed.   As set forth in the RMTA Memoranda [ECF Nos. 93, 95, 98], the opinions and testimony of TransCore's three experts related to delay ultimately are duplicative and contrary to the Court's directive that a single expert be identified per discipline. Following the production of over 41,000 documents and the depositions of numerous witnesses, including TransCore's Project Manager on September 29 and 30, 2020, and the "expert" deposition of TransCore's internal master scheduler on October 20, 2020, RMTA properly served Dr. Worrall's Supplemental Report on October 25, 2020, two days prior to his deposition.   Indeed, TransCore examined Dr. Worrall on the information contained in his Supplemental Report.

As it pertains to expert witnesses, Rule 26(e) reads:

---

[1] TransCore correctly notes that RMTA did not serve a reply expert report as it considered the submission of any such report contrary to Rule 26.   Each expert has been cross-designated and no new facts were presented in TransCore's opposition disclosures. The purpose of reply disclosures is to respond to new facts raised, not to rehabilitate a witness or raise new arguments.

(2) Expert Witness.  For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given the during the expert's deposition.  Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e).  "In other words, the clear text of Rule 26(e) establishes that a party has a 'duty to supplement,' which extends both to information in the original expert report and to information given during the expert's deposition."  *Kinlaw v. Nwaokocha*, No. 3:17-CV-772, 2019 WL 2288445, at *3 (E.D. Va. May 29, 2019) (citing *Sharpe v. United States,* 230 F.R.D. 452, 456 (E.D. Va. 2005)).  While Rule 26(e) does not permit an expert to submit a new report, "supplementation is required 'to add additional or corrective information.'"  *Id.*  Dr. Worrall's Supplemental Report did just that—considered additional information disclosed for the first time in the documents produced by TransCore and the deposition testimony of its witnesses.  Without question, RMTA served Dr. Worrall's Supplemental Report prior to the date its pretrial disclosures are due, which has not occurred.

A.      **Dr. Worrall's Supplemental Report Did Not Offer New Opinions**

TransCore identifies three opinions of Dr. Worrall rendered in his Supplemental Report that it claims are "new."  (TC Mem. in Supp. [ECF No. 123] at p. 13).

1.      **Dr. Worrall's Consistently Opined that TransCore's Recovery Efforts Were Untenable**

First, TransCore is incorrect in stating that Dr. Worrall's opinions in his Supplemental Report regarding the insufficiency of TransCore's recovery schedule are new.  *Id.*  Indeed, in his Rebuttal Report, served on August 24, 2020, Dr. Worrall describes in detail the reasons why TransCore's November 2018 Recovery Schedule was untenable upon submission.  (Rebuttal Report, Ex. 2, pp. 3-5).  For example, Dr. Worrall opines:

**Response:** The IDR was completed and approved in November of 2018 and was scheduled originally by TransCore to be completed in January of 2018, 10 months earlier. The MDR had not been completed when TransCore suspended work in June of 2019. This statement assumes that had the MDR been approved in November of 2018, just days following the submission of IDR, and that between November of 2018 and September 2019 (10 months), the 100% Design Review, the Factory Acceptance Test and the Installation Ready Design Review could have been completed followed by the Revenue Acceptance Test on September 27, 2019. This is an extraordinary projection considering TransCore's performance history on this Project. Again, such recovery was not realized.

**Response:** This statement presumes, and the TransCore suggested schedule prepared by the Master Scheduler below demonstrates, that all submissions by TransCore would be approved. It also implies that if RMTA would approve contents of the documents, without corrective comment, that TransCore would be able to accomplish the projected schedule. In essence, it suggests that RMTA would forgo the management approach defined in the RFP in TS-01 of the Technical Specifications and relinquish project control exclusively to TransCore. Such an approach would be unacceptable to RMTA because the risk of failure would be shifted from TransCore to RMTA and the risk is appropriately placed with TransCore by contract.

*Id.*

In the October 20, 2020, deposition of TransCore's master scheduler, Heather Lober (five days prior to the issuance of Dr. Worrall's Supplemental Report), Ms. Lober testified that she was relying exclusively on the November 2018 Recovery Schedule, which she created, to establish that TransCore could have recovered the 300 plus days of delay going into the MDR milestone. (Lober Dep., Ex. 5 at 234:15–24). Throughout her deposition, Ms. Lober admitted that, in creating the November 2018 Recovery Schedule, she failed to consider, among other things, whether the Project deliverables were actually submitted to RMTA, whether those deliverables met the specifications of the Agreement, and the 21-day minimum review time for Project deliverables specified in the Agreement. (*See* RMTA's Mem. In Supp. of Motion to Exclude Lober [ECF No. 98] at pp. 8-16). Relying on the testimony provided by Ms. Lober, Dr. Worrall supplemented his opinions to further explain the weaknesses in TransCore's recovery schedule and the

inconsistencies in the assumptions used by Ms. Lober when compared to the specification of the Agreement. (Supplemental Report, Ex. 3, at pp. 3-4).[2]

**2.    Dr. Worrall Consistently Opined that the Detailed Design Drawings Did Not Satisfy the Tolling Specifications.**

TransCore erroneously asserts that Dr. Worrall had not opined on the quality of the Detailed Design Drawings prior to issuing his Supplemental Report. (TC Mem. In Supp. [ECF No. 123] at p. 13). In his Expert Report served on July 15, 2020, Dr. Worrall opined: "It is appropriate to expect the development of the Project would contain a detailed definition of existing facilities into which the replacement system is to be transitioned and installed and it is reasonable for RMTA to require sufficient detail of existing facilities be documented in detail design drawings." (Expert Report, Ex. 1 at p. 14). Moreover, in his Rebuttal Report, Dr. Worrall states:

> *"The detailed design drawings can be approximately 80% complete without TransCore's completing at the MDR Milestone TS-01 #11.3.3-8's requirement to identify all items furnished by the Contractor, all existing items to be removed by the Contractor and all existing items to be reused by the Contractor"*

> **Response:** This statement is not consistent with the specification cited. TS-01, section 11.3.3.8 addresses temporary lighting. The requirement TS-01, section 11.3.3.7 states "The Detailed Design Drawings shall identify all items furnished by the Contractor, all existing items to be removed by the Contractor and all existing items to be re-used by the Contractor." The Technical Specifications are an integral part of the RFP as acknowledged by TransCore's Proposal. At the 80% completion stage, drawings should contain those elements that are new, reused etc. so that corrections can be made at the next stage, the 100% Design Review.

---

[2] During his deposition, Dr. Worrall confirmed that he needed to consider deposition testimony in order to render his opinions in the Supplemental Report. (Worrall Dep., Ex. 6, at 205:3-14). When asked when he reviewed the "Recovery Schedule," Dr. Worrall testified he did not recall but estimated "a couple of weeks ago." *Id.* at 309:19-310:7. As was counsel's standard practice throughout the depositions, TransCore never showed Dr. Worrall a copy of the "recovery schedule" counsel specifically was referencing in his questioning. However, regardless of whether Dr. Worrall previously had or had not reviewed the specific November 2018 Recovery Schedule is of no consequence, because that specific schedule was not identified by TransCore until the deposition of Ms. Lober on October 20, 2020. (Lober Dep., Ex. 5, at 169:1-173:10). Dr. Worrall timely supplemented his opinions five days later.

> "*Detailed Design Drawings package TransCore submitted in November of 2018 goes beyond industry standards for completeness of drawings at the MDR Milestone.*"

> **Response:** This statement represents subjective judgment. Detailed drawings at the 80% level should include consideration of existing physical features of the infrastructure. Industry standards would expect a definition of the total physical equipment solution not just the new equipment that is to be installed. If existing features are not considered, existing loops may be located near the location that new loops are to be cut, treadles and treadle frame locations may conflict with loop placement, concrete steel reinforcement may conflict with loop placement etc.
> TS-03, 13.1 states "The Detailed Design Drawings shall show and specifically call out each item of existing toll equipment, cabling, conduit and mounting hardware and describe whether it is to be removed or (where allowable) abandoned in place or re-used."
> TS-01,11.3.3-8 states "The Detailed Design Drawings shall identify all items furnished by the Contractor, all existing items to be removed by the Contractor and all existing items to be re-used by the Contractor."
>
> The TransCore Proposal states "TransCore will develop detailed design drawings….items will include…pavement mounted sensor locations with associated cabling and conduit…installation of other equipment, conduit, mounting hardware and cabling"

> "*The Detailed Design Drawings …. submitted November 2018 and resubmitted March 2019 is at least 80% complete and complies with industry standards for completeness of drawings at the MDR Milestone.*"

> **Response:** Detailed design drawings 80% complete and to industry standards should include existing features in the facility that might affect the design. Items such as existing loops, treadles, placement of reinforcing steel and other items could affect the detailed design.

(Rebuttal Report, Ex. 2, at pp. 9, 17).

TransCore's Project Manager identified for the first time in his September 29-30 deposition the Detailed Design Drawings relied upon by TransCore for purposes of MDR. During his deposition, it became clear that TransCore not only did not know that the Detailed Design Drawings were required to be 80% as a whole complete for MDR, but that TransCore did not intend the drawings submitted in November 2018 to even constitute submittals under the Agreement. (Email dated 10/29/18, Ex. 7; Email dated 3/19/19, Ex. 8; Mickle Dep., Ex. 9 at 371:10–16). Mr. Mickle later testified in his "expert" deposition that he did not review the

Technical Specifications related to Detailed Design Drawings (Section 11.3.3) and performed a "box check" with the Detailed Design Drawings submitted by TransCore. (Mickle Expert Dep., Ex. 10, at 86:3-12). Dr. Worrall's Supplemental Report appropriately cites to the relevant provisions of the pertinent specifications and opines that TransCore failed to meet those specifications. (Supplemental Report, Ex. 3, p. 5). Dr. Worrall, a Virginia professional engineer, confirmed in his deposition that he reviewed the Detailed Design Drawings and determined they did not meet the specifications. (Worrall Dep., Ex. 6, 315:4-20).

> 3. **Dr. Worrall Consistently Testified that TransCore's Delay Should Be Measured Based Upon Its Failure to Adhere to the Baseline Schedule for Completion of Milestones.**

Lastly, TransCore argues that Dr. Worrall opines for the first time in his Supplemental Report that delay should be calculated based upon the promised completion of the contractual milestones, as set forth in the Baseline Schedule, not the so-called critical path analysis described by TransCore's master scheduler, Ms. Lober, in her deposition. (TC Mem. In Supp. [ECF No. 123] at p. 13). As evident by Dr. Worrall's Expert Report served on July 15, 2020, he has continually calculated delay based upon TransCore's failure to meet each contractual milestone. (Expert Report, Ex. 1, at pp. 2-33). Following Ms. Lober's efforts to describe TransCore's tortured "critical path analysis" in her deposition, in reliance on this testimony, Dr. Worrall supplemented his report to provide the reasons his milestone-based calculation of delay is the appropriate measure of delay in accordance with the Agreement. (Supplemental Report, Ex. 3, at pp. 6-7; *see* RMTA's Mem. In Supp. of Mot. to Exclude Lober [ECF No. 98], pp. 12-13).

> B. **The *Southern States* Factors Establish Any Delay Was Substantially Justified and Harmless**

Even if the Court were to find that Dr. Worrall's Supplemental Report violated Rule 26, which it did not, any such violation was "substantially justified or is harmless." *Kinlaw,* at ** 17-

18.  The question of whether a failure to follow discovery rules is substantially justified or harmless is guided by the *Southern States* factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclosure the evidence.  *Southern States Rack & Fixture v. Sherwin-Williams,* 318 F.3d 592, 595-99 (4th Cir. 2003).  "The first four factors relate to the 'harmlessness exception,' while the last factor relates to the 'substantial justification exception.'"  *Kinlaw,* at *18.

Here, TransCore suffered no surprise as the opinions rendered by Dr. Worrall in his Supplemental Report already had been rendered in his prior reports.  *Id.* ("At most, the second report went into more detail and provided clarity on the first report . . .").  Further, any surprise was cured as a result of TransCore's ability to depose Dr. Worrall on any opinions asserted in the Supplemental Report.  Third, there is no disruption to the trial currently set for April 19, 2021.  Fourth, the evidence relates to causation and is critical to both parties.  Lastly, the necessity of Dr. Worrall's Supplemental Report resulted from information discovered after submission of affirmative and rebuttal reports resulting from TransCore's production of documents and the parties' deposition schedule, which did not commence until a month after the Rebuttal Report was served.  Dr. Worrall therefore was not afforded an opportunity to review and consider the testimony of TransCore's witnesses, rendering his Supplemental Report substantially justified.

## CONCLUSION

For the reasons set forth above, this Court should deny TransCore's Motion in Limine to Exclude Testimony of Harold Worrall.

Date:   January 7, 2021.                    Respectfully submitted,

                                            **RICHMOND METROPOLITAN**
                                            **TRANSPORTATION AUTHORITY**

                                            By Counsel


                                            */s/ Belinda D. Jones*
                                            Belinda D. Jones (VSB #72169)
                                            Henry I. Willett III (VSB # 44655)
                                            Shannan M. Fitzgerald (VSB #90712)
                                            CHRISTIAN & BARTON, LLP
                                            909 East Main Street, Suite 1200
                                            Richmond, Virginia 23219
                                            Telephone: (804) 697-4100
                                            Facsimile: (804) 697-6112
                                            bjones@cblaw.com
                                            hwillett@cblaw.com
                                            sfitzgerald@cblaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2021, I will electronically file the foregoing with the Clerk of Court using CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

Thomas W. Wolf
Joseph M. Rainsbury
John "Jack" M. Robb, III
Kenneth T. Stout
919 E. Main Street, Suite 110
Richmond, Virginia 23219
Telephone: (804) 905-6910
Facsimile: (804) 905-6910
twolf@milesstockbridge.com
jrainsbury@milesstockbridge.com
jrobb@milesstockbridge.com
ktstout@milesstockbridge.com

By:     */s/ Belinda D. Jones*
Belinda D. Jones (VSB No. 72169)
CHRISTIAN & BARTON, L.L.P.
909 East Main, Suite 1200
Richmond, Virginia 23219
Telephone: 804-697-4100
Facsimile: 804-697-4112
bjones@cblaw.com

*Attorney for Richmond Metropolitan*
*Transportation Authority*