# EXHIBIT 1

Expert Report of Harold W. Worrall, Ph.D., PE
Transportation Innovations, Inc.
1813 Saffron Plum Lane
Orlando, Florida 32828

# I.    Summary of Engagement

## A.    Introduction and Assignment

I was contacted by Christian and Barton, LLP, counsel for the Richmond Metropolitan Transportation Authority ("RMTA") to serve as an independent expert consultant. The primary purpose of the engagement is to provide an independent source of expert advice on the process for contracting and delivering a replacement toll collection system. Specifically, the design and replacement of the RMTA's toll system (the "Project"). Throughout this report, I will often refer to myself as the "Consultant."

The primary, and in some cases only, source of funding for a toll road is tolls. To the extent that the collection process is dependent upon a myriad of electronic components, the primary revenue source is then dependent upon those with the intellectual property (IP) of the electronics and those who maintain the electronic system. It is therefore critical to follow a careful and detailed industry standard, procurement and systems development process. Only then can RMTA be ensured it receives precisely what is required for accurate and thorough revenue collection.

**Indisputably, the current RMTA is operating with a dated legacy toll collection system**. RMTA needs to update the existing electronic toll collection ("ETC"), manual and automatic coin machines ("ACM") toll collection infrastructure as equipment has become outdated and cannot be maintained or updated. In some cases, equipment components are not available and legacy software is limited in support. RMTA responsibly has taken an approach of updating all of the equipment necessary to continue to perform a thorough and complete collection of toll revenue.

The RMTA project is particularly complex because it involves automating revenue collection processes for manual lanes, ACM lanes, all electronic toll collection (AETC) lanes and combinations. Further, some lanes operate with gate arms and others do not. In each specific case the lane controller software must be uniquely developed to handle the steps required to ensure safe and complete revenue collection.

## B.    Expert Qualifications and Engagement

### 1.    Consultant Credentials

#### a)    Education

I have a technical, business and public policy educational background with the following specific degrees.

Bachelor of Science in Civil Engineering, University of Illinois, 1969

Masters of Business Administration University of Illinois, 1972

PhD, Public Policy, Virginia Commonwealth University, 1992

*b)    Professional Registration*

I am a registered Professional Engineer in the states of Illinois, Florida and Virginia.

*c)    Practical Experience*

Practical experience includes:

Early career: Four years in engineering practice to qualify for taking the Professional Engineers examination which was primarily focused on engineering computing systems. Subsequently, early career was in the private sector performing management systems consulting for a 10 year period as analyst and project manager.

Mid-Career: Served as CFO and senior executive, including responsibility for information systems, in three transportation departments, including the Virginia Highway and Transportation Commission (1981-1985).

Recent Career: Executive Director of a large toll authority (1992-2004). I managed the implementation of one of the first ETC Systems in the US at a time crucial to the continued viability of the agency. It was successfully implemented in 1994.

Most Recent Career: Consultant to over 60 public agencies and/or private sector companies (2004-present), primarily in the tolling space.

A detailed Curriculum Vita is provided in the appendix to this report.

## C.    Consultant Compensation

The compensation is on an hourly rate of $250/ hour.


## II.    Relevant Parties

### A.    RMTA – Client

RMTA was created in 1966 by an act of the General Assembly of the Commonwealth of Virginia to plan, finance, build, and maintain an expressway to serve the Richmond Metropolitan area. The facilities of the RMTA are a mix of ETC lanes, manual toll collection lanes and ACM lanes and include the Richmond Downtown Expressway, the Powhite Parkway and the Boulevard Bridge. The agency is governed by a Board of 16 members appointed from the City of Richmond, Henrico and Chesterfield Counties and the Commonwealth of Virginia Transportation Board. The Executive Director of the agency is the Chief Executive Officer.

In 2017, RMTA published a Request for Proposal (RFP) to upgrade toll collection equipment and software and to provide continued, ten year, maintenance of the system. These upgrades are crucial to the continued collection of toll revenue as older equipment has reached the end of service life and software components lose support.

The Consultant has not been involved in any projects as a consultant to RMTA or TransCore and was only familiar with RMTA while serving with the Virginia Highway

and Transportation Commission. The Consultant has some acquaintance with staff through the International Bridge Tunnel and Turnpike Association (IBTTA).

### B.    TransCore - Contractor

TransCore is a wholly owned subsidiary of Roper Industries and is a major provider of toll systems and services in the US, performing toll systems integration, marketing transponders and other electronic equipment and performing maintenance and operations. Although TransCore has performed work outside of the US, the company is primarily a US toll systems provider.

TransCore was first known to me personally as a predecessor company SAIC-Systonic when serving as the Executive Director of the Orlando-Orange County Expressway Authority (OOCEA), now known as the Central Florida Expressway Authority (CFX). I was not involved in the procurement, as TransCore was under contract to deliver the OOCEA ETC system before I was appointed to the position. The ETC system was successfully implemented in the summer of 1994 and was the first implementation of an ETC toll system by the company in the US.

### C.    HNTB – RMTA Consulting Engineer

HNTB is a large transportation engineering consulting company and represents a significant number, if not the majority, of the toll agencies in the US. The company's practice is primarily within the US, especially with regards to toll systems.

The primary role of HNTB is to assist RMTA in procuring and managing the Project.

The Consultant has had interaction with HNTB staff on various engagements but has not been engaged directly by HNTB on any project.


## III.    Scope of Work Performed

The Consultant has reviewed documents pertaining to the Project from the start of the Project, issuance of the RFP in March 2017 through and including the various pleadings, motions and other legal documents continuing to be filed and exchanged. I have conferred with RMTA counsel and staff on several occasions and tracked the timeline of and documentation of communications within the Project team, produced by both the contractor and RMTA. Based upon this information and my experience with managing toll replacement projects, the Consultant has rendered opinions and reached conclusions concerning the Project which are presented in the balance of this report.

The opinions set forth in this report, are the present opinions of the Consultant based in part upon review of the available documents. It is my understanding that discovery is ongoing as of the date of this report. I therefore reserve all rights to supplement this report.

## A. Documentation Reviewed

The **project documentation provided has been thorough and complete** and includes the following primary documents as well as other project documentation.

### 1. Request for Proposal (RFP)

At the outset of the project an RFP was issued in March of 2017 and included a general description of RMTA and the toll roads for which it is responsible, a detailed description of the method of evaluating proposals, a timeline for the acceptance of proposals, a sample contract document, and a very detailed set of toll specifications that would drive the development of the system ("Toll Specifications"). Responding proposals were due on June 21, 2017. The RFP contains numerous general provisions that are standard in a tolling industry procurement.

#### a) General Provisions

**The RFP issued by RMTA is typical of procurements in the tolling industry**. The provisions are similar to those of any tolling system replacement project in the US. It describes the agency and the project to be undertaken, the form of the proposal expected and how the selection was to be performed. It describes the final award and negotiation process and other general contract provisions.

#### b) Technical Specifications

Tolling Specifications described in the RFP are very important to ensuring the success of tolling system replacement project. The Tolling Specifications describe in detail the project management and documentation process as well as the detailed hardware and software specifications. Because the Tolling Specifications are so important to the Project, the Consultant prepared a spreadsheet database for easy access during this assessment.

The Tolling Specifications require the Contractor to establish a progress schedule for the purpose of:

*"depicting how the Contractor will manage and coordinate all of its work and deliverables specified in this TS-01 document and all of the other Tolling Specifications (TS) documents so as to successfully mitigate risk and achieve the milestone dates specified by the Authority".*

A progress schedule is required to show all resources and their availability to the Project. It shows the sequence of work including the toll system requirements, design, development and documentation tasks; the toll system infrastructure design and construction tasks, training classes, system installation tasks and system testing tasks.

#### c) Project Management Process

The **Project management process described in the RFP is crucial to the success of the project and is standard within the industry**. It is defined in the first section of the Tolling Specifications. The major Milestones to be accomplished are as follows:

1. Baseline Schedule Agreement Milestone
2. Management Plan Review Milestone
3. Initial Design Review ("IDR") Milestone
4. Midpoint Design Review ("MDR") Milestone
5. 100% Design Review Milestone
6. Factory Acceptance Test Milestone
7. Installation-Ready Design Review Milestone
8. System Installation
9. Revenue Acceptance Test Milestone
10. Host Acceptance Test Milestone
11. Traditional lane Acceptance Test Milestone
12. ORT Acceptance Test Milestone
13. As Built Review Milestone
14. Capital Project Closeout Milestone

The aforementioned list will be referred in this report as the "Milestones". There are, of course, many more tasks to be scheduled and coordinated within each of the major Milestones.

2. Contractor's Proposal

*a)* *Organization*

The proposal outlines in detail the qualifications of the firm and the staff to undertake the project. The form of the proposal is arranged around addressing the specifications described in the RFP. A Criteria Information Index, requested by the RFP, specifies the proposal sections that relate to the toll specifications contained in the RFP.

TransCore's proposal (the "Proposal") contains considerable information on company qualifications and qualifications of the individuals dedicated the project. The Proposal contains considerable information about TransCore's existing system software (the "Infinity System") that resides at a central location and runs the systems of numerous toll facilities utilizing TransCore services.

*b)* *TransCore Systems Engineering V Process*

The Proposal describes a project management methodology which was touted as adhering to "*industry standards in project management*". The "*Systems Engineering V Process*" in Figure 1 below depicts the sequential steps that TransCore claims to perform from the initial definition of concept of operations through operations and maintenance.



Figure 1 TransCore Systems Engineering V Process Contained in the Proposal

The Proposal contains an initial baseline schedule and proposed an update to be completed within 14 days of the Notice to Proceed. The Notice to Proceed was issued on September 27, 2017. **An update to the baseline schedule was first approved in February 2018 over four months after the Notice to Proceed.**

The Proposal describes in detail TransCore's qualifications and the many agencies contracted with TransCore. Notably, **the Infinity System described in the Proposal is used for all agencies that TransCore currently serves**. The system has been developed over a long period of time contracting with a myriad of agencies. Detail system capabilities are defined in the Proposal in reference to various sections of the Toll Specification requirements in the RFP. Apparently, the Proposal was to customize the Infinity system to serve the needs of RMTA.

3.     The Agreement for Toll System and Services (the "Agreement" or "Contract").

The Agreement, as defined above, includes the Toll System and Services Agreement, including all amendments, documents, attachments and exhibits referenced therein, the RFP, TransCore's Proposal, and TransCore's Best and Final Offer dated August 25, 2017.

The Agreement for Toll System and Services (the "Agreement" or "Contract") is the primary legal contract document in terms of precedence, followed by the RFP and lastly the Proposal.

4.     The Letter Agreement

A letter agreement was signed contemporaneous with the Agreement related to the separate invoicing for Toll System Equipment (the "Letter Agreement"). The Letter Agreement permitted TransCore to invoice for Toll System Equipment in advance of installation or any specified milestone. Nothing in the Letter Agreement altered TransCore's contractual obligations and the Letter Agreement expressly states that its purpose is not to forgive or waive any of TransCore's obligations under the Agreement.

5.    Legal Documents and Communications

On 11/01/2019 a Complaint was filed by TransCore in the Eastern District Court of Virginia. On 12/03/2019, a Counterclaim was filed by RMTA. Since that time there have been various pleadings, interrogatories, motions and court orders produced. These documents describe in detail the issues in contention. A trial date has been set for November 2020.

6.    Project Management and Scheduling Documents

RMTA has documented project meetings, emails and letters establishing TransCore's project delays from the beginning of the Project.

After Notice to Proceed in September 2017, a new Baseline Schedule was to be completed by TransCore on October 11, 2017, 14 days from the Notice to Proceed. **The Baseline Schedule was submitted and approved in February of 2018, almost five months later.** The Agreement required TransCore to submit the Management Plan on or before October 25, 2017, 28 days from the Notice to Proceed. TransCore's submitted Baseline Schedule, however, required completion of the Management Plan Milestone on or before November 9, 2017. **TransCore confirmed its completion of the Management Plan on May 7, 2018, which RMTA accepted on May 8, 2018, six months late**.

The Initial Design Review (IDR) was to be completed on January 22, 2018 according to the initial Baseline Schedule. The **IDR was completed in November of 2018; eleven months after the original scheduled date, but only after substantial IDR requirements were deferred to the Midpoint Design Review (MDR) by RMTA**. According to TransCore's Baseline Schedule, Transcore was afforded 29 days after IDR to submit the revised and expanded document set for MDR. **TransCore is still in MDR some 20 months later.**

7.    Letters, Emails and Other Documents[1]

**RMTA documented and preserved numerous letters and email communications in which RMTA expresses concern to TransCore related to resources and project delay. RMTA thoroughly documented its concerns which were not adequately addressed by TransCore.** For reasons known only to Transcore, on June 12, 2019 TransCore's project manager requested an "extension of time and associated contract price reimbursement" and summarized TransCore's position on several issues of contention, all occurring during MDR. Notably, TransCore did not raise any issues regarding its substantial delay leading into MDR. The issues raised by TransCore were as follows:

- alleged response time delays by RMTA during MDR

---

[1] See the documents produced with this report, RMTA/TC 000001-000302.

- drawings and documentation requirements allegedly exceeding MDR milestone requirements
- use of existing conduit versus requiring complete replacement
- alleged unnecessary treadle frame replacement
- dimensional differences on factory acceptance test requirements
- differences concerning factory acceptance test requirements by specific lane type

Following the failed internal dispute resolution process, on September 12, 2019, RMTA's Director of Operations responded clarifying the delays that have occurred and documenting the delays in providing documentation and updated schedules as required in the Technical Specifications of the RFP. The response outlined numerous occasions that RMTA had given concessions to TransCore and provided documentation of delays resulting from TransCore's inability to complete specification requirements on a timely schedule. RMTA sufficiently addressed the alleged delay issues, in the June 12, 2019 TransCore letter are addressed as follows:

- TransCore's documented a consistent delay from the outset of the Project notwithstanding numerous concessions in an attempt to continue the Project to completion
- RMTA's offer to defer required engineering drawings for the MDR to the Final Design Review
- VDOT CSC interface demonstration is called for in the specifications and which has not occurred
- Dimensional differences exist between RMTA lanes and the lanes to be used for Factory Acceptance Testing ("FAT")
- Agreement was reached to accept the reuse of buried conduit as TransCore requested, however, TransCore would not warrant the reused conduit over the life of the Project as required by the Contract, leaving RMTA no choice but to require new conduit as per Technical Specifications
- Agreement to remove the treadle frames alleviating the concern with regard to lane equipment placement and software design

8. Other Documents

In addition to the Documents previously described, the consultant reviewed meeting minutes, comments to project submissions etc. The consultant has tracked the project development from the notice to proceed in September of 2017 to the timeframe of the contractor claim and agency counterclaim. These documents are the primary basis for conclusions provided later in this report.


## IV. Consultant Findings

With TransCore's suspension of work, expressly prohibited by the Contract, and TransCore's subsequent filing of its Complaint and RMTA's filing of its Counterclaim, the Project is at an impasse. To determine the reasons for the current impasse, the

evaluation must begin with the procurement and award process, wherein the particulars of the Project were defined.

## A.    Consultant's Evaluation Methodology

The evaluation of the Project development is not easily assessed when taken as a whole and it is important to avoid confusion of one issue with another. For the purposes of this evaluation, the analysis is divided into the following elements:

- Issues of Concern
- Project Delay
- Complete Fulfillment of Tasks

These areas are extremely interrelated and as such must be discussed in a manner that allows for some separation to prevent circular and diffusive discussion.

Issues of contention have arisen and do relate to project delay and complete fulfillment of tasks. However, an attempt to discuss these together can confuse key contractual issues with task completeness and time delay. Issues of concern will be addressed first in terms of the conformance to the terms of the Agreement and subsequently any delay and completenees.

Quality and thoroughness in the fulfillment of a task are distinct from the date on which an activity is completed. While project delay may be recorded in the number of days beyond the planned completion date, the thoroughness with which a task is completed is a separate and requires a comparison of work product to technical specification. A project may not be delayed but may be lacking in specificity or vice versa.

## B.    Summary of the RMTA Project

**The Project complexity in this undertaking is a significant factor**.

While there are larger toll agencies that have undertaken AETC projects involving significantly larger toll revenues, such projects would not be as complex as the current undertaking. An AETC project is less complex since AETC systems have no gate arms, coin machines, vaults or manual collector nuances. Further, when ETC is overlaid on a manual lane or coin machine lane, complexity is compounded. In summary, the RMTA project is small in terms of the number of lanes and the annual revenue collected by industry standards but the systems and hardware contain considerable complexity.

## C.    Procurement Process

**The systems development and scheduling process reduces risk for both the contractor and the client. It is in the common interests of both parties to remain on schedule and ensure that the final system complies with all specifications.**

With the advent of ETC in the early 1990's, toll agencies learned from others in the industry who had undertaken ETC. In particular, the process for procuring and controlling toll system developments grew increasingly standard. RMTA used the

knowledge gained from others on RFP processes, specification definition and project milestone and scheduling processes. The procurement process was therefore not only a common process but one in which elements from other procurements were replicated.

What is often overlooked is that the project development and scheduling process is for the benefit of the both parties to the contract, the contractor and the agency. There is great risk for both parties when undertaking the development of a complicated toll collection system.

## D.    Importance of Baseline Schedule

**Because of the high level of coordination required, the development of a toll replacement system from design through installation and testing must be carefully and deliberately scheduled.**

**TransCore failed at every Milestone to meet the Baseline Schedule.**

Toll replacement projects require considerable coordination between four primary groups; software designers, hardware installers, RMTA design and construction personnel and RMTA toll operations. Each step in the development of the software and hardware detail must consider existing infrastructure arrangements and any potential changes to the existing infrastructure. Further, toll operations and maintenance personnel must be coordinated with during the installation and operation of the new toll replacement system.

The technical specifications are therefore crucial to ensuring a successful project. Delaying decisions in the early stages of the project development to later stages increases risk and decreases the likelihood of a successful toll replacement system project. Accordingly, the RMTA project is defined in 14 milestone stages (containing numerous activities), each of which is required to be completed to its fullest extent before proceeding to the next milestone. To do otherwise, obscures the true status of Project definition and leads to a greater probability of failure.

In themselves, computer software projects are risky undertakings. However, toll system integrations have the additional elements of hardware installation and lane tuning. There are electronic hardware components that have to be perfectly specified for this application so that they work together with other procured hardware and can be installed in existing facility infrastructure. There are complicated wiring and cabling elements to integrate the equipment in the field and all of this must work precisely and in the particular infrastructure of the agency.

Hence, a meticulous, intentional development process that accommodates the system to be implemented with the existing facility features, to ferret out all anomalies as the project progresses must be used in the development of the replacement toll system.

E.    Procurement Process and Contract

**The RMTA procurement process conformed to industry standards and was well formulated. The project management process described in the procurement documents is also standard in the industry.**

The RMTA used an industry standard procurement process that allowed adequate time for questions and input from the contractor community. In fact, the input of potential contractors resulted in addenda being issued to the RFP. In addition, the process encouraged physical access to RMTA facilities and encouraged photography and measurement and other methods to ensure that prospective contractors would have adequate knowledge of the conditions in which the Project would take place. The RFP was issued on March 24, 2017 and allowed the contractors until June 21, 2017 to submit proposals.

**A clear set of Milestones are defined in detail and payment is contingent upon the successful accomplishment of the tasks within each of the Milestones. Once again, this is a standard industry practice.**

1.    Proposal Evaluation Criteria

**Seventy percent of the evaluation points were awarded based on the ability to carry out the Project in accordance with a prescribed schedule. The emphasis was clearly to get the project accomplished on time.**

The following evaluation point system was applied in the selection of the contractor.

1. Toll System Design and Technical Approach -15 points
2. Ability to Execute in Meet the Project Schedule -15 points
3. System Maintenance and Warranty Approach 15 -points
4. Proposer Qualifications  - 20 points
5. Project Organization and Key Staff Qualifications - 20 points
6. Price 15 – points

The RFP selection process emphasized company qualifications, staff experience, technical approach, and price. Price accounted for only 15 of the 100 points as shown. The point assignment is indicative of the desire of RMTA to select a contractor that had the history (qualifications) and the specific personnel listed in the proposal, representing a total of 40% of the evaluation points. Another 30 points were dedicated to the firm's technical approach and ability to meet the project schedule.

Once proposals were submitted and determined to be in compliance with the RFP, evaluations were performed and the firms were ranked. The firms were then asked to enter into negotiations for a best and final price and the contract was awarded on September 27, 2017.

2.    Technical Specifications (TS)

**There should be little question about system requirements or the process of controlling the Project development considering the detail provided in the specifications.**

There are nearly 1400 separate specifications listed in the RMTA RFP covering the Project development process, hardware components, systems development processes, equipment testing, personnel training, and system requirements. The specifications define in detail the system requirements and a development methodology to follow. The specifications define what is desired and how RMTA wished to see it accomplished.. This level of detail is common for toll system integration projects. Technical specifications were divided into six sections:

> TS-01 Project Management, Documentation and Testing
> TS-02 Operations and Maintenance Work
> TS-03 Hardware and Installation
> TS-04 Host Subsystem
> TS-05 ORT Zone Subsystem
> TS-06 Traditional Lane Subsystem

Section TS-01 focused on the manner in which the project is to be developed. Section TS-02 is concerned with subsequent operations and maintenance of the equipment and systems and warranties provided by the contractor. Section TS-03 defines the physical attributes of hardware definition and installation. The remaining three sections of the technical specifications, Host, ORT Zone and Traditional Lane Subsystems, describe the detail attributes of the ETC system. These three sections define the hardware and software components for manual collection lanes, automatic coin machine lanes, ETC lanes and combinations.

3.    Project Development Process

The Project development process requires frequent, documented communication between RMTA and TransCore to ensure that, at each step the hardware and software system produced will completely and efficiently support RMTA revenue collection. **The weekly progress meetings supported these communication needs and were well documented.**

**If payments are made for work outside of a Milestone, RMTA is at greater risk if the next phase is further delayed.** As contractor payments are made, the potential cost of a failed project increases. Accordingly, industry standard is that payments are based on Milestone accomplishment as defined in the technical specifications.

**At the stage equipment is purchased and paid for, RMTA must be assured that the design has reached sufficient detail to support payment. Project detail in task fulfillment was insisted upon by RMTA to reduce Project risk.** As a percentage of the total project costs, equipment usually represents one half or more. To pay for equipment, the client must be confident it is correct for the software to integrate and that the

equipment can be correctly installed in existing infrastructure. Therefore, the system design must be detailed enough to support the purchase.

Over the years the project development process has been refined using the knowledge gained on previous projects as to what worked and what did not. ETC came to the US in 1989-1990 and the system complication of RFID (radio frequency identification) introduced electronic aspects that required a formal project development process. Now there were antennae, ground loops, electronic readers, light curtains, lane controllers, license plate cameras and back office systems to be integrated to process a large amount of transactional data.

Previously, toll collection was performed by toll personnel manually or by Automatic Coin Machines (ACM). Some lanes contained gates to preclude movement through the lane until payment was recorded and some facilities were operated without gates. With the introduction of ETC, lane types increased considerably. Now, they could be in MLT/ETC gated, ACM/ETC gated, MLT/ETC ungated, ACM/ETC ungated, ETC gated or ETC ungated. Each has its own unique logic that must be supported by the lane software.

With the increased complexity introduced by ETC, there was a greater focus on systems engineering and the project development process. The application of system science became even more important.

F.      Project Issues of Concern

1.      Maintenance of Communication -- Weekly Progress Meetings
**From the documentation reviewed by the Consultant, the Consultant concludes that Project communications occurred as planned with allowances provided by RMTA notwithstanding certain disruptions by TransCore.**

The maintenance of communications is a basic underlying principle in project management, and it is particularly critical with so many design elements and participants involved; RMTA (design, construction and operations staff), TransCore, suppliers and subcontractors. The process prescribed in the Technical Specifications specified weekly meetings. Occasionally, these meetings were canceled, but it was relatively infrequent. The weekly meetings were documented by HNTB.

Continuous communications were somewhat hampered by changes in TransCore staffing. TransCore changed staffing on several occasions, including changes in the project leadership that impacted Project communications.

Though Monthly Progress Reports were required in the Technical Specifications, RMTA permitted TransCore to forego submission it is Monthly Progress Reports during the IDR to allow TransCore to recover its incurred Project Delay. Project Delay is discussed in detail in a later section of theis report.

2.     The Reuse of Existing Facilities - Conduit reuse

**RMTA acted appropriately and in accordance with the Agreement requiring either new conduit or the warranty of reused conduit.**

The Technical Specifications require the placement of new conduit as part of TS 02.2.2 unless TransCore determined that it could be reused in the new toll collection system. TransCore requested the reuse of underground and island conduit and on February 13, 2019 RMTA accepted the use of certain existing conduit, under the condition that TransCore would certify or warrant the reused conduit as part of the toll replacement system for the ten year service life of the Agreement. TransCore refused to do so.

The primary purpose of the Project is to ensure the complete and thorough collection of toll revenue, which is the only source of revenue for RMTA. For RMTA to do other than require warranty for the reuse of conduit would leave RMTA open to the potential of paying for the replacement of conduit in the 10-year period maintenance portion of the Agreement. Ten year maintenance is part of this Toll Replacement Sytem contract and TransCore is responsible for that work.

3.     Detailed Design Drawing Submissions

**It is appropriate to expect the development of the Project would contain a detailed definition of existing facilities into which the replacement system is to be transitioned and installed and it is reasonable for RMTA to require sufficient detail of existing facilities be documented in detail design drawings.**

Specifically, In the RMTA letter to TransCore of November 20, 2018, RMTA stated its position as follows "*detailed design drawings shall be 80% complete and contain all items as required by section 11.3.3 for successful completion of the MDR milestone..... There are no details of pavement joint locations, existing loops and treadle locations and their proximity to new loops*"

Detailed design drawings of existing RMTA infrastructure were made available in the procurement process by RMTA and would assist in satisfying this requirement. TransCore takes the untenable position that this requirement is not contained in the Technical Specifications and has refused to comply.

Unlike the installation of toll system equipment in a newly constructed facility, the Project required equipment to be installed in existing facilities. The RMTA roadways currently have loops cut in the pavements, current ETC RFID antennae and other ETC related existing equipment installed in the lanes. Further, RMTA lane infrastructure, such as the placement of reinforcing steel in the pavement, existing overhead gantries, treadles and other physical features affect the placement and design of the new toll system components.

The Technical Specifications also require the continued service of existing toll collection equipment during the time in which new equipment is installed and placed into operation. It is difficult to understand how this transition might be accomplished without knowing

precisely where every element of existing toll equipment is located and precisely how existing infrastructure might conflict with installation. Detailed design drawings of existing facilities would clearly document any potential issues such as location of existing treadles, the width of appurtenant shoulders etc.

4.    SB Shoulder Powhite ETC Lanes
**No delay should be allowed under terms of the Technical Specifications for the southbound Powhite shoulder issue.**

Although the SB Powhite Shoulder ETC lane was shown on the as-built drawings (sheet 60 of 160) included with the RFP as 8 feet in width, a pricing table (Tab E, ORT subsystem zones) in the RFP indicated the shoulder to be 4 feet in width and TransCore priced outfitting the shoulder at 4 feet width. Notably, TransCore executed the Gantry and Pavement Statement attached to the Proposal representation that it had visually inspected the RMTA toll system. Further, TransCore was under contract at the time for the maintenance of the same Powhite ETC Lanes.

In February 2018, TransCore recognized that the shoulder with was 8 feet. TransCore did not propose a modification to the Agreement to instrument the 8 foot shoulder until ten months later on December 2018. After many conversations and meetings between RMTA and TransCore, including a revised price proposal by TransCore, RMTA concluded on March 26, 2019, that, rather than increasing the Agreement price, RMTA would physically bar vehicles from being able to pass on the shoulder at its own expense.

TransCore has maintained that this issue resulted in delay and increased costs in preparing to instrument the shoulder. **Discussion regarding the outfitting of the shoulder would not have delayed issues of software design.**

5.    Existing Treadles
**Removal of existing treadles is specifically covered in section TS-06, 5.3 of the Technical Specifications and should not result in the need for a contract modification in TransCore's favor.**

The existing treadles would not be needed in for the Replacement Toll Collection system. Technical specification TS-02, section 2.1.1 required TransCore to conduct a field survey of existing equipment in the lanes. Technical Specification TS-06, section 5.3 requires the removal of the treadles.

Rather than plan to remove the treadles, TransCore redesigned software to leave the treadles in place thereby inaccurately contends that the removal of treadles is extra-contractual because the treadles used by RMTA for existing toll collection purposes are not be required in the redesign proposed by TransCore.

Assuming treadles would not be a necessary component of the new toll collection system, because they would result in a poor surface for the traveling public and perhaps represent a hazard, RMTA agreed to remove the treadles at its cost, a cost which TransCore is responsible for under the Agreement.

Given RMTA's agreement to remove the treadles, the TransCore software as originally designed could conform to standard lane geometry and TransCore would not have needed to modify the software for that purpose.

6.      Demonstration of the VDOT Customer Service Center (CSC) Interface
**It is industry standard and required in the Technical Specifications that a demonstration of the VDOT CSC interface take place prior to completion of the MDR. A demonstration of TransCore's Infinity System to VDOT CSC on another toll road does not satisfy TransCore's obligations under the Agreement.**

An important component of the new toll collection system is the interface with the statewide VDOT CSC to properly record transactions and collect revenue. The Technical Specification, TS-01, 2.4.22, specifically requires the CSC interface demonstration prior to the completion of the MDR. The specification states "*Prior to successful completion of the Midpoint Design Review Milestone, the Contractor shall demonstrate the Toll System's use of the complete interface with the VDOT's E-ZPass Customer Service Center.*"

No questions about this requirement arose during the procurement process, or in the first year of the project.

TransCore identified the deliverable on its Baseline Schedule and in the Action Item List exchanged between the parties. In fact, RMTA, TransCore and VDOT communicated regarding the process necessary for demonstration.

TransCore now maintains that it is impossible to demonstrate a "complete" CSC interface until the entire new toll system is in place. That would presume that the new toll system had passed through 100% design, modifications had been coded, the project had passed the factory acceptance test and would essentially be ready for full operation. TransCore proposes a demonstration of another agency's interface with the VDOT CSC. This position is inconsistent with the Agreement, industry standards, and TransCore's own communication to RMTA.

The importance of the CSC Demonstration is that the RMTA network is unique and the physical barrier the James River prevents the transmission of images from the north side of the River to the south side of the River where the single host subsystem is to be located. The RFP requires a single host subsystem which stores all the transactional data and image data files in a single location (on the south side of the river) to allow easy access to the data by RMTA. But, due to the uniqueness of the RMTA network, the violation images from the north side of the River must be transmitted separately from the associated transactional data to the VDOT CSC.

Specifically, images are sent from the north side of the river directly to the CSC and are brought together with the north and south side transactional data and the south side image data which are sent to the CSC from the RMTA host separately. The demonstration is required to show how this uniqueness in the interface can be addressed.

Additionally, the interface demonstration that is required by the RFP in MDR is not held to the same testing requirements that are specified for the FAT. During FAT, the actual testing of the single host system and transmission of data is held to performance standards.

7.    Factory Acceptance Test Requirements

**It is reasonable and required in the Technical Specification that Factory Acceptance Testing ("FAT") test the system in the RMTA environment and not a mere demonstration of the Infinity System.**

The Technical Specification TS-01, section 4.2.4.15 requires that "*The Midpoint Design Review Submittal shall include the Detailed Test Procedures document (see section 5.4 below) updated to address all Authority comments from the Initial Design Review and issues discovered during the Contractor's design process. The Factory Acceptance Test, Revenue Service Acceptance Test and Project Acceptance Test aspects of the Detailed Test Procedures document shall each be 80% complete.*"

Once again, this specification was not questioned by TransCore during the procurement nor during the first year of the project.

The purpose of the test is to ensure tha the new system will function within the RMTA facilities environmnet. The detail should be sufficient to demonstrate that the software and equipment will perform in RMTA lanes, including issues with antennae height and specific location of loops etc.

8.    Audit Requirements

**RMTA offered TransCore a reasonable accommodation on the audit requirements of MDR, which TransCore refused.**

On July 30, 2019 RMTA agreed to defer the VITA and SSAE requirements to the 100% design milestone to further assist in moving the Project to completion. The waiver was conditioned on the assumption that the requirements would be demonstrated within 60 days of revenue acceptance test. This waiver was rejected by TransCore and it was suggested that it would take place six months after project acceptance test.

9.    Manual Lane issues

*a)    Digital Video Audit Function*

**No delay should be allowed under terms of the Technical Specification for transmission of the manual keystroke information to the Host subsystem.**

Technical Specification TS-04, 3.4.6 specifies the digital video audit to be capable of searching for and playing back "*video images, associated transaction data and potential violation images by criteria including but not limited to transaction time range, lane number, lane/zone mode, transaction record number, violation record number, E-ZPass transponder number and toll collection attendant employee number, alarm condition, class mismatch condition, collector button presses and unusual occurrence type*".

On March 20, 2019 in a letter to TransCore, RMTA responded "*the RMTA agrees to relieve TransCore of having to transmit the MLT keystroke information to the host subsystem or to reconfigure the Ad Hoc Reporting tool to search and report keystroke information.....*", resolving the issue.

*b)      Insufficient Funds Functionality*
### No delay should be allowed for TransCore's failed insufficient funds design.

TransCore points to the Insufficient Funds ("ISF") design, which it proposed using its packaged "Button A/B" in lieu of the customization requirements in the Agreement. TransCore promised the ready-made "Button A/B" solution would result in time and cost savings to RMTA. The extensive written record between the parties establishes that prior to waiving the customization requirements for ISF in the Agreement, RMTA appropriately requested a credit memo and schedule savings for the ISF solution in June 2018.

After numerous RMTA requests for a written description of the "Button A/B" Manual ISF process, RMTA reminded TransCore that the Requirements Compliance Matrix (submitted in the procurement and incorporated into the Agreement) showed more than 420 hours of system customization work and hardware keyboards for the Manual ISF functions as originally specified by RMTA in accordance with the Agreement. On February 25, 2019, in response to the RMTA's request 209 days earlier and numerous reminders, TransCore submitted pricing for the "Button A/B" Manual ISF process that increased the contract price by $123,847.89 instead of reducing it as originally promised. RMTA notified TransCore no later than May 6, 2019, that it would forgo TransCore's proposal and require TransCore to meet the specification in the Agreement. On August 29, 2019, RMTA removed the ISF functionality requirements in total from the Agreement. To date, RMTA has not received any credit for the reduction of work and scope of the Project.

*c)      Manual Lanes Training Simulator*
### No delay should be allowed related to the MLT Simulator

The Technical Specifications required TransCore to provide training and training aids for system operation.

TransCore proposed a PowerPoint Slide Deck be used for RMTA employee training related to the manual lanes. On February 5, 2019, TransCore submitted a MLT Simulator Slide Deck to RMTA, which RMTA subsequently reviewed and approved. The MLT Slide Deck understandably was a low priority deliverable because RMTA staff were not to be trained until post-installation and specific "screen shots" may need to be adjusted as design of the toll collection system progressed. There were a number of communications between RMTA and TransCore regarding the Slide Deck in which TransCore affirmed that no delay was being caused due to the review. Notably, TransCore provides no substantive description of the issue in its June 12, 2019, letter.

The approval of the Slide Deck had no impact on TransCore's submission of the midpoint design review.

*d)*


## V.    Project Delay

**TransCore's delay began immediately from the start of the Project, and continued to mount throughout.  TransCore's delay is not attributable to RMTA.**

Section 16 of the Agreement speaks specifically to the process to be followed when TransCore contends that delay in the Project is caused by some action or inaction of RMTA.  The consultant could find no documentation of TransCore notifying RMTA of any delay allegedly caused by RMTA until June 12, 2019, over six months into MDR.

In any large project a progress schedule is essential to maintain control and prevent delay, especially considering the complexity of the RMTA toll collection system project. A baseline schedule was proposed in the Proposal and was to be reevaluated and submitted 14 days subsequent to the completion of the project award and Notice to Proceed on September 27, 2017. **Due to TransCore's delays, the Baseline Schedule submitted by TransCore was not able to be approved until February 2, 2018, some four months later. This demonstrates the very slow start of the RMTA project.**

Though Milestones must be completed before proceeding to following Milestones. This does not preclude the contractor from working on tasks in subsequent Milestones. TransCore suggested that they would be working on subsequent Milestone tasks and was told by RMTA that that was acceptable but must be done at their risk, which is an appropriate response.

The progress schedule was to be updated at each monthly progress meeting. There was an initial baseline schedule, a progress schedule submission in February of 2018 and update to the progress schedule on March 21, 2018. Another progress schedule was not delivered until August 15, 2018. The following table shows the progress from the original Baseline Schedule compared to that of March 21, 2018. Though some waivers were made by RMTA for monthly updates, **progress schedules were not delivered to RMTA as required in the RFP or as promised in TransCore's Proposal.**

| | Original Milestone Schedule | March 20, 2019 Milestone Schedule | |
|---|---|---|---|
| | Finish | Finished | Planned |
| **Baseline Schedule Agreement Milestone** | 10/11/2017 | 2/2/2018 | |
| **Management Plan Review Milestone** | 11/9/2017 | 5/8/2018 | |
| **Initial Design Review Milestone** | 1/22/2018 | 11/20/2018 | |
| **Midpoint Design Review Milestone** | 4/24/2018 | | 4/15/2019 |
| **100% Design Review Milestone** | 6/28/2018 | | 5/31/2019 |
| **Factory Acceptance test Milestone** | 10/24/2018 | | 8/1/2019 |
| **Installation Ready Design Review Milestone** | 11/29/2018 | | 9/10/2019 |
| **System Installation** | 11/29/2018 | | 9/10/2019 |
| **Revenue Acceptance Test Milestone** | 9/27/2019 | | 1/24/2020 |
| **Project Acceptance Test Milestone** | 3/30/2020 | | 7/29/2020 |
| **As Built Review Milestone** | 5/18/2020 | | 9/15/2020 |
| **Capital Project Closeout Milestone** | 5/19/2020 | | 9/17/2020 |

**The date for system installation shown in the March progress schedule update was 10 months later than in the original baseline schedule. Within the first six months (September 2017 to March 2018), 10 months had slipped for the installation date.** As evidenced by TransCore's schedule submission, the project was significantly behind only a few months after the Project award.

TS-01, section 4.3.2.7 states the following *"The Contractor shall prepare and submit an updated Progress Schedule to the Authority at every progress meeting (see section 4.4.2 below) and as part of the management plan in accordance with the milestone requirements (see section 4.2 above)."* Since this did not occur, it is reasonable to conclude that **project scheduling was inadequate in the early part of the project.** Additionally, on numerous occasions RMTA expressed concern for the dedication of contractor staff.

A.     RMTA Delay Calculation
The delay in schedule accomplishment to date has been significant. A quick review of delay in the first four Milestones is informative.

1.     Delay in Delivery of Baseline Schedule
The following table shows **the planned delivery date of the Baseline Schedule and the actual accepted delivery date amounting to 114 days delay for the first Milestone.**

| Deliverable Name | Expected Delivery | Initial Delivery* | Initial Delivery Delay (days) | Accepted Delivery* | Total Delay (days) |
|---|---|---|---|---|---|
| Baseline Schedule | 10/11/2017 | 10/5/2017 | -6 | 2/2/2018 | 114 |

2.    Delay in Delivery of Management Plan

The second major Milestone is the Management Plan and the following table shows the initial and final delivery dates for each of the major subcomponents of the Management Plan.

| Deliverable Name | Delivery Date In Agreed-to Baseline Schedule | Initial Delivery | Initial Delivery Delay (days) | Acceptable Delivery | Total Delay (days) |
|---|---|---|---|---|---|
| Bill of Materials | 10/25/2017 | 10/27/2017 | 2 | 1/29/2018 | 96 |
| Management Plan: Configuration and Change Plan | 10/25/2017 | 10/27/2017 | 2 | 10/27/2017 | |
| Management Plan: Installation Plan | 10/25/2017 | 10/27/2017 | 2 | 4/25/2018 | 182 |
| Management Plan: Approach | 10/25/2017 | 10/27/2017 | 2 | 2/2/2018 | 100 |
| Management Plan: Data Migration | 10/25/2017 | 10/27/2017 | | | |
| Management Plan: Operations & Maintenance Plan | 10/25/2017 | 11/14/2017 | 20 | 3/1/2018 | 127 |
| Management Plan: Quality Plan | 10/25/2017 | 10/27/2017 | 2 | 10/27/2017 | 2 |
| Management Plan: Security Plan | 10/25/2017 | 10/27/2017 | 2 | 10/27/2017 | 2 |
| Management Plan: Software Development Plan | 10/25/2017 | 10/27/2017 | 2 | 10/27/2017 | 2 |
| Management Plan: Testing Plan | 10/25/2017 | 10/27/2017 | 2 | 2/26/2018 | 124 |
| Management Plan: Training Plan | 10/25/2017 | 10/27/2017 | 2 | 10/27/2017 | 2 |
| Project Schedule | 10/11/2017 | 11/8/2017 | 28 | 2/2/2018 | 114 |
| Health & Safety Plan | 10/11/2017 | 1/5/2018 | 86 | 1/5/2018 | 86 |

As shown in the table, **progress in the accomplishment of the second major Milestone, the Management Plan, continued to lag behind. Additionally, the installation plan already slipped six months.** The slippage was nearly equal to the amount of time the project had been underway.

3.    Delay in Accomplishing Initial Design Review (IDR)

The IDR is the first step in defining a conceptual definition of the system. Much of the conceptual system design, 40% of the detailed drawings, detailed design calculations, systems manuals and testing procedures are to be defined in the IDR. Significant further delay occurred in the IDR completion.

| Deliverable Name | Delivery Date In Agreed-to Baseline Schedule | Initial Delivery | Initial Delivery Delay (days) | Acceptable Delivery | Total Delay (days) |
|---|---|---|---|---|---|
| Bill of Materials | 12/26/2017 | 7/31/2018 | 217 | 9/6/2018 | 254 |
| Management Plan: Configuration and Change Plan | 11/30/2017 | 6/22/2018 | 204 | 6/26/2018 | 208 |
| Management Plan: Installation Plan | 12/14/2017 | 7/10/2018 | 208 | 10/18/2018 | 308 |
| Management Plan: Approach | 12/29/2017 | 6/20/2018 | 173 | 6/20/2018 | 173 |
| Management Plan: Operations & Maintenance Plan | 12/14/2017 | 7/31/2018 | 229 | 8/16/2018 | 245 |
| Management Plan: Quality Plan | 11/30/2017 | 6/22/2018 | 204 | 6/26/2018 | 208 |
| Management Plan: Security Plan | 11/30/2017 | 6/22/2018 | 204 | 6/22/2018 | 204 |
| Management Plan: Software Development Plan | 12/14/2017 | 6/22/2018 | 190 | 6/25/2018 | 193 |
| Management Plan: Factory Acceptance Testing Plans | 12/14/2017 | 6/8/2018 | 176 | 6/8/2018 | 176 |
| Management Plan: Revenue Service Acceptance Testing Plans | 12/14/2017 | 6/8/2018 | 176 | 6/8/2018 | 176 |
| Management Plan: Project Acceptance Testing Plans | 12/14/2017 | 6/8/2018 | 176 | 6/8/2018 | 176 |
| Management Plan: Training Plan | 12/29/2017 | 6/26/2018 | 179 | 6/26/2018 | 179 |
| Project Schedule | 11/27/2017 | 5/14/2018 | 168 | 5/21/2018 | 175 |
| System Design Requirements | 12/11/2017 | 5/29/2018 | 169 | 7/31/2018 | 232 |
| Detailed Design Calculations | 12/26/2017 | 8/16/2018 | 233 | 8/16/2018 | 233 |
| Detailed Design Drawings | 12/26/2017 | 5/28/2018 | 153 | 7/31/2018 | 217 |
| Detailed Design Specifications | 12/26/2017 | 5/28/2018 | 153 | 8/16/2018 | 233 |
| Detailed Design Testing Procedures: Factory Acceptance | 12/14/2017 | 5/29/2018 | 166 | 5/29/2018 | 166 |
| Detailed Design Testing Procedures: Revenue Acceptance | 12/14/2017 | 5/29/2018 | 166 | 5/29/2018 | 166 |
| Detailed Design Testing Procedures: Project Acceptance | 12/14/2017 | 5/29/2018 | 166 | 5/29/2018 | 166 |
| Shop Drawings | 12/26/2017 | 8/16/2018 | 233 | 8/16/2018 | 233 |
| Business Rules | 12/29/2017 | 8/28/2018 | 242 | 8/28/2018 | 242 |
| System Manuals: System Administrator | 12/26/2017 | 6/27/2018 | 183 | 6/27/2018 | 183 |
| System Manuals: Plaza Supervisor | 12/26/2017 | 6/27/2018 | 183 | 6/27/2018 | 183 |
| System Manuals: Toll Collection Attendant | 12/26/2017 | 6/27/2018 | 183 | 6/27/2018 | 183 |
| System Manuals: System Maintenance | 12/26/2017 | 7/16/2018 | 202 | 7/16/2018 | 202 |
| Training Materials | 12/29/2017 | 5/28/2018 | 150 | 9/12/2018 | 257 |
| System Detail Design Document Chapter 1 | 12/26/2017 | 5/29/2018 | 154 | 5/29/2018 | 154 |

| | | | | | |
|---|---|---|---|---|---|
| System Detail Design Document Chapter 2 | 12/26/2017 | 5/29/2018 | 154 | 5/29/2018 | 154 |
| System Detail Design Document Chapter 3 | 12/26/2017 | 5/29/2018 | 154 | 5/29/2018 | 154 |
| System Detail Design Document Chapter 4 | 12/26/2017 | 5/8/2018 | 133 | 5/8/2018 | 133 |
| System Detail Design Document Chapter 5 | 12/26/2017 | 5/8/2018 | 133 | 8/21/2018 | 238 |
| System Detail Design Document Chapter 6 | 12/26/2017 | 5/8/2018 | 133 | 5/8/2018 | 133 |
| System Detail Design Document Chapter 7 | 12/26/2017 | 5/29/2018 | 154 | 5/29/2018 | 154 |
| System Detail Design Document Chapter 8 | 12/26/2017 | 6/8/2018 | 164 | 6/8/2018 | 164 |
| System Detail Design Document Chapter 9 | 12/26/2017 | 5/29/2018 | 154 | 5/29/2018 | 154 |
| System Detail Design Document Chapter 10 | 12/26/2017 | 5/29/2018 | 154 | 5/29/2018 | 154 |
| System Detail Design Document Chapter 11 | 12/26/2017 | 5/29/2018 | 154 | 5/29/2018 | 154 |
| System Detail Design Document Chapter 12 | 12/26/2017 | 5/29/2018 | 154 | 5/29/2018 | 154 |
| System Detail Design Document Chapter 13 | 12/26/2017 | 5/29/2018 | 154 | 5/29/2018 | 154 |
| System Detail Design Document Chapter 14 | 12/26/2017 | 5/29/2018 | 154 | 5/29/2018 | 154 |
| System Detail Design Document Chapter 15 | 12/26/2017 | 5/8/2018 | 133 | 5/8/2018 | 133 |
| System Detail Design Document Chapter 16 | 12/26/2017 | 7/31/2018 | 217 | 7/31/2018 | 217 |
| System Detail Design Document Chapter 17 | 12/26/2017 | 5/29/2018 | 154 | 5/29/2018 | 154 |
| System Detail Design Document Chapter 18 | 12/29/2017 | 5/8/2018 | 130 | 5/8/2018 | 130 |
| System Detail Design Document Chapter 19 | 12/29/2017 | 7/31/2018 | 214 | 7/31/2018 | 214 |
| System Detail Design Document Chapter 20 | 12/29/2017 | 7/31/2018 | 214 | 7/31/2018 | 214 |

**Delay of activities within the IDR now range 5-10 months beyond the dates agreed to in the Baseline schedule**. The IDR was finally invoiced in November 2018. It is important to note however that several concessions were made to accept the IDR and moved into the MDR. These allowances reflect the cooperation of RMTA in moving the Project forward.

4.    Delay in the Midpoint Design Review (MDR)

**The MDR has not been accomplished.  Notably, 302 days of delay, all attributed to TransCore, have been documented prior to entering the MDR phase.** Further, as stated in RMTA's letter of September 12, 2019: "completion *of IDR occurred only after TransCore asked for substantial relief and RMTA allowed TransCore to defer many of the deliverables required at the IDR Milestone into its submittals for the next milestone*". The following table provides the detail activity status prior to the beginning of the MDR.

| Deliverable Name | Delivery Date In Agreed-to Baseline Schedule | Delivery** | Delivery Delay (days) |
|---|---|---|---|
| Approach | 2/20/2018 | 11/14/2018 | 267 |
| Quality Management | 2/5/2018 | 12/10/2018 | 308 |
| Security Plan | 2/5/2018 | 12/5/2018 | 303 |
| Configuration & Change Management Plan | 2/5/2018 | 11/28/2018 | 296 |
| Software Development Plan | 2/20/2018 | 11/29/2018 | 282 |
| Test Plan | 2/20/2018 | 2/12/2018 | -8 |
| Training Plan | 2/20/2018 | 12/18/2018 | 301 |
| Installation Plan | 2/5/2018 | 1/11/2019 | 340 |
| Operations & Maintenance Plan | 2/5/2018 | 12/20/2018 | 318 |
| Bill of Materials | 2/20/2018 | 12/20/2018 | 303 |
| Civil Design Calculations | 2/20/2018 | 3/28/2019 | 401 |
| Civil Design Drawings | 2/20/2018 | 11/16/2018 | 269 |
| Electrical Design Calculations | 2/20/2018 | 3/28/2019 | 401 |
| Electrical Design Drawings | 2/20/2018 | 11/16/2018 | 269 |
| Structural Design Calculations | 2/20/2018 | 11/16/2018 | 269 |
| Structural Design Drawings | 2/20/2018 | 3/28/2019 | 401 |
| Maintenance of Traffic Plans | 2/20/2018 | 11/16/2018 | 269 |
| System Design Requirements | 2/20/2018 | 4/10/2019 | 414 |
| 1. Document Overview | 2/21/2018 | 11/14/2018 | 266 |
| 2. System Overview | 2/21/2018 | 11/14/2018 | 266 |
| 3. Automatic Vehicle Detection & Classification System | 2/21/2018 | 11/14/2018 | 266 |
| 4. Automatic Vehicle Identification System | 2/21/2018 | 11/14/2018 | 266 |
| 5. Violation Enforcement System | 2/21/2018 | 11/14/2018 | 266 |
| 6. Digital Video Audit System | 2/21/2018 | 11/14/2018 | 266 |
| 7. Toll Management Console | 2/21/2018 | 11/30/2018 | 282 |
| 8. Open Road Tolling (ORT) Zone Design | 2/21/2018 | 11/14/2018 | 266 |
| 9. Traditional Lane Design | 2/21/2018 | 11/14/2018 | 266 |
| 10. Cash Management System (Vaults) | 2/21/2018 | 12/3/2018 | 285 |
| 11. Software & Database Design | 2/21/2018 | 12/3/2018 | 285 |
| 12. Reports | 2/21/2018 | 11/15/2018 | 267 |
| 13. Insight (MOMS) | 2/21/2018 | 11/15/2018 | 267 |
| 14. Degraded Mode of Operation | 2/21/2018 | 11/15/2018 | 267 |
| 15. Network Communications & Time Synchronization | 2/21/2018 | 11/15/2018 | 267 |
| 16. Toll Schedules | 2/21/2018 | 12/3/2018 | 285 |
| 17. External Interfaces | 2/21/2018 | 12/3/2018 | 285 |

| | | | |
|---|---|---|---|
| 18.  Host Hardware and Software | 2/21/2018 | 11/15/2018 | 267 |
| 19.  Door Access Control | 2/21/2018 | 12/3/2018 | 285 |
| 20.  Toll System Hardware | 2/21/2018 | 11/15/2018 | 267 |
| Factory Acceptance Test Procedures & Scripts | 2/20/2018 | 3/29/2019 | 402 |
| Revenue Service Acceptance Test Procedures & Scripts | 2/20/2018 | 4/1/2019 | 405 |
| Project Acceptance Test Procedures & Scripts | 2/20/2018 | 3/29/2019 | 402 |
| System Administrator Manual | 2/20/2018 | 12/4/2018 | 287 |
| Plaza Supervisor Manual | 2/20/2018 | 12/18/2018 | 301 |
| Toll Collection Attendant Manual | 2/20/2018 | 12/18/2018 | 301 |
| System Maintenance Manual | 2/20/2018 | 1/23/2019 | 337 |
| System Operation Overview Instructor Guide | 2/20/2018 | 2/22/2019 | 367 |
| System Audit Instructor Guide | 2/20/2018 | 3/19/2019 | 392 |
| System Toll Collection Attendant Instructor Guide | 2/20/2018 | 2/25/2019 | 370 |
| System Administrator Attendant Instructor Guide | 2/20/2018 | 3/21/2020 | 760 |
| System Operation Overview Training Aids | 2/20/2018 | 2/22/2019 | 367 |
| System Audit Training Aids | 2/20/2018 | 3/19/2019 | 392 |
| System Toll Collection Attendant Training Aids | 2/20/2018 | 2/5/2019 | 350 |
| System Administrator Training Aids * | | | |
| System Operations Overview Student Workbook | 2/20/2018 | 2/22/2019 | 367 |
| System Audit Student Workbook | 2/20/2018 | 3/19/2019 | 392 |
| System Toll Collection Attendant Student Workbook | 2/20/2018 | 2/25/2019 | 370 |
| System Administrator Student Workbook | 2/20/2018 | 3/21/2019 | 394 |
| Detailed Design Specifications | 2/20/2018 | 11/16/2018 | 269 |
| Shop Drawings | 2/20/2018 | 12/14/2018 | 297 |

The documented delay, shown in the previous tables, amounts to 18,632 days total.

The Technical Specifications require the Authority to review and comment on TransCore's submittals within a minimum of 21 days.  By providing the Authority at least 21 days to review submissions, the Agreement prevents the scenario where project documents are held until the last minute and then dumped on the Authority.  TransCore was encouraged to make partial deliveries of each submittal to avoid creating a backlog in RMTA's review and comment process.  Therefore, TransCore inaccurately documented what is characterizes as RMTA's missed response cycles on 56 separate occasions but admitted they were nominal, except for 3 occasions, each of which were on issues exacerbated by inadequate or late submissions on the part of TransCore. These three issues are discussed in detail on previous pages.

The Consultant maintains the right to supplement this report based upon information produced by TransCore in support of its claims.

## VI.    Complete fulfillment of tasks

To evaluate the true status of a project, one must go beyond schedule and assess the level of detail that has been completed in each project Milestone. Complete fulfillment of tasks is demonstrated by the lack of detail developed for each task in the toll systems development process. When detail in one phase is lacking or deferred to future phases, the potential increases for system failures or at least poor system performance.

The first two Milestones, Baseline Schedule agreement and Management Plan, ultimately were successfully completed, but did not contain system definition requirements like those of the IDR and MDR. System definition progression is expected through the initial, midpoint, and 100% design review Milestones. These three stages move the system design from a conceptual to a final detailed description of the toll collection system. During the IDR there was considerable delay and a documented lack of system definition detail. At the present time the contractor is in the MDR phase and the detail provided by contractor is insufficient to permit completion of the MDR.

The concessions made by RMTA are an indication of TransCore's lack of detail in defining the system, how it would be installed in the existing infrastructure and how the revenue collection process would be transitioned from the old system to the new. In an effort to keep the project moving, several concessions were made by RMTA. TransCore agreed that these incomplete elements of the IDR would be satisfied in the MDR, but to date many of these tasks remain incomplete.

## VII.    TransCore Cessation of Work

Sections 7.12 and 7.14 of the Agreement prohibit TransCore from withholding or disrupting any service or work under the Agreement due to a dispute over payment by RMTA. The purposes of these provisions in the Consultant's experience is to prevent contractors from using billing practices to hold the Project hostage. This is precisely what TransCore has done in the instant case with the Equipment Invoice.

**It is customary for toll system agreements to include provisions preventing the cessation of work and highly unusual to do so in exchange for paying an invoice. TransCore has ceased work on the Project in violation of the Agreement. Further, toll system project agreements typically contain provisions for assuring completion in the form of a performance bond.**

Section 26 of the Agreement permits RMTA to seek adequate assurances from TransCore in the event RMTA becomes insecure about the prospect of compliance under the Agreement. **RMTA reasonably sought adequate assurances from TransCore on November 8, 2019, once TransCore had ceased work. Although required to respond within five days under the Agreement, TransCore has provided RMTA no adequate assurances.**

## VIII.    Equipment Invoice

On June 4, 2019 TransCore sent invoice number 30516 to RMTA in the amount of $6,434,683.35 consisting of $2,598,381.22 for "TransCore Equipment" and $3,836,302.13 for "All Other Equipment". As of June 4, 2019, the Project was well over a year delayed.

Many of the items invoiced actually appear to have been purchased in 2018.  For example, on August 30, 2018, TransCore purportedly paid for the items identified as "KAPSCH JANUS MPR2.3 REDUNDANT" and "KAPSCH MP2.3 LANE KIT (MRFM-S[)]" in the amounts of $166,763 and $260,000 respectively.  As of that date, the Project was already well behind schedule and IDR was not completed until more than two months later.  Even if the equipment had been ordered only 30 days before, in July 2018, which is highly unlikely, TransCore could not have reasonably known what products would ultimately have been needed and there is no justifiable reason for making a purchase for the Project that early.  Additionally, there could be no legitimate reason for purchasing a product for the Project and then not invoicing until almost 9 months later.

It is my understanding that RMTA has requested the underlying invoices that comprise the Equipment Invoice from TransCore, but that information has not been provided to date.  A complete assessment of the need for the equipment invoiced cannot be made without a review of the underlying invoices that comprise the Invoice.  Accordingly, I reserve the right to supplement this portion of my Report when such documents are provided.

**It is highly unusual in the industry to invoice for toll system equipment when the Project is so far from complete, and when the design is so incomplete.** It is my understanding that there remain discrepancies in the Bill of Materials submitted to date raising questions regarding the specific equipment needed for the Project. Any equipment invoiced must comport with the requirements of the Agreement and certainly be in comformance with an approved Bill of Materials. RMTA did not waive any requirements of TransCore under the Agreement.

On the award date of the contract, September 27, 2017, a letter from the Chief Executive Officer of the RMTA documented the position of RMTA as to the willingness to pay for Toll System Equipment, as defined in the Agreement, outside of the Milestone process (the "Letter Agreement").  The Letter Agreement further requires that "Contractor must fully satisfy all approved test case requirements in the Factory Acceptance Test Plan."  The Letter Agreement expressly states that its purpose is not to forgive or waive any of TransCore's obligations under the Agreement.


## IX.    Liquated Damages

**Liquidated damages are reasonable and customary in the toll industry.**
**Liquidated damages are industry standard and were appropriately included in the Agreement.**  To account for monetary damages resulting from delay  in the ability to efficiently collect revenue, and because these delay damages are difficult to calculate, it is an industry standard practice to require liquidated damages provisions.

Because it is difficult to calculate, and agree on damages, related to lost revenues, an amount of $3,100 was established in the Agreement. The specific wording in the agreement is *"$3,100 for each day of delay or portion thereof"…* *"where [TransCore] does not successfully complete Revenue Service Acceptance Test ("RSAT") of all material parts of the Base Work in accordance with the terms of the Agreement by September 27, 2019."*

RMTA collects over $42 million a year in toll revenue or $115,000 a day, therefore, lost revenue damages are significant and could, and soon will, exceed the maximum liquidated damages agreed to in the contract of $1,131,500, one year of liquidated damages, very quickly.

## A. DIRECT DAMAGES

**RMTA has incurred, and continues to incur, direct damages as a result of TransCore's delay and refusal to continue work under the Agreement. Such damages include increased Project costs, including operational and maintenance costs, as well as mitigation costs, as shown by the records of, and testified to by, RMTA.**

**In the event the Agreement is terminated by RMTA, in addition to the increased Project costs set forth above, RMTA's damages should include costs for RFP development and procurement, all amounts paid to TransCore under the Agreement, and any cost differential for completion of the Project.**

Damages to RMTA resulting from TransCore's delay in the completion of its obligations under the Agreement are composed of direct costs that RMTA would not otherwise have incurred. Direct costs include increased Project costs, including operation and maintenance costs. Direct costs further include those required to support the continued Project development beyond the planned RSAT date, including staff dedicated to the Project and consultants who assist in the management of the Project.

However, a greater concern is the ability to continue to maintain the current system to accurately and completely collect tolls and the increased maintenance costs charged by TransCore. As equipment ages, maintenance costs rise as components wear out and have to be replaced. Further, working with legacy equipment can be inefficient to operate. Eventually equipment will need to be replaced because it can no longer be kept in working order. Parts often are no longer available or the company no longer services the device. Any such costs incurred by RMTA are the direct result of TransCore's delay and work stoppage and are shown by the records of RMTA and will be testified to by RMTA.

In addition to increased Project costs, RMTA has incurred and will continue to incur mitigation costs RMTA would testify to at trial. As an example, RMTA has expended funds for an ORT solution and recommissioned ACM lanes so that ACMs can be cannibalized for spare parts.

TransCore is under contract to maintain the current system and is fully aware of the legacy equipment. The end-of-life condition of the existing toll system is the primary reason RMTA undertook the procurement of the Agreement, now almost three years ago. TransCore is responsible for these damages under the Agreement.

Additionally, in the event that the Agreement is terminated as a result of TransCore's breach, there would be additional direct damages incurred including reimbursement of the approximately $1.4 million paid to TransCore under the Agreement and costs equal to, if not greater than, the $567,461 that RMTA previously spent on the RFP process for the Project, as will be testified to by RMTA.

## X.    Summary

The Project is significantly delayed and many elements of detail have been deferred to later stages in an effort to keep the Project progressing. Either insufficient resources have been applied by TransCore or the personnel assigned by TransCore were not sufficiently skilled to accomplish the tasks at hand. In either case, RMTA remains committed to the Project, and continues to incur damages daily as a result of TransCore's failures to comply with the Agreement.

XI.    Appendix A – Curriculum Vitae

**Harold W. Worrall, PhD, PE**

**Education**

BS Civil Engineering, University of Illinois

MBA, University of Illinois

Ph.D. Public Policy, Virginia Commonwealth University

**Experience**

**Transportation Innovations, Inc.  2004 – Present**

Upon leaving the Orlando-Orange County Expressway Authority, Dr. Worrall formed Transportation Innovations with a focus on the toll and ITS practice areas. He has consulted with over 60 public and private agencies assisted with mergers and consulted with a number of private sector consortia. The client list includes firms engaged in toll technology, engineering, asset management, financial advice, transportation operations and integration.

**Orlando-Orange County Expressway Authority 1992- 2004**

Dr. Worrall joined the Orlando-Orange County Expressway Authority (OOCEA) as the Executive Director in May of 1992.  He was the chief operating officer for the agency guiding the functions of engineering, construction, planning, toll operations and finance.  The Authority is now a five county organization with revenues approaching $500 MM annually and 125 centerline miles of four lane limited access toll motorways.  He led the original development of the agency's five-year capital program and the annual updates. He was instrumental in the implementation of electronic toll collection (EPASS) on 200 lanes and other improvements that brought toll collection operations to high levels of accountability.  During his tenure he attracted over $195 million in state financial assistance.  Dr. Worrall was also involved in refinancing activities that generated net present value savings of over $47 million.  The Authority won international association innovation awards for six consecutive years and a total of eight during his twelve years at the agency.

**Florida Department of Transportation 1989 - 1992**

Dr. Worrall was the Assistant Secretary of Finance and Administration for the Florida Department of Transportation.  He was responsible for the financial, program planning, toll operations, information systems, personnel and general administration of the department.  He served in a liaison capacity to the Transportation Commission and the Legislature on financial and capital program matters.  With a budget of $4 billion and 9,000 personnel, the Florida Department of Transportation was one of the largest in the nation.

**Utah Department of Transportation 1985 - 1989**

Dr. Worrall served as Comptroller with the Utah Department of Transportation and was responsible for the budget and financial functions of UDOT. He was the principal liaison with the Utah Legislature on financial matters and the capital work program and prepared various funding strategies for public/private participation in transportation facilities development. He provided guidance to the information systems division particularly on matters concerning finance. He also served as a principal liaison with the Transportation Commission.

**Virginia Department of Transportation 1981 – 1985**

In 1981 Dr. Worrall accepted the position of Director of Finance with the Virginia Department of Highways and Transportation reporting directly to the Commissioner of Transportation. Dr. Worrall was the chief budget and financial officer of the department and served in a liaison capacity to the Virginia General Assembly on financial matters. He was instrumental in preparing bond issues for several toll facilities and participated in a number of federal and state financial studies sponsored by AASHTO. His responsibilities included the engineering and administrative information systems of the department

**R.J. Hansen Associates 1973 - 1981**

Dr. Worrall served as project manager on the development of several transportation information systems and management studies nationally, and later as project director. Project conceptual areas included program/project management, financial management, construction management, and materials testing. His experience included work in the province of Alberta, several state transportation departments and King County in the state of Washington. Dr. Worrall continued to serve the firm as the principal in charge of state highway and transportation department projects and was subsequently given the responsibility of Vice President of the Midwest Region. In this capacity he was responsible for the marketing and performance of several projects for governmental agencies primarily in transportation. In addition, he served as an advisor on transportation management studies for the firm nationwide.

**Illinois Department of Transportation 1969 - 1973**

Dr. Worrall served in an engineering capacity with the Illinois Department of Transportation and gained experience in the research, planning and computer science divisions. As the section manager in charge of engineering computing department-wide, Dr. Worrall was responsible for the development of a number of engineering systems for design, hydraulics, structural analysis, and geometric analysis. He provided training in the use of most of the engineering application systems used in the department.

**Professional Activities**

Dr. Worrall is a Registered Professional Engineer in Illinois, Virginia, and Florida and is a member of the Florida Engineering Society, the International Bridge Tunnel and Turnpike Association and the Intelligent Transportation Society of America. He is a past President and member of the Board of Directors of the International Bridge, Tunnel and Turnpike Association (IBTTA), Past Chair and member of the Board of Intelligent Transportation Systems of America (ITS America), the President and Chairman of the Board of ITS Florida Chapter of ITS America and served on various committees on each. He has served on the curriculum advisory committee of the Engineering

School at the University of Central Florida and on the curriculum advisory committee in the School of Public Administration. He also served as Chairman of the Board of Citilog, a video detection and technology company headquartered in Paris, France.

## Publications, Presentations and Academics

Dr. Worrall is the author of numerous transportation management studies and has published articles on information systems, public finance, toll technology, intelligent transportation systems and management of transportation agencies for association journals, several international technology magazines, and other publications in the U.S. (a sample listing of publications follows these vitae). He has taught masters level courses in public finance at Virginia Commonwealth University, Management of Information Technology at the University of Central Florida. He has been a guest lecturer at George Mason University and the University of Michigan on the subject of Intelligent Transportation Systems. He has presented executive level courses on the subject of information systems and management at the AASHTO Transportation Executive Institute at the University of Virginia and has presented various topics at national and regional meetings of AASHTO, IBTTA and ITSA. He was an instructor at the first IBTTA Leadership Academy. His book "A System at Risk, *The Economics of Transportation*" published in 2005 is still in print.

## Personal and Civic Affiliations

Dr. Worrall was previously a member of the Governing Board of the Orlando Regional Chamber of Commerce and member of the Corporate Council of the Economic Development Commission.

Dr. Worrall was a member of the board and Executive Committee of the Coalition for the Homeless and past Chair of the Board.

## XII. Sample of toll system related articles published

*"A Customer Centric AETC Strategy"*, Thinking Highways Magazine.

*"ETC and the Infrequent Customer"*, TollTrans International Magazine

*"A Career in Modeling: the U.S. Public Toll Company"*, Thinking Highways Magazine

*"Will ORT Become a Reality"*, ITS International.

*"ETC and Institutional Momentum"*, Thinking Highways Magazine.

*"Electronic Tolling of Major Truck Routes in the U.S."*, ITS International.

*"The Future of Electronic tolling"*, Thinking Highways Magazine.

*"When the Music Stops"*, Thinking Highways Magazine.

*"A US Concession Model"*, Thinking Highways Magazine.

*"The Many Facets of Electronic Toll Collection Interoperability"*, ITS World Congress, London, England.

*"RFID Standards in the Toll Industry"*, ITS International.

*"Violation Enforcement – the Path to All-Electronic-Toll-Collection (AETC),"* ITS International.

*"International Toll Interoperability Models,"* South African National Toll Roads Ltd.

*"The Path to Open Road Tolling,"* Tollways Magazine.

*"ORT Thinking Outside the Box,"* TollTrans International Magazine.

*"Technology Solutions Through Partnership,"* Traffic Technology.

The opinions in this report are my own, based on my training, experiences, education, and review of the relevant documentation sent to me. As additional material and evidence is brought forward and made available to me, I may add to and amend my opinions.

Harold W. Worrall