# EXHIBIT 3

# Supplemental Expert Consultant Report

RMTA Toll System Replacement Project

**Harold W. Worrall, PhD, P.E.**
**10/25/2020**



Table of Contents

Additional Information Reviewed ........................................................................................... 2
Project Systems Design Approach .......................................................................................... 2
Project Scheduling ................................................................................................................. 3
Project Issues of Concern ....................................................................................................... 4
    Reuse of Conduit ............................................................................................................... 4
    Adequacy of Design Drawings ............................................................................................ 5
    Removal of Treadles .......................................................................................................... 5
    VDOT CSC Interface ........................................................................................................... 6
    VITA and SSAE Certification ............................................................................................... 6
Project Delay ......................................................................................................................... 6
    RMTA Did Not Cause Delay to the Project ......................................................................... 7
    Powhite Shoulder .............................................................................................................. 7
    MLT Simulator ................................................................................................................... 8
    ISF Solution ....................................................................................................................... 8
Equipment Purchases ............................................................................................................ 8
Damages ................................................................................................................................ 9



## Additional Information Reviewed

The following information is intended as a supplement to information contained in my previous expert witness reports based on the review of information exchanged in discovery and the deposition testimony of critical TransCore and RMTA witnesses. At the time of the issuance of my initial report on July 15, 2020, and my rebuttal report on August 24, 2020, no depositions had been conducted. The following list of documents is indicative of additional documents reviewed:

- Depositions of TransCore and RMTA personnel and exhibits used in those depositions
- TransCore Expert Disclosures
- Emails and other written project team communications
- CPM and other scheduling data
- Exhibits accompanying court submissions and depositions

## Project Systems Design Approach

The concept of systems design is clearly demonstrated by the V diagram contained in the TransCore Proposal on page 4-8 of 146 in section 4.1.2.1 and prescribes five levels to reach the detailed design stage; "*concept of operations, high level requirements, detailed requirements, high level design, detailed design*". It parallels the systems approach outlined in TS-01 and more specifically section 4.3.1.6 of the technical specifications accompanying the RMTA RFP.

The Project Systems Design Approach is iterative in nature and anticipates the following steps:

1. Integrator submits design documents
2. RMTA reviews the submissions and comments
3. Weekly project meetings occur in which the comments are discussed, addressed by TransCore and a resolution is reached or resubmittal occurs for further discussion
4. These meetings are documented in detail
5. RMTA approval of the documents closes the milestone and the milestone payment is made

This approach is clearly documented in the RFP and the technical specifications but was not followed as evidenced by the testimony of the Project Manager and Master Scheduler.

TransCore approached the project with the view that the Milestone approvals are of no benefit to TransCore, a task of annoyance rather than a useful approach to communicating and complying with Project requirements. In TransCore's Opposition Expert Disclosure, the Project Manager opines "*Certain aspects of the project development and scheduling process are for the benefit of the agency only, such as the gated milestone approach adopted for the Project".* Further, he states, "*Until the liquidated damages cap is reached, RMTA's risk is delay.*" There is no recognition that RMTA bears the ultimate risk of not timely receiving a system to replace the current aged system. Liquidated damages at the capped amount account for at most a year of delay. TransCore is well over a year delayed. The quality of a submission is crucial to keeping a project on schedule, increasing the likelihood of success. However, TransCore's Project Manager opines in his expert disclosure, "*Delaying decisions to later stages of the Project …. benefits the project and increases the risk of success."* This is an extraordinary statement by someone responsible for the quality of work in progress.



The deposition of TransCore's Master Scheduler established that TransCore's position as set forth in the Expert Disclosures of its Project Manager was not rhetoric, but fully incorporated into the Project's baseline and recovery schedules. When the TransCore Master Scheduler was asked about other Milestone projects carried out by TransCore, she stated, "they are high risk". Further, she indicated that she recommended that the Milestone approval process be bypassed entirely. It is further demonstrated that there is little understanding of the technical approach to be followed when asked, "*And were you aware when you reviewed the RFP and the tolling specifications, that resubmission is required for the design review milestones until it is approved by RMTA*?", response "*That is a broad statement. It was not part of the original baseline plan*." When asked, "*is it industry standard to have a single submittal for design review milestones*?" the response was, "*when there are multiple design review milestone phases, yes*." This indicates that the Master Scheduler anticipated only one submission for each milestone with automatic approvals, and scheduled accordingly. TransCore's Master Scheduler conceded that all schedules developed by TransCore, including the November 2018 recovery schedule upon which the Master Scheduler and Project Manager rely, were developed based upon the mere act of producing a submission regardless of whether content meets the technical specification. When the Master Scheduler was asked about TransCore's own systems engineering approach in scheduling, "*Do you know what the systems engineering approach is?*", the response was, "*I do not. I have seen the diagram.*"

TransCore's approach of approve now and conform later should changes be required is not consistent with the systems engineering process and the contract documents and transfers control of the Project from the owner to the vendor. Although TransCore contends that changes may occur later, it did not contemplate redesign in its scheduling.

## Project Scheduling

The systems engineering process, required by the contract, ensures that the owner will have knowledge of the status of the Project through a clearly defined schedule and an understanding of what constitutes progress.

As demonstrated in the discussion of the systems approach as compared to TransCore's scheduling practices, TransCore's focus on scheduling has been almost independent of Project Milestones and has focused on arriving at the RSAT. While TransCore contends that it has performed a critical path analysis, its Master Scheduler conceded the critical path was a software calculation not a deliberate decision by TransCore. TransCore first rejects the obvious notion that the Milestones define the critical path in the first three Milestones (up through IDR), but later accepts that MDR represented the critical path in its attempt to establish that RMTA delayed the Project. The TransCore perspective of scheduling disregards the Milestones. In fact, the Master Scheduler suggested that the recovery schedules actually depended upon RMTA agreeing to "a relaxation of gates", meaning the Milestones, an act RMTA was not contractually obligated to do. It appears that TransCore ceased recovery efforts when RMTA refused to remove the contractual Milestone approval process.

Beyond the disregard for Milestone process control, It is evident from the additional materials reviewed that the Master Scheduler views the submission of materials for each Milestone as sufficient to satisfy



Milestone requirements regardless of submission content or owner approval. This perspective is neither consistent nor compliant with Project control concepts imbedded in the contract provisions.

As made clear in the deposition, the Master Scheduler for TransCore developed schedules with the following anomalies:

- Assumption that all submittals represent task completion
- No consideration for resource availability
- Ignorance of TransCore's own systems approach which the Master Scheduler is unfamiliar
- Calculates delay based strictly on CPM dates regardless of Milestone documentation content, approval or resource constraint

TransCore's Master Scheduler relies exclusively on the November 2018 recovery for the proposition that TransCore could make up the delay on the Project and, after review, had the following inconsistencies with the accepted contract provisions as follows:

- Acceptance of the MDR based upon November 2018 submittals, which were withdrawn by TransCore
- Approvals upon submission of each design Milestone with no corrective action or resubmission
  - MDR
  - 100%DR
  - IRDR
- Passing of the FAT immediately
- Passing of the RSAT immediately
- Reduction of installation time from 271 days to 161 days
- No provision for re-design or resource constraints

## Project Issues of Concern

The following issues of concern and the lack of resolution contributed in RMTA being unable to approve the MDR and move the project forward.

### Reuse of Conduit

Sections TS-04 # 5-1, TS-05 #5-1, TS-06 #5-1, prohibit reuse of any element of the existing system. TS-03, section 2.2-2 states, "*If re-use of an existing toll system element is not specifically allowed, or if the Contractor determines that re-use is not appropriate, the Contractor shall remove and properly dispose of all such items in accordance with all federal, state and local statutes.*" TransCore was responsible for surveying existing equipment and suggesting reuse of various toll elements. TransCore interprets this specification to mean that they have been given carte blanche to reuse any existing toll system elements and that they may make that decision at any point even during the installation stage, for example when running wires through conduits. The Project Manager opines in the expert opposition disclosure "*TransCore did not request the reuse of underground and island conduit. The agreement provides TransCore the right to reuse underground and island conduit if TransCore determines it is acceptable for reuse.*"



RMTA contracted for a full parts and labor warranty that extends throughout all Operations and Maintenance portions of the Agreement. This very expensive warranty is already priced into the Agreement's fixed flat-fee monthly Operation and Maintenance amounts. TS-02, section 7.1 states, "*The Contractor shall procure, ship, stock, secure, furnish and install all Toll System elements used to repair Toll System performance degradation and failures caused by manufacturing defect; installation method; and the age of the component*".

Because RMTA procured this extended warranty on a full replacement system, any reuse of toll systems elements, including conduit, would need to preserve this very expensive "full bumper-to-bumper" warranty that is already priced into TransCore's 10 years of fixed flat-fee monthly Operation and Maintenance services.

### Adequacy of Design Drawings

The IDR drawings were to be, as a whole, 40% complete. The MDR drawings were to be 80%, as a whole complete, and 100% drawings are to be 100% complete. TransCore's Project Manager opines in the expert opposition disclosure, "*The Agreement does not require that details of existing facilities be documented in detail design drawings for MDR", which is to be 80% complete.* A review of the submissions made in July 2018 for the IDR, those in November 2018, January 2019 and March 2019 demonstrate little progress in terms of additional information and nothing about existing tolling elements. TS-01, section 11.3.3-8 states "*The Detailed Design Drawings shall identify all items furnished by the Contractor, all existing items to be removed by the Contractor and all existing items to be re-used by the Contractor.*" Considering the progress made from July 2018 to March 2019 and considering MDR drawings should be 80%, as a whole, complete, existing tolling elements should be identified to determine potential conflicts that may exist when installation begins. Further, those elements that are to be reused to be defined to ensure that the BOM accurately reflects what needs to be purchased or manufactured. Section 11.3.3-11 states "*Contractor shall have the Engineer Of Record prepare and approve specifications and drawings such that they do not contain conflicting information. In the event conflicting information is found, the requirements shown on Detailed Design Drawings shall supersede the requirements contained in the Detailed Design Specifications*." The March 2019 drawings, which TransCore contends were 100% complete, contained an inconsistency in design between the civil and electrical drawings.

### Removal of Treadles

On page 106 of 146 in the TransCore Proposal in the first paragraph is the following statement, "*There are 12 lanes that still contain treadles. In these lanes we would remove the treadle, frame and a 12 foot by 6 foot section of the surrounding concrete. We will clean up and dispose of the spoils and then pour a new concrete section.*" In TransCore's Proposal, this statement pledges to RMTA to remove treadles, treadle frames and pour new concrete sections. Instead, after first agreeing to achieve standard lane geometries, TransCore decided to design the software so that treadles and frames would not have to be removed for their system to operate and thereby creating differing lane geometries. In express opposition to technical specification TS-06 section 5-1 as follows; "…, *re-use of any existing toll system*



*equipment is not allowed and the Contractor shall remove, scrap for zero value and dispose of all such elements including but not limited to toll system equipment mounted on the canopy, on the toll island, in the toll booth and in the personnel tunnel; cabling; exposed conduit; mounting hardware; and enclosures at each of the locations….".* Since treadles are a part of the existing toll system equipment, they should have been removed. Further, TransCore chose to ignore the promise to remove treadles in its Proposal and to comply with the technical specifications and design the software to operate around existing treadles, leaving RMTA with treadles and frames which are of no use and could create a hazard to travel. RMTA agreed to remove the treadles and treadle frames at their cost to keep the project moving forward and get back to the traditional lane geometry agreed to by the parties.

### VDOT CSC Interface

Technical Specification TS-01, section 4.2.4-22 states, "*Prior to successful completion of the Midpoint Design Review Milestone, the Contractor shall demonstrate the Toll System's use of the complete interface with the VDOT's E-ZPass Customer Service Center."* This requirement appeared on TransCore's baseline schedule and was not disputed by TransCore at any point. The central issue is the requirement to match transactions and image capture information at the VDOT CSC because of the network restrictions. In the expert opposition disclosure, the Project Manager stated, "TransCore's design for RMTA's system accomplishes this combined transmission." During the litigation, TransCore has taken the position that a demonstration is not possible because the RMTA toll system is not yet fully designed or installed.  Obviously, a fully developed and tested system would not be available at MDR. According to all witnesses, including TransCore's Project Manager, such a demonstration did not require hardware. The Project Manager stated in the deposition in response to how an interface demonstration might occur, "*On our side we would need something to contain the information that we would use to talk to the interface…..Could be as easy as a flash drive."*  A demonstration of another system does not ensure that the RMTA network issues would be resolved.  The TransCore Project Manager could not answer questions about how the proposed Dulles Toll Road System compared to the RMTA system.

### VITA and SSAE Certification

The Virginia Information Technologies Agency (VITA) standards and the Statement on Standards for Attestation Engagements  (SSAE) are requirements set out in the RFP. TransCore summarily states it is VITA compliant, yet internal e-mail communications establish otherwise. "*The reality is that we probably aren't meeting VITA requirements, and it's a relatively large undertaking to do so".* When counsel asked in Mr. Mickle's deposition, "*It was not communicated to RMTA that they were not being met as of March 6th?*", Mr. Mickle responded, "*There's no requirement for us to notify them at that point*." In effect neither of these required audit standards was going to be met.

### Project Delay

The definition of schedule delay should be measured as the planned versus actual date for accomplishing a Milestone. This would be consistent with the RFP, Technical Specifications and contract agreement and is the reason that integrator payments were specified by Milestone in the contract agreement. It is the measure by which the Consultant reported project progress. From depositions and



expert opposition disclosures, TransCore's concept of delay relies on the TransCore CPM schedule for TransCore activities exclusive of Milestone considerations.

Considerable information has previously been presented about the manner in which TransCore develops and maintains schedules. In the deposition of the Master Scheduler, counsel inquired as to how 112 days of float in a schedule could have been recovered between February and March of 2018 and was told there was a schedule update.  As is clear from the testimony of the Master Scheduler, there was no regard given to content or quality of submissions.

The primary issue in calculating delay according to the technical specifications is the planned date for completion of Milestones and the actual date for the completion of Milestones. TransCore's method of calculating delay focuses on the activities to be accomplished for procurement, installation and Infinity system configuration. The CPM methods are not compliant with the Milestone approval process and the contract.

TransCore prepared a recovery schedule in November of 2018 that was based on submissions that were withdrawn without allowing for RMTA approval review. The schedule was based on an assumption that all design and test approvals would occur nearly immediately upon submission and without consideration for personnel resources available, a pervasive issue throughout the Project. It was this schedule that resulted in TransCore stating that they were only 56 days delayed and had plans for getting back on schedule.

## RMTA Did Not Cause Delay to the Project

### Deliverable Log
TransCore's Project Manager prepared the deliverable log that is attached to TransCore's Claim Letter and Complaint.  The Deliverable Log purports to represent the number of review days by RMTA, highlighting that in some instances RMTA took over 21 days to review certain submissions.  During the deposition of TransCore's Project Manager, it became evident that this log is unreliable.  It is based on the assumption that RMTA has a maximum, as opposed to a minimum, of 21 days to review as set forth in the contract.  It also fails to consider the time TransCore took to respond to RMTA comments and to schedule review meetings on those comments, both of which are critical to determining any schedule impact of review time.  A draft of the deliverable log was presented to TransCore's Project Manager at his deposition showing that TransCore took well over 21 days in some instances to respond to comments.  He could only testify that he believed that document to be a draft.  The document presented to RMTA and the Court is devoid of any information on TransCore's response times and therefore an unreliable compilation of review time.

### Powhite Shoulder
TransCore has asserted that RMTA caused schedule delay in MDR due the discussions between the parties related to outfitting the additional four feet of the Powhite SB Shoulder.  When calculating this supposed delay, TransCore's Project Manager conceded that he did not take into account the fact that TransCore took from February 2018 to December 2018 to provide RMTA a cost estimate for the



outfitting of the shoulder. TransCore's Master Scheduler conceded she did not know of the ten month delay by TransCore and had never reviewed the RFIs related to the Shoulder.

### MLT Simulator

TransCore has asserted that RMTA caused schedule delay in MDR related to the MLT Simulator but neither TransCore's Project Manager nor its Master Scheduler had reviewed any communications between the parties or the RFIs in calculating the amount of days RMTA caused such delay.

### ISF Solution

TransCore has asserted that RMTA caused schedule delay in MDR due to the ISF Solution. In the depositions of both TransCore's Project Manager and Master Scheduler, both conceded that they did not review the communications between TransCore and RMTA related to the ISF solution, including the lengthy back and forth by both parties in reaching a solution. TransCore's Master Scheduler admitted that she did not even review the RFIs related to ISF. Both also conceded that they did not take into account the fact that RMTA informed TransCore that any design implications could be addressed in the 100% Design Review and not MDR. The entire discussion related to ISF occurred because TransCore suggested that software modifications could be easily made to allow for an A/B buttons that would allow the operator to process ISF events differently in the Infinity system depending on whether a violation was to be assessed. After some time, TransCore came back with a solution that was too expensive for the frequency with which these events occurred. TransCore then committed to satisfying the specifications in the contract related to ISF. When it was unable to do so, RMTA concluded it was best to remove the requirement for a credit from TransCore for the removal of that requirement. No credit has been provided to RMTA.

### Equipment Purchases

The depositions of RMTA and TransCore witnesses establish that both parties performed the contract knowing that authorization was required to purchase equipment. The technical specifications require TransCore to develop a project management system that includes submittals for project performance which include comment logs and action item lists. Project submittals are critical to documenting resolutions between the owner and contractor and documents the need for approval of equipment purchases based on long lead times. From Project kickoff through the date of the invoice, TransCore communicated to RMTA it would seek authorization and operated consistent with that representation.

Since the initial expert review report, the Consultant has been able to review the TransCore invoice that was submitted to RMTA in June of 2019 and further information has become available. One purchase is particularly problematic and indicative of purchasing prematurely. It was determined that automatic coin machines purchased by TransCore from Conduent will not be supported and component parts (coin sorters) will not be readily available. In the deposition Counsel asked, "*ordering the ACMs early was a risk because after they were ordered, TransCore found out that Conduent is no longer going to manufacture them*", Mr. Mickle *"We did learn that",* Counsel*, "six days later you billed them for those ACMs, right? Without ever notifying them that a component of those ACMs would no longer be manufactured; is that correct?"* Mr. Mickle*, "That is correct".* Not only did TransCore invoice RMTA for equipment now obsolete, it intentionally withheld this information from RMTA. In later conversations



with Mr. Curtis of TransCore Mr. Curtis asked, "*How long are we planning to wait before we let the customer know of the changes?....Is there anything I need to be doing in advance of them finding out?*" and Mr. Mickle responds, ""*Nothing for you to do. We will wait as long as we can to notify the customer.*"

The definition of equipment to be purchased should be the result of developing a BOM as the design progresses and then the procurement of equipment that is contained in the BOM based on lead times, the analysis which was to be presented to RMTA for authorization. The BOM is developed as the design of the system is refined. In deposition testimony it appears that the BOM was updated as purchases were made. Once again the owner anticipates a design specific to their needs and TransCore provides a system and list of equipment that then needs to be documented on the BOM. The lead time analysis was critical and was to be shared with RMTA for RMTA approval. This was not done. TransCore further ignored the direction of RMTA not to purchase equipment until the schedule stabilized.

### Damages
I have reviewed the interrogatory responses and agree that RMTA would occur the damages asserted by RMTA related to expenses incurred for the procurement and management of the Project and increased maintenance costs for the current system following the contracted for installation date.


Harold W. Worrall, PhD, P.E.

*Harold W. Worrall*