# EXHIBIT 4

AGREEMENT

FOR

TOLL SYSTEM

AND SERVICES

between

RICHMOND METROPOLITAN TRANSPORTATION AUTHORITY

and

TRANSCORE, LP,
a Delaware limited partnership

Dated as of September 25, 2017

**Contents**

1.   Recitals..................................................................................................................1

2.   Definitions.............................................................................................................1

3.   Incorporation/Inclusion and Priority of Documents ...........................................2

4.   Scope of Toll Equipment Work ...........................................................................3

    4.1    Base Work...................................................................................................3
    4.2    Maintenance Work......................................................................................3
    4.3    Extra Work..................................................................................................3
    4.4    Change Orders ............................................................................................4
    4.5    Construction Change Directives .................................................................4
    4.6    Minor Changes in the Work........................................................................5
    4.7    Change in Applicable Law..........................................................................6

5.   Contract Term and Renewal. ...............................................................................6

6.   Contractor Responsibilities..................................................................................7

    6.1    Contractor Personnel..................................................................................7
    6.2    Contractor Program Manager .....................................................................7
    6.3    Permits, Licenses .......................................................................................7
    6.4    No Discrimination.......................................................................................7
    6.5    Drug Free Workplace..................................................................................8
    6.6    Cooperation................................................................................................8
    6.7    Meetings.....................................................................................................9
    6.8    Material Change in Contractor's Financial Condition.................................9
    6.9    Contractor-owned Facilities.......................................................................9
    6.10   Registration................................................................................................9
    6.11   Standard of Care ........................................................................................9
    6.12   Source of Supply and Quality Requirements............................................10
    6.13   Barricades and Warning Signs..................................................................10
    6.14   Bucket Truck; Traffic Management..........................................................10
    6.15   Contract (Performance) Bonds .................................................................10
    6.16   Pervasive Defects.....................................................................................11

7.   Pricing and Payment ..........................................................................................12

    7.1    Payment Amounts.....................................................................................12
    7.2    Payment Schedule.....................................................................................13
    7.3    Overpayment.............................................................................................13
    7.4    Withholding Payments..............................................................................13
    7.5    Payment not Acceptance...........................................................................13

7.6    Liquidated Damages/Price Adjustments ..................................................13
7.7    Net 30 Days ..........................................................................................13
7.8    Invoicing ..............................................................................................14
7.9    Monthly Draws ....................................................................................14
7.10   Right of Set Off ...................................................................................14
7.11   Full Compensation ..............................................................................14
7.12   Disputed Invoices ................................................................................15
7.13   No Late Fees ........................................................................................15
7.14   Contractor Not to Withhold ................................................................15
7.15   Payments to Subcontractor .................................................................15
7.16   Retainage .............................................................................................16
7.17   Final Payment ......................................................................................16

8.     Subcontracting and Assignment .....................................................................16

8.1    Subcontracting or Assignment ............................................................16
8.2    Subcontractor Assignments and Changes in Control ...........................17
8.3    Contractor Remains Responsible .........................................................17
8.4    Failure to Comply ...............................................................................17

9.     Warranties .....................................................................................................17

9.1    Express Warranties .............................................................................17
9.2    Third Party Warranties .......................................................................22
9.3    No Waiver ...........................................................................................22
9.4    Contractor Duty to Remedy ................................................................22
9.5    RMTA Cure .........................................................................................22
9.6    Remedies Not Exclusive .....................................................................23

10.    Relationship of the Parties .............................................................................23

11.    Proprietary Information ................................................................................23

12.    Title and Delivery .........................................................................................24

12.1   Title ....................................................................................................24
12.2   Shipping ..............................................................................................24
12.3   Delivery ..............................................................................................24
12.4   Risk of Loss ........................................................................................24
12.5   Storage of Material and Equipment ....................................................24

13.    Support Services ...........................................................................................25

13.1   Personnel .............................................................................................25
13.2   Delay by Third Party ..........................................................................25
13.3   RMTA's Right to Remove ...................................................................25

14.    Inspection ................................................................................25

15.    Delivery of Software ................................................................25

16.    Delay and Extensions of Time ..................................................26

17.    Liquidated Damages; Price Adjustments ....................................27

       17.1   Liquidated Damages ......................................................27
       17.2   Difficulty of Ascertaining Certain Damages ..................27
       17.3   Price Adjustments ........................................................28
       17.4   No Waiver; Reservation of Rights; Corrective Actions .....30

18.    Confidentiality ........................................................................31

       18.1   Confidential Information ................................................31
       18.2   Exclusions ..................................................................31
       18.3   Use Restriction ............................................................31
       18.4   Length of Confidentiality ..............................................32
       18.5   Return of Confidential Information ..................................32

19.    Indemnification ......................................................................32

       19.1   General Indemnification ................................................32
       19.2   Intellectual Property Indemnification ..............................33
       19.3   General ......................................................................34

20.    Limitation of Liability ..............................................................34

21.    Insurance ..............................................................................34

       21.1   Insurance Certificates ..................................................34
       21.2   Insurer Qualifications, Insurance Requirements ..............35
       21.3   Required Insurance Coverages ......................................35
       21.4   Termination of Obligation to Insure ..............................37
       21.5   Failure of Insurers ......................................................37
       21.6   Ongoing Coverage ......................................................37
       21.7   General ......................................................................38

22.    Non-exclusivity ......................................................................38

23.    Spare Parts ............................................................................38

24.    Reserved ................................................................................39

| 25. | Dispute Resolution | 39 |
|---|---|---|
| 26. | Adequate Assurances. | 39 |
| 27. | Event of Default; Damages/Remedies | 40 |
| | 27.1 Event of Default | 40 |
| | 27.2 RMTA Damages/Remedies | 41 |
| 28. | Cover | 42 |
| | 28.1 Withhold Payment | 42 |
| | 28.2 Replacements | 42 |
| 29. | Cooperation, Transition of Equipment, and End of Contract Responsibilities | 43 |
| | 29.1 Cooperation | 43 |
| | 29.2 Transition | 43 |
| | 29.3 End of Contract | 43 |
| | 29.4 Contractor Obligations | 43 |
| | 29.5 Failure to Comply | 44 |
| 30. | Termination. | 44 |
| | 30.1 Termination for Cause | 44 |
| | 30.2 Termination for Convenience | 45 |
| 31. | Conflicts of Interest | 45 |
| 32. | Records Retention and Audit Rights | 45 |
| 33. | Attachments | 46 |
| 34. | Cooperative Purchasing. | 46 |
| 35. | Miscellaneous Provisions | 47 |
| | 35.1. Compliance with Laws | 47 |
| | 35.2 Parties Bound | 47 |
| | 35.3 Time of the Essence; Force Majeure | 47 |
| | 35.4 Non-disparagement | 47 |
| | 35.5 Federal Intellectual Property Bankruptcy Protection Act | 47 |
| | 35.6 Governing Law | 48 |
| | 35.7 Notices | 48 |
| | 35.8 Compliance with Laws; Taxes | 48 |
| | 35.9 Publicity | 49 |

35.10   Reserved.................................................................49
35.11   Remedies Cumulative.......................................49
35.12   Waiver and Severability...................................49
35.13   No Third Party Beneficiaries...........................49
35.14   Interpretation......................................................49
35.15   Counterparts.......................................................50
35.16   Construction of Contract.................................50
35.17   Survival...............................................................50
35.18   Non-exclusivity.................................................50
35.19   Entire Contract; Amendment...........................50

ATTACHMENTS:

    A.    Request for Proposals
    B.    Contractor's Proposal
    C.    Pricing and Payment Schedules
    D.    Work Schedules
    E.    Form of Contract Bonds

# AGREEMENT FOR TOLL SYSTEM
# AND SERVICES

**THIS AGREEMENT FOR TOLL SYSTEM AND SERVICES** (this *"Agreement"*) is made and entered into as of the 25th day of September, 2017 (the *"Effective Date"*), between the **RICHMOND METROPOLITAN TRANSPORTATION AUTHORITY**, a political subdivision of the Commonwealth of Virginia (the *"Authority"* or *"RMTA"*), and **TRANSCORE, LP**, a Delaware limited partnership duly qualified to do business in the Commonwealth of Virginia (the *"Contractor"*).  In this Agreement, either RMTA or Contractor may be referred to individually as a *"Party"* or collectively as the *"Parties."*

**WHEREAS**, RMTA desires to engage a qualified and experienced contractor to provide certain goods and services as more particularly described in RMTA's Request for Proposals No. TSS – 2017 and all exhibits, attachments, schedules and any addenda thereto and any documents referenced therein (collectively, the *"RFP"*);

**WHEREAS**, Contractor has represented to RMTA that it is experienced, qualified and willing to provide such goods and services;

**WHEREAS**, RMTA has relied upon such representations to select Contractor for providing such goods and services;

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.   **Recitals**.  The recitals set forth above are true and correct and are incorporated into this Agreement.

2.   **Definitions**.   Certain terms used in this Agreement are defined above, while other capitalized terms not specifically defined in this Agreement shall have the same meaning assigned in the RFP to that term and the following words and phrases shall have the following meanings in this Agreement unless the context otherwise requires:

*Business Day* shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which the Authority or commercial banks in the Commonwealth of Virginia, are authorized by law to close, or (iii) such other days as the Authority may designate to Contractor.

*Civil Contractor* means any contractor, subcontractor or vendor performing any construction, installation, acquisition, renovation, equipping, engineering or similar work in, on, about or with respect to the RMTA Expressway System during the term of this Agreement.

*Commonwealth* or *State* shall mean the Commonwealth of Virginia.

*Days* or *days* shall mean calendar days unless otherwise specified in this Agreement.

*Implementation Documentation* shall mean all plans, calculations, specifications, drawings and other documents as described in TS-01, TS-03, TS-04, TS-05 and TS-06 (in this Agreement, "*TS-xx*" shall refer to the particular numbered Technical (or Tolling) Specification that is set forth in the RFP).

*Key Performance Indicator* is described in Section 17.3.

*Maintenance Documentation* shall mean those documents as described in TS-02.

*Pervasive Defect* is defined in Section 6.16.

*Project* or *Toll Equipment Work* shall mean the Base Work and Maintenance Work described in **Section 4** below.

*System* shall mean those elements of the RMTA toll collection system where Contractor has integrated, installed or provided hardware or software, all as the case may be, as provided under this Agreement and as set forth in the Contract Documents.

3.  **Incorporation/Inclusion and Priority of Documents.** The RFP, which is incorporated herein by reference as **Attachment A**, and Contractor's Proposal (and any documents referenced therein) submitted in response thereto, which is incorporated herein by reference as **Attachment B** (collectively, the "*Contractor's Proposal*"), are integral parts of this Agreement. The RFP, Contractor's Proposal, this Agreement (including all amendments, documents, attachments and exhibits referenced in this Agreement) and Contractor's Best and Final Offer dated August 25, 2017, shall be collectively referred to as the "*Contract Documents*" or the "*Agreement*" or this "*Agreement*" and shall govern the contractual relationship between Contractor and RMTA. Each of the Contract Documents is an essential part of the Agreement between Contractor and RMTA, and a requirement occurring in one is as binding as though occurring in all. The Contract Documents are intended to be complementary and to describe and provide for a complete agreement. In the event of a conflict among the Contract Documents, the Contract Documents shall control one over another in the following descending order of precedence:

    A.  Any formally executed amendments to this Agreement, and including changes pursuant to Sections 4.4 through 4.7 hereof;
    B.  This Agreement, including all exhibits, attachments and documents or agreements incorporated by reference;
    C.  The RFP, including all addenda, exhibits and attachments; and
    D.  Contractor's Proposal.

To the extent that the terms of the Contract Documents are in conflict, the Contract Documents shall take precedence based upon the order in which they are listed. If any element or term appears to conflict with any provision, specification, or requirement of any preceding or higher priority document, the apparent conflicting element or term shall

control only if such element or term is expressly addressed as an exception, reservation or caveat or exceeds the requirements set forth in Contract subject to mutual agreement by the parties. In all other instances of conflict, preceding or higher priority documents shall control.

4. **Scope of Toll Equipment Work.**

    4.1    <u>Base Work</u>. Contractor agrees to perform the design, integration, testing, installation and other work as described in the RFP and the Implementation Documentation, including but not limited to TS-01, TS-02, TS-03, TS-04, TS-05 and TS-06 and agrees to furnish the software, equipment, other hardware and documentation as described therein (collectively, the *"Base Work")*. All software, equipment, other hardware and documentation so furnished shall be free and clear of all liens and encumbrances, and not violate any Intellectual Property (as defined in **Section 9.1.3**) rights of any third party.

        All Base Work shall be completed by Contractor within the periods specified in the project schedule set forth in **Attachment D** of this Agreement (*"Base Work Schedule"*) and in full cooperation with RMTA and specified third parties as identified in **Section 6.6** below.

    4.2    <u>Maintenance Work</u>. Contractor agrees to provide maintenance, support and other services and perform other work as described in the RFP, including but not limited to TS-01 and TS-02 and agrees to furnish the software, hardware and documentation as described therein (collectively, the *"Maintenance Work")*. All Maintenance Work shall be completed by Contractor so as to meet or exceed the performance requirements specified in the RFP, including but not limited to TS-02 and in full cooperation with RMTA and specified third parties as identified in **Section 6.6** below.

    4.3    <u>Extra Work</u>. Changes in this Agreement or the work required as a result of the Authority's undertaking and implementation of "Extra Work" (as defined below) may be accomplished after execution of this Agreement, and without invalidating this Agreement, by change order, construction change directive or order for a minor change in this Agreement, as provided below. Changes in the System shall be performed under applicable provisions of this Agreement, and Contractor shall proceed promptly therewith, unless otherwise provided in the change order, construction change directive or order for a minor change in the System. If the unit prices are stated in this Agreement or subsequently agreed upon, and if quantities originally contemplated are so changed in a proposed change order or construction change directive that application of such unit prices to quantities of work on the System proposed will cause substantial inequity to the Authority or Contractor, the applicable unit prices shall be equitably adjusted.

        "Extra Work" shall mean the undertaking, installation, equipping and servicing of toll system equipment in and about the RMTA Expressway System as the Parties may agree to from time to time and that is not included in the Base Work or

Maintenance Work referred to above; provided that Extra Work does not include Contractor's alternate phased approach to the installation of automatic coin machines as described in Contractor's Proposal.

4.4     Change Orders.  A change order is a written instrument entered into between the Authority and Contractor stating their agreement upon items including but not limited to the following:

(1)     a change in the System or the Project;
(2)     the exercise of the options of the Authority described in **Section 4.3** above;
(3)     the amount of any adjustment in amounts due hereunder, as contemplated in **Attachment C (Pricing and Payment Schedules)**, with the understanding that pricing adjustments for items or pricing matters not contemplated under **Attachment C (Pricing and Payment Schedules)** may include those methods described under **Section 4.5**;
(4)     the extent of the adjustment in the **Schedule (Attachment D)**, if any, and
(5)     Any changes resulting from a change in applicable law as provided under **Section 4.7**.

4.5     Construction Change Directives.  A construction change directive is a written order signed by the Authority directing a change in the System and stating a proposed basis for adjustment, if any, in the **Pricing and Payment Schedules (Attachment C)** or the **Schedule (Attachment D)**, or both.  The Authority may by construction change directive, without invalidating this Agreement, order changes in the System within the general scope of this Agreement consisting of additions, deletions or other revisions of or to, the **Pricing and Payment Schedule (Attachment C)** or the **Schedule (Attachment D)** being adjusted accordingly.  A construction change directive shall be used in the absence of total agreement on the terms of a change order.  If the construction change directive provides for an adjustment to the **Pricing and Payment Schedules (Attachment C)**, the adjustment shall be based on one of the following methods:

(1)     mutual acceptance of a lump sum properly itemized and supported by sufficient data to permit evaluation;
(2)     unit prices stated in this Agreement, RFP or subsequently agreed upon;
(3)     cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed fee.

Upon receipt of a construction change directive, Contractor shall promptly proceed with the change in the work involved and advise the Authority of Contractor's agreement or disagreement with the method, if any, provided in the construction change directive for determining the proposed adjustment in the **Pricing and Payment Schedule (Attachment C)** or the **Schedule (Attachment D)**.  A construction change directive signed by Contractor indicates the agreement of Contractor therewith, including adjustment in the **Pricing and Payment**

Schedule (**Attachment C**) or the **Schedule (Attachment D)** or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a change order. If Contractor does not respond promptly or disagrees with the method the adjustment shall be determined by the Authority on the basis of reasonable expenditures and savings of those performing the work on the System attributable to the change, including, in case of an increase in the **Pricing and Payment Schedule (Attachment C),** a reasonable allowance for overhead and profit. In such case, Contractor shall keep and present, in such form as the Authority may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in this Agreement, cost shall be limited to the following:

(1)     cost of labor, including social security, unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

(2)     costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

(3)     rental costs of machinery and equipment, exclusive of hand tools, whether rented from Contractor or others;

(4)     costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the work; and

(5)     additional costs of supervision and field office personnel directly attributable to the change.

Pending final determination of cost to the Authority, amounts not in dispute may be included in applications for payment. The amount of credit to be allowed by Contractor to the Authority for a deletion or change which results in a net decrease in the **Pricing and Payment Schedule (Attachment C)** shall be actual net cost as confirmed by the Authority. When both additions and credits covering related work on the System, system maintenance or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

If the Authority and Contractor do not agree with the adjustment in **Attachment D (Schedule)** or the method for determining it, the adjustment or the method shall be referred to the CEO of the Authority for determination. When the Authority and Contractor ultimately reach agreement with any adjustments in the **Pricing and Payment Schedule (Attachment C)** or date of completion of the Toll Equipment Work/extension of **Schedule (Attachment D)**, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate change order.

4.6     Minor Changes in the Work.   The Authority will have authority to order minor changes in the Project not involving adjustment in the **Pricing and Payment Schedules (Attachment C)** or date of completion of the Toll Equipment Work or extension of the **Schedule (Attachment D)** and not inconsistent with the intent of

the Contract Documents. Such changes shall be effected by written order and shall be binding on the Authority and Contractor. Contractor shall carry out such written orders promptly.

4.7    Change in Applicable Law. Any final and unappealable change in federal or Virginia law, or court decisions which constitute binding precedent in Virginia, and which significantly alter Contractor's required activities or any change in the availability of funds, shall warrant good faith renegotiation of the compensation paid by or due to Contractor from the Authority and of such other provisions of this Agreement that are affected.

If any other changes to this contract become necessary, a formal contract change order will be negotiated by the Authority and Contractor in each case, to address any changes to the terms and conditions, including the costs of work included under this contract. An approved contract change order must be in writing with proper date and executed by a duly authorized representative of the Authority and placed in the U.S. Mail postage prepaid or delivered by other appropriate means to Contractor prior to the effective date of the contract amendment contemplated by the change order. An approved contract change order is required whenever the change materially (as determined in good faith by the Authority) affects:

(a)    the payment provisions;

(b)    the scope of the Toll Equipment Work;

(c)    date of completion of the Toll Equipment Work or any portion thereof; or

(d)    a change in the date for any deliverables; or a like provision.

Such changes may be necessitated by new and amended Federal and State regulations and requirements. As soon as possible after receipt of a written change request from the Authority, but in no event more than thirty (30) days thereafter, Contractor shall determine if there is an impact on price with the change requested and provide the Authority a written statement identifying any price, schedule and/or performance impacts on this Agreement or to state that there is no impact. In the event that price will be impacted by the change, Contractor shall provide a description of the price increase or decrease involved in implementing the requested change. No change shall be implemented by Contractor until such time as Contractor receives an approved written change order from the Authority.

5.    **Contract Term and Renewal**. This Agreement shall begin on the Effective Date and shall continue until successful completion of the Project Acceptance Test and for an initial period of five (5) years from such successful completion (the "*Initial Term*"). The parties shall agree on what dates constitute the successful acceptance and therefore the dates and period comprising the Initial Term. RMTA has the sole option, in its discretion, to renew this Agreement for one (1) renewal term of five years (the "*Renewal Term*"). Unless RMTA notifies Contractor of its intention not to renew this Agreement,

by written notice given at least ninety (90) days prior to the expiration of the Initial Term or any Renewal Term hereunder, this Agreement shall automatically renew upon the terms and conditions set forth herein.

6. **Contractor Responsibilities**.

6.1 <u>Contractor Personnel</u>. Contractor shall provide sufficient professional personnel and staffing to provide the Toll Equipment Work. All persons assigned to perform under this Agreement shall be employees or authorized subcontractors of Contractor and shall be fully qualified to perform the Toll Equipment Work. Contractor and its personnel (and any approved subcontractors and their personnel) shall comply with the confidentiality provisions of **Section 18 (Confidentiality)**. The key personnel that Contractor identifies in its response must be contractually committed for the Project. Any substitution or replacement of key personnel identified in the response shall be subject to RMTA's prior written consent, not unreasonably withheld.

6.2 <u>Contractor Program Manager</u>. As provided in the RFP, throughout the Initial Term and each Renewal Term, Contractor shall assign a program manager who shall provide the primary point of contact with RMTA, any Civil Contractor and any other third party vendor of RMTA.

6.3 <u>Permits, Licenses</u>. As provided in the RFP, throughout the Initial Term and each Renewal Term, Contractor shall procure and maintain, at its expense, all permits and licenses that may be required in connection with the performance of Toll Equipment Work by Contractor and as otherwise required in the Contract Documents. Contractor shall furnish copies of the permits and licenses upon RMTA's request.

6.4 <u>No Discrimination</u>. At all times during the performance of this Agreement, Contractor agrees as follows:

Contractor will not discriminate, and shall cause any subcontractor to not discriminate, against any employee or applicant for employment because of race, religion, color, sex, national origin, age, disability, or other basis prohibited by state law relating to discrimination in employment, except where there is a bona fide occupational qualification reasonably necessary to the normal operation of Contractor. Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this nondiscrimination clause; and

Contractor will, in all solicitations or advertisements for employees placed by or on behalf of Contractor, state that such Contractor is an equal opportunity employer, provided, however, that notices, advertisements and solicitations placed in accordance with federal law, rule and regulation shall be deemed sufficient for the purpose of meeting the requirements of this provision.

Contractor will include the provisions of both items above in this paragraph in every subcontract or purchase order of over ten thousand dollars ($10,000), so that such provisions will be binding upon each subcontractor or firm.

6.5 <u>Drug-Free Workplace</u>. At all times during the performance of this Agreement, Contractor agrees to:

Provide a drug-free workplace for Contractor's employees;

Post in conspicuous places, available to employees and applicants for employment, a statement notifying employees that the unlawful manufacture, sale, distribution, dispensation, possession, or use of a controlled substance or marijuana is prohibited in Contractor's workplace and specifying the actions that will be taken against employees for violations of such prohibition;

State in all solicitations or advertisements for employees placed by on behalf of Contractor that Contractor maintains a drug-free workplace; and

Include the provisions of the foregoing clauses in every subcontract or purchase order of over $10,000, so that the provisions will be binding upon each subcontractor or firm.

6.6 <u>Cooperation</u>.
*With Authority.* RMTA shall be entitled to full and prompt cooperation of Contractor in all aspects of the Toll Equipment Work. Contractor shall also fully and promptly cooperate with all Civil Contractors, and any third party vendors providing maintenance, transponders, other equipment and/or services to or on behalf of RMTA. In the event Contractor deems that a Civil Contractor or any other of RMTA's contractors/vendors is delaying or not performing their work or otherwise interfering with the Toll Equipment Work, Contractor shall immediately notify RMTA in writing of such matter, including a detailed explanation of such delay so that RMTA may investigate the issue and assist with a resolution. Contractor's failure to furnish a detailed written notification within seven (7) Days after a Civil Contractor or any other of RMTA's contractors/vendors first failed to cooperate with Contractor or otherwise improperly performed their work, shall result in RMTA's denial of any future claim by Contractor that a Civil Contractor or any other of RMTA's contractors/vendors, as applicable, failed to properly perform their work or failed to cooperate with Contractor and Contractor shall be deemed to have waived such claim and Contractor shall be held to any applicable requirement under the Contact Documents that Contractor alleges is affected thereby.

*With certain Third Parties.* Contractor agrees to cooperate and to assist all Civil Contractors as set forth in the RFP and this Agreement and as reasonably directed by the Authority. Contractor further agrees to cooperate in all reasonable respects and perform its responsibilities, obligations and services in a timely manner to facilitate a Civil Contractor's timely and efficient performance of its applicable

work and so as not to delay or interfere with such Civil Contractor's performance of its obligations.

Contractor shall cooperate with, and coordinate work performed at or in respect of the Project with, other Project contractors, including applicable transition work with existing RMTA contractors on RMTA toll equipment matters, so to provide for orderly and safe work at Project sites and to achieve efficiencies in conduct of the Toll Equipment Work and completion of the Project.

Contractor shall also at all times cooperate with the Virginia Department of Transportation and any third party servicer or agent of VDOT's customer service center, violations processing facility, or replacement facility or system, in connection with the handling and processing of electronic toll collection and violations processing matters, as the Authority may reasonably direct.

6.7     Meetings.  RMTA and Contractor shall conduct meetings as provided in the RFP and as deemed needed by RMTA to review, discuss and resolve matters relating to coordination, Toll Equipment Work, and other matters relating to the Contract Documents.

6.8     Material Change in Contractor's Financial Condition.  Contractor shall immediately notify RMTA of any material adverse change since the Effective Date in Contractor's financial condition, business, prospects, affairs or operations or of any change of any partner or of such change of any shareholder holding greater than a 10% interest in Contractor, or of the existence of any material impairment of rights or ability of Contractor to carry on as its business and operations are currently conducted.

6.9     Contractor-owned Facilities.  Contractor shall have sole responsibility for risk of loss to Contractor-owned facilities, equipment and other goods.

6.10    Registration.  All contractors and subcontractors must comply with the registration requirements of Title 54, Chapter 11, Code of Virginia (1950), as amended.  To the extent required, all non-resident contractors and subcontractors engaged on the Project shall register with the Department of Labor and Industry under the provisions of Section 40.1-30 of the Code of Virginia (1950), as amended.

This Agreement, and all other contracts and subcontracts are subject to the provisions of Article 3, Chapter 4, Title 40.1, Code of Virginia (1950), as amended, relating to labor unions and the "right to work" and all contractors, or subcontractors, whether residents or non-residents of the Commonwealth of Virginia who perform any work related to this project shall comply with all of the such provisions.

6.11    Standard of Care.  Contractor, in performing any services or undertakings under this Agreement, shall perform in a manner consistent with that level of care and

skill ordinarily exercised by members of the profession currently practicing under similar conditions and in similar locations in the electronic toll collection industry.

6.12 Source of Supply and Quality Requirements. Contractor shall not use in performance under this Agreement or in prosecution of the goods, services and work any supplier or material person, hereinafter referred to simply as supplier, debarred by the Virginia Department of Transportation (*"VDOT"*). It shall be the responsibility of Contractor to determine from the Department's listings which suppliers are debarred as of any particular date. Such listings will be posted in the office of the VDOT Engineer, 1401 E. Broad Street, Richmond, Virginia and in each District Office. The Authority will not approve for use any material furnished by a supplier debarred by VDOT. If subsequent to the Effective Date, a previously debarred supplier is reinstated to eligibility, the Authority may approve the use of that supplier hereunder when requested by Contractor and after consideration of all relevant factors.

6.13 Barricades and Warning Signs. Contractor shall comply with VDOT's Virginia Work Area Protection Manual in its conduct of the Toll Equipment Work under this Agreement, as well as comply with the applicable provisions in the Contract Documents concerning maintenance and management of traffic.

6.14 Bucket Truck; Traffic Management. When Contractor is working on the Project site, RMTA may provide to Contractor bucket trucks and traffic management as and to the extent available, and upon Contractor's successful completion of any training or certification required by the Authority.

6.15 Contract (Performance) Bonds. Concurrently with the final execution and delivery of this Agreement, Contractor shall provide security to RMTA for its obligations hereunder in the form of a guaranty or contract (performance) bond, substantially in the form of **Attachment E-1**, in the amount of $18,198,309. Such bond shall be issued by a surety listed in the U.S. Dept. of the Treasury Listing of Approved Sureties (Treasury Circular 570) and shall remain in full force during the Initial Term of this Agreement or until full completion of the Base Work, whichever is later. Such bond shall serve as additional security for the performance of Contractor's obligations during such period, and in no event shall the existence of any such bond or security or the stated amount thereof be construed to cap, liquidate or otherwise modify or limit the amount of damages payable by Contractor hereunder based on the occurrence of a Contractor event of default or other liability assumed or incurred by Contractor under this Agreement.

The contract (performance) bond referenced above shall remain in full force and effect until full completion of the Base Work and satisfaction of all contractual obligations in connection therewith. At such time and upon delivery by Contractor of a contract (performance) bond to be in effect during the

Maintenance Work, as provided below, RMTA will return the initial contract (performance) bond to Contractor.

During the Maintenance Work phases of the Toll Equipment Work, Contractor shall provide security to RMTA for its obligations hereunder in the form of a guaranty or contract (performance) bond, substantially in the form of **Attachment E-2**. The initial amount of such bond shall be $$18,198,309 (or such other amount as RMTA may approve in writing). Such bond shall be renewable annually, with the amount of such bond declining by 20% each year from its initial amount, effective on the anniversary date of the commencement of the Maintenance Work, with the first 20% reduction commencing on the first such anniversary. Such bond shall be issued by a surety listed in the U.S. Dept. of the Treasury Listing of Approved Sureties (Treasury Circular 570) and shall remain in full force during the renewal term of this Agreement or until full completion of the Maintenance Work, whichever is later; provided, however, that Contractor need no longer maintain such bond when the required value amount has declined to zero ($0.00). Such bond shall serve as additional security for the performance of Contractor's obligations during such period, and in no event shall the existence of any such bond or security or the stated amount thereof be construed to cap, liquidate or otherwise modify or limit the amount of damages payable by Contractor hereunder based on the occurrence of a Contractor event of default or other liability assumed or incurred by Contractor under this Agreement. Contractor shall provide RMTA with notice of extension or renewal of such bond, or a similar equivalent security, not later than thirty (30) days prior to its termination.

6.16    Pervasive Defects.  Contractor agrees to promptly remedy, at no cost to RMTA any "Pervasive Defect (as defined below).  Contractor shall be required to investigate, develop, fix, implement and deploy, at no additional expense to RMTA, all required component or System performance improvements to remediate a Pervasive Defect.

"Pervasive Defect" shall mean, as determined by RMTA in the exercise of its reasonable discretion, any defect, condition or combination thereof, in or pertaining to any equipment, component, sub-component or software that is experiencing continued, persistent or repetitive failure or below specification performance such that frequent or recurrent service, replacement or repair is required.

A resolution plan shall be produced by Contractor and submitted to RMTA within seven (7) days of notification of the Pervasive Defect.  The plan shall include the investigation results, remediation steps performed to-date, and a plan and schedule to complete resolution of the Pervasive Defect.  The status shall be updated and briefed in periodic meetings until complete resolution.

The obligations set forth in this Section shall be in addition to any warranty obligations set forth in this Agreement. The provisions of this Section shall survive the expiration or earlier termination of this Agreement.

7. **Pricing and Payment**.

7.1 <u>Payment Amounts</u>. Subject to the applicable provisions of this Agreement, RMTA hereby agrees to compensate Contractor in accordance with the prices or on the milestone basis set forth in **Attachment C (Pricing and Payment Schedules)**.

As to Base Work, such prices or basis will not be subject to any increase after the Authority has issued a notice to proceed for the applicable element of the Project and will be considered firm for the duration of the work on such Project elements.

As to Maintenance Work, prices quoted by Contractor in its Proposal or as set forth in the **Pricing and Payment Schedule (Attachment C)**, will not be subject to any increase for the Initial Term. The price for any Renewal Term thereafter shall be adjusted up or down in proportion to the change between the U.S. government's Consumer Price Index ("*CPI*") applicable to the Richmond, Virginia metropolitan area (presently, the United States Department of Labor Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers; Washington-Baltimore, DC-MD-VA-WV; Series ID CUURA311SA0, CUUSA311SA0; November 1996=100, or succeeding or replacement index) for the date ninety (90) days prior to the date of commencement of the last year of the Initial Term, and the date ninety (90) days prior to commencement of the succeeding (new) Renewal Term.

Only price changes due to an Authority-approved change order shall be allowed under this Agreement. The Authority shall have the right to purchase additional quantities of hardware, software, installation services, testing services, and other system implementation related services. Contractor grants the Authority the right to make such purchases at any time during the life of this Agreement at the prices quoted in its Proposal or as set forth in **Attachment C (Pricing and Payment Schedules)**. The Authority will issue a change order for each such additional purchase. The price of each such purchase(s) shall be equal to that in Contractor's Proposal adjusted for the change in the CPI which occurred between the applicable notice to proceed and the month prior to issuance of the change order, provided however, CPI will not be applied if there is not a current price in this Agreement for additional purchase items. Reference is hereby made to **Sections 4.3 through 4.6** for terms, conditions and pricing of optional and additional system work where pricing is not provided or not comprehensive.

All payments made by RMTA to Contractor for the Toll Equipment Work under the Contract Documents shall be used by Contractor solely to pay Contractor's employees, agents, assigns, subcontractors, suppliers and any other labor who provided any part of the Toll Equipment Work.

7.2     <u>Payment Schedule</u>. Invoicing for Base Work shall be in accordance with the milestones provided under **Attachment C (Pricing and Payment Schedules)**, prior to successful completion of the Project Acceptance Test. No payment shall be due and owing to Contractor with respect to any such milestone unless and until Contractor has satisfied all conditions and requirements with respect to such milestone and RMTA has accepted and approved same.

Following successful completion of the Project Acceptance Test, invoicing for Maintenance Work shall be based on a fixed monthly fee as provided in **Attachment C (Pricing and Payment Schedules)**.

7.3     <u>Overpayment</u>. In the event an overpayment is made to Contractor under this Agreement, Contractor shall immediately refund to RMTA the full amount of any such erroneous payment or overpayment following RMTA's written notice of such erroneous payment or overpayment. If Contractor fails to refund the erroneous payment or overpayment within thirty (30) Days after RMTA's demand therefore, RMTA shall be entitled to interest at one (1%) percent per month, compounded, on the amount not repaid from the date of overpayment. If applicable, RMTA may deduct the amount of overpayment from any subsequent payment owed by RMTA to Contractor.

7.4     <u>Withholding Payments</u>. RMTA reserves the right to withhold payment or payments in whole or in part, and to continue to withhold any such payments for Toll Equipment Work not completed or not completed in accordance with the Contract Documents. Any and all such payment previously withheld shall be released and paid to Contractor promptly when the Toll Equipment Work is subsequently performed in accordance with the requirements of the Contract Documents.

7.5     <u>Payment not Acceptance</u>. Payment or use of any Toll Equipment Work or portions thereof by RMTA shall not constitute an acceptance of any Toll Equipment Work not performed in accordance with the Contract Documents.

7.6     <u>Liquidated Damages/Price Adjustments</u>. If Liquidated Damages or Price Adjustments are assessed against Contractor pursuant to **Section 17 (Liquidated Damages; Price Adjustments)**, RMTA shall deduct the same from any payment owing by RMTA to Contractor subsequent to the time any Liquidated Damages or Price Adjustments are assessed. If final payment has been made to Contractor, then Contractor shall reimburse the assessed amount of unpaid Liquidated Damages or Price Adjustments to RMTA within thirty (30) Business Days of written demand therefore by RMTA.

7.7     <u>Net 30 Days</u>. RMTA agrees to pay Contractor in accordance with its normal processes and procedures for all undisputed amounts within thirty (30) Days of

receipt of a valid Invoice (defined in **Section 7.8/Invoicing**) and supporting documentation.

7.8     Invoicing. Contractor shall deliver to the attention of RMTA and its designated representatives an itemized invoice (each an "*Invoice*") requesting payment hereunder.

As to Base Work, prior to the successful completion of the Project Acceptance Test (to include any final punch list items and final retainage amounts), Contractor will submit an Invoice, providing an itemized billing, identifying the milestone(s) completed, the status of any on-going work, a detailed account or description of work performed during the time period or milestone period in question to further or complete a milestone. Along with each invoice, Contractor will provide any necessary backup documentation, certifications and test results, as required in the Contract Documents or otherwise reasonably requested by RMTA or its designated representative. An authorized representative of Contractor must sign each Invoice.

As to any Maintenance Work, Contractor will submit an Invoice on or before the fifteenth (15th) day of each month, providing an itemized billing identifying the month thereof and detailing the Maintenance Work provided and such other information as RMTA or its designated representative may reasonably request. An authorized representative of Contractor must sign each Invoice.

7.9     Monthly Draws. Contractor shall submit an Invoice not more frequently than monthly, unless RMTA agrees otherwise.

7.10    Right of Set Off. RMTA may retain or set off any amount owed to it by Contractor under this Contract, including as provided in **Section 7.6**.

7.11    Full Compensation. All Toll Equipment Work performed by Contractor in meeting the requirements of the Contract Documents shall be paid as set forth above, which shall constitute full compensation for the Toll Equipment Work including, but not limited to: (a) the cost of all insurance, shipping and handling, job site and other overhead, and profit relating to Contractor's performance of its obligations under this Agreement; (b) the cost of performance of each and every portion of the Toll Equipment Work (including all costs of all Toll Equipment Work provided by subcontractors and suppliers); (c) the cost of obtaining all governmental approvals and all costs of compliance with and maintenance of such governmental approvals; (d) all risk of inflation, currency risk, interest and other costs of funds associated with the progress payment schedule for the Toll Equipment Work as provided herein; (e) payment of any taxes, duties, permits, licenses, and other fees and/or royalties imposed with respect to the Toll Equipment Work and any equipment, materials, supplies, documentation, labor or services included therein; and (f) any and all travel and expenses related thereto.

7.12 Disputed Invoices. RMTA and its designated representatives will review each Invoice and respond with a written request for additional information or documentation, changes or corrections no later than twenty (20) Days of RMTA's receipt of any applicable Invoice. Contractor shall have seven (7) Days within which to respond to RMTA's request. Based on RMTA's response, Contractor shall submit a new Invoice ("*New Invoice*") incorporating any changes or corrections made by RMTA, together with any additional requested information or documentation. If RMTA agrees with all requests for compensation in the New Invoice, RMTA will pay the entire sum found due within thirty (30) Days of its receipt of the New Invoice. If RMTA disputes any amounts submitted for compensation, RMTA shall pay Contractor amounts not in dispute and notify Contractor within seven (7) Days of its receipt of the New Invoice, identifying those items in the New Invoice that RMTA disputes, along with a written explanation of the basis of the dispute. The provisions of **Section 7.7 (Net 30 Days)** shall not apply to the provisions of this **Section 7.12** and/or any New Invoice. Under no circumstances whatsoever, shall Toll Equipment Work to be provided by Contractor be withheld, disrupted or delayed due to non-payment by RMTA pursuant to this **Section 7.12**.

7.13 No Late Fees. In no event shall Contractor be entitled to charge RMTA late fees, collection fees, attorney's fees, interest, or other fees incurred by Contractor as a result of non-payment by RMTA.

7.14 Contractor Not to Withhold. Contractor may not withhold or disrupt any goods or services or Work to be provided by Contractor hereunder due to non-payment by RMTA hereunder, including pursuant to **Section 7.4** or the default provisions hereof.

7.15 Payments to Subcontractor. Contractor shall:

a. Pay subcontractors within seven (7) days of Contractor's receipt of payment from RMTA for the proportionate share of the payment received for work performed by the subcontractor under the contract; or

b. Notify RMTA and the subcontractor, in writing, of Contractor's intention to withhold payment and the reason. Contractor is obligated to pay the subcontractor interest at the rate of one percent per month (unless otherwise provided under the terms of the contract) on all amounts owed by Contractor that remain unpaid seven (7) days following receipt of payment from RMTA, except for amounts withheld as stated above. The date of mailing of any payment by U.S. Mail is deemed to be payment to the addressee. These provisions apply to each sub-tier contractor performing under this Agreement. Contractor's obligation to pay an interest charge to a subcontractor may not be construed to be an obligation of RMTA.

7.16   Retainage. Except as RMTA may agree otherwise, payments of Invoices for Installation Work shall not include applicable retainage. Retainage in the amount of five percent (5%) of any such invoiced amount shall be withheld by the Authority from each payment that the Authority makes to Contractor under this Agreement. Retainage associated with Base Work will be delivered to Contractor after successful completion of the Project Acceptance Test and final close-out work for the Base Work, provided that the Authority may withhold at its discretion from the release of the retainage an amount the Authority reasonably determines is necessary to complete or repair any incomplete or non-conforming items at the time of successful completion of the Project Acceptance Test. Payment of the final retainage shall be made in accordance with the provisions of **Sections 7.8 and 7.17.**

7.17   Final Payment. As a prerequisite to the issuance of final payment, Contractor will be required to furnish the Authority with an executed final release of liability (which may be on the Authority's standard form) certifying that all bills, charges and salaries for labor, services, materials and rental of equipment, arising out of the prosecution of work under this Agreement have been fully paid or arrangements satisfactory to the Authority therefore have been made and all other just demands and liens relating to the Project fully satisfied or released, as applicable, or arrangements to the Authority therefore have been made, and releasing the Authority and its representatives from all claims, demands and liability of whatsoever nature from anything done or furnished under this Contract, except to the extent only as to such matters for which unresolved claims have been submitted by Contractor in accordance with the provisions of this Agreement.

8.   **Subcontracting and Assignment.**

8.1   Subcontracting or Assignment. It is the intent of RMTA that Contractor shall perform, with its own organization, contract work amounting to at least fifty-one percent (51%) of the Toll Equipment Work, unless RMTA agrees otherwise. Accordingly, other than as specifically specified in the RFP or Contractor's Proposal, Contractor shall not assign, subcontract, delegate, sublet or transfer this Agreement or any rights under or interest in this Agreement or otherwise dispose of its right, title or interest therein or any part thereof to any person, or otherwise permit anyone other than Contractor's personnel to perform any of the Toll Equipment Work, furnish the Documents or provide the Toll Equipment under this Agreement, without obtaining the prior written consent of RMTA, which RMTA may grant, deny or condition in its sole discretion or for any reason. For purposes of this provision, a sale or transfer of the ownership interests or all, or substantially all, of the assets of Contractor (or Contractor's parent company), a merger (by operation of law or otherwise), consolidation, exchange, a change of control or other business combination involving Contractor or Contractor's parent company shall be deemed an assignment, regardless of whether such transaction results in Contractor (or its parent, as applicable) being the surviving or

disappearing corporation. A change of control shall mean if any other person or entity acquires, at a minimum, a fifty percent (50%) direct or indirect ownership interest in, or control over, Contractor and/or Contractor's parent company. Consent by RMTA to any transfer, assignment or subcontract of this Agreement shall not be deemed to relieve Contractor of its obligations under this Agreement. Any attempted transfer, subcontracting or assignment without such prior written consent shall be void and of no force and effect. Contractor warrants that it shall make timely payments for work performed to any subcontractor or supplier hereunder and Contractor shall indemnify and hold harmless RMTA for any breach of this warranty.

8.2  <u>Subcontractor Assignments and Changes in Control</u>. Contractor shall cause the provisions of Section 8.1 hereof to be set forth, *mutatis mutandis*, in all material subcontracts, or as may be required by RMTA, with the consent rights running in favor of RMTA.

8.3  <u>Contractor Remains Responsible</u>. If Contractor properly subcontracts any of the Toll Equipment Work to be performed under this Agreement, Contractor shall remain as fully responsible to RMTA for the acts, errors, or omissions of Contractor's subcontractor and/or supplier and of the persons employed by them as Contractor is for the acts and omissions of persons directly employed by Contractor. Contractor shall be obligated to assist RMTA in the enforcement of any rights against Contractor's subcontractor that RMTA has against Contractor. Notwithstanding any subcontract or agreement with any subcontractor or third party, Contractor shall be fully responsible for furnishing all of the Toll Equipment Work.

8.4  <u>Failure to Comply</u>. Any assignments or subcontracts made in violation of **Sections 8.1 (Assignment), 8.2 (Subcontracting)** and/or **8.3 (Subcontractor Assignments and Change in Control)** shall be null and void.

9.  **Warranties**. In addition to any express or implied warranties provided by law, Contractor hereby expressly represents and warrants:

9.1  <u>Express Warranties</u>.

9.1.1  *Work*. Contractor represents and warrants that all Base Work and all Maintenance Work shall (i) conform to the performance, capabilities, accuracy, completeness, characteristics, specifications, configurations, standards, and functions required by the Contract Documents, and (ii) be performed on time as required in the Contract Documents, and in a workmanlike manner, consistent with the highest level of care and skill exercised by other providers of similar work under similar circumstances at the time the work is performed.

Contractor shall, at its sole cost, repair or replace, at its option, any item of hardware, equipment, support services, software or firmware or any construction item whose non-performance is discovered or which is defective either in material or workmanship and made known to Contractor in writing by the Authority during the contract warranty period which is six (6) months from the date of "warranty commencement," which is deemed to commence upon successful completion of the Project Acceptance Test.

Except as set forth herein or with regard to any express or implied warranties provided by law, the express warranties are the sole and exclusive warranties provided by Contractor, and Contractor specifically disclaims any other warranties, express or implied including but not limited to warranties of merchantability or fitness for a particular purpose, as well as any warranties alleged to have arisen from custom, usage or past dealings between the parties.

9.1.2 *Cooperation.* Contractor represents and warrants that Contractor shall fully cooperate with RMTA, RMTA's other contractors and vendors, and any other governing authority, in performing all Base Work and all Maintenance Work required by the Contract Documents.

9.1.3 *Intellectual Property.* As used in this Agreement, "*Intellectual Property*" shall mean any and all works, know-how, inventions, patents, copyrights, models, designs, trademarks, trade dress, trade secrets, discoveries, regulatory filings, or other information (whether or not patentable and whether or not in tangible or intangible form), information and data; formulas, procedures and processes; designs, drawings, sketches and models; computer programs (in both source code and object code); documentation, notes and specifications; trade secrets; discoveries, developments, improvements and inventions, and any other industrial or proprietary rights, and any documentation relating thereto, and any and all applications for any of the forgoing, whether or not registered as of the Effective Date or at any later date.

9.1.4.1 Contractor represents and warrants that RMTA will have, upon completion of the Base Work and shall additionally receive without restriction thereafter, all necessary patent, copyright, and any other necessary intellectual property rights to all Base Work furnished by Contractor under this Agreement and that all Base Work and Maintenance Work, as a whole and each of its components shall not infringe any third party patent, copyright, trademark, trade secret or other intellectual property right.

9.1.4.2 Contractor represents and warrants that it is the lawful owner or licensee of all software, firmware, hardware, methods,

methodologies and any Intellectual Property used in the Base Work and Maintenance Work and Contractor has the right to convey to, or permit RMTA access to or use of, such software, firmware, hardware, methods, methodologies and Intellectual Property;

9.1.4.3 Contractor represents and warrants that RMTA's use of the Intellectual Property for, in, on and in respect of the Base Work and Maintenance Work in accordance with the Contract Documents will not infringe any patent, copyright, trade secret, confidential information, or any other proprietary right or Intellectual Property right of any third party.

9.1.5 *Compliance with Laws, Rules and Regulations.* Contractor represents and warrants that (a) the Base Work and Maintenance Work will not be in violation of any applicable law, rule or regulation, and Contractor will obtain all permits and licenses required to comply with such laws and regulations, (b) Contractor is registered with all applicable state and local authorities and is authorized to perform the Base Work and Maintenance Work in the Commonwealth of Virginia, and (c) Contractor will comply in all respects with all other laws, rules, regulations, ordinances of any governing authority that impact or relate in any way to the Base Work and Maintenance Work.

9.1.6 *Good Title.* Contractor will convey good and marketable title to all goods and services, including but not limited to software and subject to the terms of any applicable software license agreement, provided under this Agreement upon RMTA's receipt of such goods and services, and all goods and services shall be delivered to RMTA free from all security interests or other liens or encumbrances. Contractor also agrees to defend RMTA's title against all persons claiming ownership or other interest in the whole or part of any goods and services supplied to RMTA under this Agreement;

9.1.7 *Software.* All proprietary or custom software and firmware provided hereunder or present in the Toll Equipment and any update or revision to any of such software and firmware will be maintained up to date as provided in the Contract Documents and free from defects, and will meet all specifications set forth in this Agreement and the Contract Documents. Contractor will, without charge to RMTA, correct any defects and make any fixes, additions, modifications or adjustments to any of such software or any update or revision to such software as may be necessary to keep the software in operating order in accordance with specifications at all times throughout the term of this Agreement.

9.1.8 Contractor hereby irrevocably assigns and transfers to RMTA all

worldwide right, title, and interest (including without limitation all copyright, patent, trademark and trade secrets rights) in and to the Intellectual Property created, made, conceived, reduced to practice, or authored by Contractor (including by any employee and permitted subcontractor of Contractor), either solely or jointly with others, pursuant to this Agreement or with the use of information, materials, or facilities of RMTA received by Contractor during the term of this Agreement (the "*Developed Intellectual Property*"). Except as otherwise provided in Section 9.1.9 hereof, any contribution by Contractor or its employees to the creation of Developed Intellectual Property shall be considered works made for hire by Contractor for RMTA and that such Developed Intellectual Property shall, upon their creation, be owned exclusively by RMTA. To the extent that any Developed Intellectual Property may not be considered works made for hire for RMTA under applicable law, Contractor agrees to assign and, upon their creation, automatically assigns to RMTA the ownership of such Developed Intellectual Property, without the necessity of any further consideration. Upon preparation or receipt of Developed Intellectual Property by RMTA, RMTA shall receive ownership of the property rights (except for copyrights in Pre-Existing Software) in any such Developed Intellectual Property. RMTA may use, reproduce and make derivative works from the Developed Intellectual Property, and Contractor grants RMTA any permissions or licenses to effectuate this grant of permission, provided, however, that RMTA may use any such Developed Intellectual Property solely to operate, maintain and support the Project and at any RMTA property or facilities as contemplated pursuant to this Agreement.

In furtherance of the foregoing, RMTA shall have the sole right to determine the treatment of any Developed Intellectual Property, including the right to keep Developed Intellectual Property as trade secrets, to file and execute patent applications on Developed Intellectual Property, to use and disclose Developed Intellectual Property without prior patent application, to file registrations for copyright or trademark on Developed Intellectual Property in its own name, or to follow any other procedure that RMTA deems appropriate. Contractor shall promptly disclose to RMTA all Intellectual Property created by Contractor or on its behalf (including by any employee and permitted subcontractor of Contractor) during the term of this Agreement. Contractor shall cooperate with and assist RMTA to apply for, and to execute or cause to be executed, all documents (including all applications and/or assignments) and perform such acts as may be necessary, useful or convenient to secure for RMTA statutory protection throughout the world for all Developed Intellectual Property assigned to RMTA pursuant to this Section 9.1.8. Contractor represents and warrants that all employees and permitted subcontractors performing Toll Equipment Work pursuant to this Agreement have agreed in writing to assign all Developed Intellectual Property to RMTA as

required by this Section 9.1.8.

RMTA hereby grants Contractor a worldwide, nonexclusive, perpetual, and royalty-free license to the Developed Intellectual Property.

When and if, from time to time, Contractor provides RMTA with a revision, enhancement, modification or update to any software that is Developed Intellectual Property, Contractor shall within ten (10) business days thereafter deliver the corresponding updated Source Code to the Software Escrow Agent as provided in Section 15.

"*Source Code*" means a complete copy, expressed in high-level (*i.e.*, human readable; not machine language or object code) computer language, of the software which, when assembled or compiled, becomes the executable object code of the software. Source Code shall include all material including but not limited to design documentation, software documentation, reference manuals and documentation, libraries for the software, and interface software (patch or whole programs), in any form (printed, electronic, or magnetic) and any other information necessary that a reasonably skilled programmer or analyst can understand and maintain the software.

9.1.9   Contractor's software license agreement sets forth a list of the "Pre-Existing Software," which shall include Contractor's own software that it owns or has developed as of the date of this Agreement that it intends to use in connection with the Project. To the extent that Pre-Existing Software is included in the Project, Contractor grants RMTA (as an exception to the transfer and assignment provided in Section 9.1.8), an irrevocable, nonexclusive, world-wide, royalty-free right and license to use, execute, reproduce, display, perform, and distribute internally copies of, and prepare derivative works based upon, the Pre-Existing Software, and the right to authorize third parties to do any of the foregoing, subject to the terms of this Agreement. The foregoing licenses and rights shall be used solely as needed to operate, maintain and support the Project and at any RMTA property or facilities as contemplated pursuant to this Agreement. The rights and licenses granted in this Section 9.1.9 shall survive expiration or termination of this Agreement.

RMTA's interest in and obligations with respect to any commercial off-the-shelf software ("COTS Software") incorporated into the Project shall be determined in accordance with the standard license terms applicable to such COTS Software; provided, however, that Contractor shall be solely responsible for all costs associated with such software.

Contractor shall place all Source Code for Pre-Existing Software used in connection with the Project in the Software Escrow as provided in Section

15. When and if, from time to time, Contractor provides RMTA with a revision, enhancement, modification or update to the Pre-Existing Software in furtherance of this Agreement, Contractor shall within ten (10) business days thereafter deliver updated Source Code to the Software Escrow Agent as provided in Section 15.

9.2     Third Party Warranties. Contractor shall assign to RMTA the manufacturers' or other third party warranties for software, equipment and other hardware furnished to RMTA.

9.3     No Waiver. Neither any provision of this Agreement nor any decision of RMTA shall relieve Contractor of responsibility for faulty materials, faulty workmanship, or omission of any software, equipment and other hardware.

9.4     Contractor Duty to Remedy. Contractor shall, within fifteen (15) Days of Contractor's receipt of notice of a defective item of Base Work or Maintenance Work, correct, remedy, replace, re-execute, supply omitted or defective software, equipment and other hardware and pay for any damage to other work resulting therefrom, without expense to RMTA and ensure RMTA's receipt of a replacement at a location specified by RMTA. Correction of defective Base Work or Maintenance Work or supplying of omitted Base Work or Maintenance Work whether or not covered by warranty of a manufacturer, subcontractor or supplier of Contractor, remains the primary, direct responsibility of Contractor. Contractor agrees to receive and accept any shipments of defective Equipment sent to Contractor by a representative designated by RMTA.

Subject to the warranty set forth in **Section 9.1** hereof, neither approval of work, nor final payment shall relieve Contractor of legal responsibility for faulty materials or workmanship, subject to the warranty provision herein, and Contractor shall promptly remedy any defects due thereto and pay for any damage to other work resulting therefrom, provided that RMTA can reasonably demonstrate that any such defect, damage or work is attributable to Contractor's work.

9.5     RMTA Cure. If Contractor does not remove, make good the deficiency, correct, or remedy defective Base Work or Maintenance Work, or supply any omitted Base Work or Maintenance Work within the time periods set forth under this Agreement, then RMTA may, in addition to all other remedies available to RMTA under this Agreement, at law or in equity, after ten (10) Business Days written notice to Contractor, remove the Base Work or Maintenance Work, correct the Base Work or Maintenance Work, remedy the Base Work or Maintenance Work or supply omitted Base Work or Maintenance Work at the expense of Contractor. If RMTA has not yet made payment to Contractor, then RMTA may deduct the cost thereof from any payment then or thereafter due and owing Contractor. If final payment has been made to Contractor, then Contractor shall reimburse the cost to RMTA within five (5) Business Days of written

demand therefore by RMTA. In case of emergency involving health, safety of property, or safety of life, RMTA may proceed at once and without notice to Contractor and Contractor shall remain responsible for the cost thereof.

9.6     Remedies Not Exclusive. The remedies stated in this **Section 9** are in addition to the remedies otherwise available to RMTA, do not exclude such other remedies, and are without prejudice to any other remedies.

10.     **Relationship of the Parties**. Each Party, in the performance of this Agreement, shall be acting in its individual capacity and not as an agent, employee, partner, joint venturer, or associate of the other Party. The employees, agents, partners or contractors of one Party shall not be deemed or construed to be the employees, agents, partners or contractors of the other Party for any purposes. Neither Party shall assume any liability of any type on behalf of the other Party or any of such other Party's employees, agents, partners or contractors. The parties expressly understand and agree that Contractor is an independent contractor of RMTA in all manner and respects. Contractor shall be solely responsible for all payments to its subcontractors, agents, consultants, suppliers, employees, partners or any other parties with which it does business including, but not limited to, paying all benefits, taxes and insurance, including workmen's compensation insurance, for its employees. Except as RMTA may otherwise specify in writing, Contractor shall have no authority, express or implied, to act on behalf of RMTA in any capacity whatsoever, as an agent or otherwise, and shall have no authority, express or implied, to bind RMTA or its members, agents or employees, to any obligation whatsoever, unless expressly provided in this Agreement.

11.     **Proprietary Information**. Except as may specifically be set forth in this Agreement, ownership of all materials, drawings, manuals, training materials and documentation originated and prepared for the Authority pursuant to the RFP and under this Agreement, together with all updates, supplements and amendments thereto, shall belong exclusively to the Authority. Contractor is hereby advised that such material is subject to public inspection and disclosure in accordance with the Virginia Freedom of Information Act.

Trade secrets or proprietary information may not be subject to public disclosure as and to the extent provided under the Virginia Freedom of Information Act, provided that Contractor has properly invoked the protections of Section 2.2-4342.F of the Virginia Public Procurement Act of the Code of Virginia, in writing, either before or at the time the data is submitted or disclosed. The written notice must specifically identify the data or materials to be protected and state the reasons why protection is necessary. The proprietary or trade secret material submitted must be identified by some distinct method such as highlighting or underlining and must indicate only the specific words, figures, or paragraphs that constitute trade secret or proprietary information. The classification of any entire document, line item prices or prices as proprietary or trade secret is not acceptable.

12. **Title and Delivery**.

12.1 Title. Title to the hardware components provided pursuant to this Agreement shall pass to the Authority upon receipt of payment associated with such hardware from the Authority and installation at the respective Authority work site. Contractor represents and warrants that it will have absolute and good title to the hardware components, free and clear of all liens, encumbrances or any claims of any kind whatsoever at the date of the transfer of title and it will transfer same to the Authority. Notwithstanding the fact that the Authority may have been deemed to have accepted title in accordance with the foregoing, title acceptance is contingent upon successful completion of the Revenue Service Acceptance Test Milestone (as set forth in **Attachment C (Pricing and Payment Schedules))** by the Authority, accordingly, in the event the System is not fully accepted by the Authority as contemplated by this Agreement, it shall have the right, at is election, to reject title to any or all components comprising all or any part of the System, and thereupon receive a refund from Contractor for any amounts paid for such rejected items.

12.2 Shipping. Contractor shall confirm receipt of all shipping orders and manifests with the Authority in writing. No terms or conditions, preprinted or otherwise, on Contractor's confirmation or any other documentation supplied by Contractor shall be effective or otherwise govern any transactions between RMTA and Contractor and all such preprinted terms are hereby declared null and void. Contractor shall be responsible for all transportation charges to the FOB Destination Point, Freight Prepaid, with such point being RMTA's designated delivery location(s) specified in each P.O. This point shall also be the point at which RMTA takes title to the delivered Equipment in accordance with **Section 9.1.8 (Good Title)**.

12.3 Delivery. All deliveries made must be complete unless otherwise agreed to in writing by RMTA. All packages must contain a packing slip that identifies all items included with the shipment and RMTA's contract, work or purchase order number. Acceptance of the delivery occurs after delivery to the specified location(s) and RMTA or their designated representative inspects the shipment and acknowledges in writing that the contents appear to conform to the Contract Documents. Equipment ordered shall be delivered in accordance with the project schedule set forth in **Attachment D** and the RFP (unless a shorter time period is included in Contractor's Proposal, in which case such shorter time period shall control).

12.4 Risk of Loss. Regardless of the FOB point, Contractor shall assume the risk of loss for all software, equipment and other hardware until its delivery at the specified location and its installation as a part of the System.

12.5 Storage of Material and Equipment. Contractor shall be responsible for proper security of all storage areas under its control and shall take all reasonable

precautions and provide protection to prevent damage, injury or loss to the materials and equipment provided for under the Agreement.

13. **Support Services.** Contractor understands and agrees that:

13.1 <u>Personnel</u>. Contractor may be required to assign personnel, as needed, who are highly experienced with the Toll Equipment to positively and actively engage with all Civil Contractors or the Authority or its third party vendors to answer questions concerning the installation of the Toll Equipment; to troubleshoot any problem that may arise during the installation of the Toll Equipment; and to do all other things necessary, desirable or appropriate to perform the Base Work and Maintenance Work.

13.2 <u>Delay by Third Party</u>. In the event Contractor deems that a third party is delaying Contractor's ability to perform under this Agreement or not performing, Contractor shall immediately notify RMTA in writing of this matter, including a detailed explanation of such delay so that RMTA may investigate the issue and assist with a resolution. Contractor's failure to furnish a detailed written notification within two weeks after the third party first failed to cooperate with Contractor shall result in RMTA's denial of any future claim by Contractor that the third party has caused Contractor to fail to meet the agreed-upon schedule or properly perform the Base Work or Maintenance Work or failed to cooperate with Contractor, and Contractor shall be deemed to have waived such claim.

13.3 <u>RMTA's Right to Remove</u>. RMTA shall have the absolute right to require Contractor to remove an individual from performing under this Agreement for any or no reason. In the event of such removal, Contractor will replace such individual within the time specified by RMTA.

14. **Inspection**. As to the testing or approval of any software, equipment or other hardware, Contractor shall give RMTA timely notice in writing of its readiness for inspection and testing, and if the inspection is by any authority other than RMTA, of the date fixed for such inspection. Contractor assumes the responsibility of furnishing all test items in accordance with this Agreement. No provisions of this **Section 14** nor any inspection by RMTA, representatives of RMTA, or any other third party shall in any way diminish, relieve, or alter the responsibility and undertaking of Contractor; nor shall the omission of any of the foregoing to discover or to bring to the attention of Contractor the existence of any software, equipment or hardware that is not in accordance with the Contract Documents in any way diminishes, relieves, or alters the obligations of Contractor nor shall the aforesaid omission diminish or alter the rights or remedies of RMTA as set forth in this Agreement.

15. **Delivery of Software.** Within 10 days of the designated Installation Ready and Revenue Service Acceptance milestone (as specified in **Attachment D**), Contractor shall deposit, or cause the deposit of, all System software and its related Source Code (*i.e.*, human-readable and as defined in Section 9.1.8) and object code ((*i.e.*, machine readable) in a

format that is commonly used in the industry in an escrow (the "Software Escrow") with an escrow company designated by Contractor that is engaged in the business of receiving and maintaining escrows of software source code, related documentation and other technology (the "Software Escrow Agent"), subject to the reasonable approval of RMTA. All terms and conditions of such agreement (the "Software Escrow Agreement") shall be a part of, and by this reference are incorporated in, this Agreement, and any breach thereof by Contractor shall be a breach of this Agreement. Contractor's failure to execute the Software Escrow Agreement and any breach by Contractor of such Software Escrow Agreement shall be deemed a default under Section 27.1.11 hereof. In connection with the foregoing, RMTA shall pay the reasonable charges assessed by the Software Escrow Agent.

Each of the following shall constitute a "Release Event" for purposes of this Agreement and the Software Escrow Agreement:

> a. presentation to the Software Escrow Agent of an endorsed file copy of a voluntary petition in bankruptcy naming Contractor as debtor;

> b. notification by Contractor to RMTA that the Software Escrow materials, including the Source Code, will no longer be supported, including applications support;

> c. Contractor otherwise goes out of business or no longer offers support for the Software Escrow materials, including the Source Code;

> d. RMTA presents to the Software Escrow Agent a final, unappealable order of court in an action to which Contractor is a named party allowing access to the Software Escrow materials, including the Source Code; or

> e. any proceeding seeking involuntary reorganization, arrangement, bankruptcy, readjustment, liquidation, dissolution, or similar relief as filed against Contractor under any present or future statute, law, or regulation which is admitted or not dismissed within sixty (60) days or if any trustee, receiver or liquidator of all or a substantial part of its business, assets or properties is appointed with or without Contractor's consent or acquiescence in such appointment and is not vacated within sixty (60) days.

In the event that Contractor transfers or assigns its interests in the Software Escrow materials, including the Source Code, to a third party, the aforementioned conditions shall continue to apply to the third party to which the Software Escrow materials, including the Source Code, is transferred or assigned.

16. **Delay and Extensions of Time.** If Contractor is delayed in the progress by any act, failure to act, or neglect of RMTA (including RMTA's contractors, vendors, suppliers or consultants), or by an event listed in **Section 35.3**, then the time of completion set forth in the Schedule shall be extended for such reasonable time as RMTA may decide in its sole

discretion after consultation with Contractor, and the associated contract price may be adjusted as RMTA and Contractor mutually agree. Contractor expressly agrees that Contractor's sole and exclusive remedy for such delay shall be an extension of contract time any mutually agreed upon change in the associated contract price, and that Contractor shall make no demand for any damages. No such extension shall be made for delay occurring more than ten (10) Days before claim thereof is made in writing to RMTA. In the case of a continuing cause of delay, only one claim is necessary, but no claim for a continuing delay shall be valid unless Contractor, within ten Days from the cessation of the delay, shall have given notice in writing to RMTA, with copy to RMTA, as to the amount of additional time claimed and any request for a change in the associated contract price, which shall be accompanied by full justification to support such requested change.

17. **Liquidated Damages; Price Adjustments.**

17.1 <u>Liquidated Damages</u>. Contractor agrees that liquidated damages shall be imposed by this Agreement. The terms below shall in no way be considered exclusive and shall not limit the Authority or Authority's right to pursue any other additional remedy which the Authority may be entitled to pursue.

Contractor shall pay to the Authority liquidated damages as follows:

| <u>Requirement</u> | <u>Associated Liquidated Damages</u> |
|---|---|
| Contractor shall successfully complete in accordance with the terms of this Agreement the Revenue Acceptance Test for all material parts of the Base Work by **September 27, 2019** | Where Contractor does not successfully complete Revenue Service Acceptance Test of all material parts of the Base Work in accordance with the terms of this Agreement by **September 27, 2019**, Contractor shall pay $3,100 for each day of delay or portion thereof |

The total amount of liquidated damages under this section shall not exceed $1,131,500 in the aggregate.

17.2 <u>Difficulty of Ascertaining Certain Damages</u>. The amount of liquidated damages as set forth or referenced in **Section 17.1** is fixed and agreed to by and between Contractor and RMTA because both Parties agree and acknowledge the impracticability and extreme difficulty of fixing and ascertaining the true value of the damages which RMTA will sustain by failure of Contractor to meet certain performance criteria, such as loss of revenue, RMTA's being found in breach of third party contracts, service charges, interest charges, harm and inconvenience to the public, delays caused to other activities of RMTA by failure to perform this Agreement, and other damages, some of which are indefinite and not susceptible of easy proof, such amounts were actively negotiated between the Parties, and are in each instance agreed by both Parties to be a reasonable estimate of the amount of damages which RMTA will sustain in each instance and such amount shall be

deducted from any monies due or that may become due to Contractor.  Liquidated damages as specified or referenced in **Section 17.1** will be deducted from any money due Contractor, not as a penalty, but as a reasonable estimate of RMTA's damages; provided however, that due consideration shall be taken of any adjustment of the time for performance granted under the provisions of **Section 16 (Delays and Extension of Time)**.

17.3    <u>Price Adjustments</u>.  Contractor is responsible for Contractor's Base Work, the Maintenance Work and the System meeting all of the requirements set forth in this Agreement and the Technical/Tolling Specifications during all phases of the Toll Work (including all installation phases, all maintenance phases before success completion of a project and/or revenue acceptance test, and all subsequent maintenance phases) and for the life of this Agreement, including the renewal term, if any.    The Authority intends to focus on the outcomes of these responsibilities using the metrics described below, each of which is hereafter referred to as a "Key Performance Indicator" or KPI.    The Authority has selected KPIs to provide a high confidence in all System performance and reflect the minimum tolerable performance expected of Contractor to avoid unnecessary impact to the Authority, the general public, the VDOT customer service center and other third parties, including but not limited to other electronic toll collection and violations processing vendors.  The final amount that the Authority pays to Contractor for Maintenance Work will be based on Contractor's ability to continually meet the KPIs.  Price Adjustments shall not be made for events or circumstances attributable to Force Majeure or any other event or circumstance beyond the reasonable control of Contractor.

Appendix A of TS-02 lists the KPIs, the measurement frequency for each and the non-compliance points for each in a scorecard format.  The point values shown there reflect the number of non-compliance points assessed for each deviation from the KPI and the points escalate whenever non-compliance is not resolved in subsequent months.

Contractor shall use commercially reasonable best efforts to minimize the impacts that result from failure to meet each KPI, regardless of whether invoice adjustments are made.  Furthermore, Contractor shall take corrective action to immediately remedy any failures and provide a Corrective Action Plan (CAP) to the Authority that documents the corrective action taken to prevent future reoccurrence of the problem associated with the non-compliance.  All CAPs shall be subject to the Authority's approval.

17.3.1    <u>KPI Reporting</u>.  As part of the monthly invoice for Maintenance Work, Contractor shall provide a KPI compliance report listing areas of compliance and detailing failures that resulted in non-compliance.  Regardless of how often a KPI is measured, Contractor shall provide reporting for all KPIs monthly.  Contractor shall use KPI measurement and reporting methods developed collaboratively with

the Authority to produce this report. All such measurement and reporting methods shall be subject to the Authority's approval.

17.3.2 <u>KPI Points</u>. Where Contractor fails to meet a KPI, the Authority will assess non-compliance points for each failure. The amount by which the KPI is missed matters in determining how well the System is performing so the non-compliance points for a particular failure are increased as the deviation from the KPI increases. Thus, by way of example, if there were a KPI requiring a System element to be available 99.95% of the time and 1 point was to be assessed for each 0.1% or portion thereof below the compliance level:

- If the actual availability was measured to be 99.85%, Contractor would be assessed 1 non-compliance point for this Key Performance Indicator.

- If the actual availability was measured to be 99.00%, Contractor would be assessed 10 non-compliance points for this Key Performance Indicator.

Escalation is then applied to this Key Performance Indicator based on how long the non-compliance has continued, as detailed below. Similar calculations apply to each of the other KPIs as shown in TS-02. The sum total of non-compliance points (with escalation) from KPIs no. 1 through no. 15 as set forth in TS-02 is then used to determine the non-compliance price adjustment.

17.3.4 <u>Escalation and KPI Scoring</u>. Non-compliance points will accrue as follows:

- In the first month that a specific KPI is not met, there is no escalation and only the non-compliance points are used to score the KPI;

- In the second consecutive month that a specific KPI is not met, the non-compliance points will be doubled (*i.e.*, an escalation multiplier of 2 will apply) to score the KPI for the month;

- In the third consecutive month that a specific KPI is not met, the non-compliance points will be quadrupled (*i.e.*, an escalation multiplier of 4 will apply) to score the KPI for the month; and

- In every consecutive month thereafter that the specific KPI remains unmet, the non-compliance points will be quadrupled (*i.e.*, an escalation factor of 4 will be applied) to score the KPI for each such month.

17.3.5 <u>Non-Compliance Price Adjustments</u>. Non-compliance points will be summed, the total of which will determine the price adjustment (if any) to be made to

Contractor's monthly invoice as further detailed below. A price adjustment will be made to the monthly invoice for each month that Contractor exceeds the allowable number of non-compliance points, and Contractor acknowledges and agrees that the Authority shall have the right to withhold payment of the monthly fee in respect of Maintenance Work for the subsequent month in which the event occurred (without incurring any interest charges) until such time as Contractor corrects or otherwise rectifies the non-conformance as provided herein. The parties acknowledge and agree that damages for such improper performance on the part of Contractor will be difficult to determine and that the amounts specified in this Section 17.3 have been agreed to by the parties as a reasonable estimate of the Authority's economic loss.

| Total Non-Compliance Points (including escalation) | Percent Reduction in Monthly Invoice For Maintenance Work |
|---|---|
| 0 – 20 | 0% |
| 21 – 30 | 10% |
| 31 – 40 | 20% |
| 41 – 50 | 30% |
| 51 – 60 | 40% |
| 61 or more | 50% |

In all cases, Contractor shall identify the failure condition; take immediate action to remedy the condition; ensure that corrective action is taken to prevent future reoccurrence of the failure condition; and provide comprehensive documentation of all these aspects as part of a corrective action plan.

17.4 <u>No Waiver; Reservation of Rights; Corrective Actions</u>. Permitting Contractor to continue and finish the Toll Equipment Work or any part of the Toll Equipment Work after the expiration of the time allowed for completion or after any extension of time, shall not operate as a waiver of the rights of RMTA under this **Section 17** or any other provision of the Contract Documents.

Failure to meet a KPI does not relieve Contractor of the requirement to complete all activities associated with the KPI. For example, if Contractor fails to completely and accurately transmit the transactions to the VDOT Customer Service Center within the time required by the KPIs, Contractor shall still completely and accurately transmit such transactions.

Nothing contained in this Section 17 shall be construed as limiting the rights of RMTA to additionally recover from Contractor any or all payments which become due to RMTA for reasons other than untimely performance, such as improper performance, failure to perform or breach of contract in any other respect, including but not limited to defective workmanship, equipment or materials.

18.  **Confidentiality.**

18.1  Confidential Information.

The parties acknowledge that in order to perform the Base Work and Maintenance Work called for in this Agreement, it may be necessary for RMTA to disclose to Contractor certain proprietary and/or confidential information such as toll data, toll or System records, security schemes or the like (collectively "*Confidential Information*"). Contractor will use any such Confidential Information solely for the Authority's benefit under this Agreement. Contractor shall use its best efforts to hold the Confidential Information in strictest confidence and will not disclose at any time, nor permit its officers or employees to disclose at any time (either during their respective employment by Contractor or thereafter), nor appropriate or use on its own behalf or on the behalf of others, any Confidential Information, without in each and every instance first obtaining the Authority's written consent thereto. Contractor shall restrict disclosure solely to those officers and/or employees of Contractor having a need to know and who have executed written confidentiality agreements with Contractor with provisions at least as restrictive as those expressed in this Agreement and which provisions clearly include the Confidential Information. Contractor shall not discuss nor disclose Confidential Information to any third Party, including but not limited to the Authority's consultants, contractors or vendors unless allowed to do so in writing by the Authority. Contractor shall not make or permit to be made by its officers and employees, copies, abstracts or summaries of any Confidential Information, including, but not limited to pictures, plans, data, notes and reports embodying any Confidential Information, except as required to perform the Toll Equipment Work under this Agreement. Upon the Authority's request, Contractor shall either return to the Authority or certify the destruction thereof, the Confidential Information and all such documents or other embodiments of any such Confidential Information.

18.2  Exclusions. Confidential Information shall not include (a) information which was known to Contractor prior to the time of disclosure by the Authority, provided Contractor was not otherwise under obligation of confidentiality at the time of such other disclosure; (b) information that is disclosed to Contractor by a third party without violation of any rights of the Authority or the rights of any third party; (c) information which was publicly available at the time of disclosure by the Authority; and (d) information which becomes publicly available through no fault of Contractor. Contractor may disclose the Confidential Information if and to the extent that such disclosure is required by law or by court order, provided that Contractor provides the Authority a reasonable opportunity to review the disclosure before it is made and to interpose its own objection to the disclosure.

18.3  Use Restriction. Contractor and its representatives shall use the confidential information solely for the benefit of the Authority in performing the Base Work

and Maintenance Work and shall not in any way use the Confidential Information to the detriment of RMTA.

18.4 <u>Length of Confidentiality</u>. Contractor's confidentiality obligations herein shall extend for a period of ten (10) years after the date each disclosure of Confidential Information is first made. However, if a court of competent jurisdiction determines that the maintenance of confidentiality for this period of time is not enforceable, then Contractor shall agree to maintain the confidentiality of the Confidential Information for the greatest amount of time as set forth in an applicable court order. The provisions of this Section 18.4 shall survive the termination of this Agreement.

18.5 <u>Return of Confidential Information</u>. Contractor shall return to RMTA any Confidential Information immediately on request but no later than upon the termination for whatever reason of this Agreement.

## 19. **Indemnification**.

19.1 <u>General Indemnification</u>. Contractor hereby agrees to indemnify, protect and save harmless RMTA, and its officers, employees, representatives and members of the board (hereinafter collectively referred to as "*Indemnitees*"), of and from any and all claims, demands, liabilities, losses, costs or expenses for any loss or damage (including but not limited to reasonable attorney's fees and expert's fees) growing out of, or otherwise happening in connection with this Agreement, (i) due to any act or omission on the part of Contractor, its agents, employees, Subcontractors, or others working at the direction of Contractor or on its behalf, unless specifically directed in writing by RMTA to perform such act or omission; or (ii) due to any breach of this Agreement by Contractor; or (iii) due to the application or violation of any pertinent Federal, State or local law, rule or regulation by Contractor, its agents, employees, subcontractors, or others working at the direction of Contractor or on its behalf. The foregoing shall not apply in the situation giving rise to the claim results solely from the act or omission of the Indemnitees.

This indemnification extends to the successors and assigns of Contractor, and this indemnification and release survives the duration of this Agreement, the termination of this Agreement and the dissolution or, to the extent allowed by law, the bankruptcy of Contractor.

Without restricting the authority of counsel to RMTA, Contractor shall, at its expense, be entitled to participate to the fullest extent allowed by law and shall have the duty to participate in the defense of any suit against the Indemnitees. Neither Contractor nor its insurer shall be permitted to settle or compromise any claim, loss or damage asserted against the Indemnitees without the express approval of the Indemnitees, where required.

Any claim by RMTA against Contractor under this Section, other than in warranty, shall be made in writing to Contractor within two (2) years after RMTA has actual knowledge of the event, condition, omission or situation giving rise to such claim. A claim under warranty shall be made within the time specified in the applicable warranty clause.

19.2    Intellectual Property Indemnification. Contractor shall, at its cost and expense, indemnify and hold harmless RMTA from and against any third party claims, allegations or causes of action that any Equipment, or any other Toll Equipment Work supplied under the Contract Documents, or RMTA's use of the Toll Equipment or other Toll Equipment Work pursuant to the terms of the Contract Documents infringes any patent, copyright, trade secret, confidential information, or any other proprietary right or Intellectual Property right of any third party. Contractor shall pay all costs of such defense, settlement, and any penalties, costs, damages and experts' and attorneys' fees awarded by a court or otherwise incurred by RMTA, provided that (a) RMTA promptly notifies Contractor of the claim but RMTA's failure to provide timely notice shall only relieve Contractor from its indemnification obligations if and to the extent such late notice prejudiced the defense or resulted in an actual increase in expense or loss to Contractor, and (b) Contractor notifies and agrees to request RMTA to grant Contractor sole control of the defense and all related settlement negotiations, the Parties agreeing that RMTA is under no obligation to grant such request.

19.2.1   If such claim has occurred, or in Contractor's opinion is likely to occur, RMTA agrees to permit Contractor, at its option, cost and expense, either to procure for RMTA the right to continue using the Toll Equipment or to replace or modify the same so that they become non infringing while meeting all of the Contract Requirements.

19.2.2   In case any Equipment is held to constitute an infringement of the patent rights or copyrights or other Intellectual Property rights of a third party and its use is enjoined (temporarily or permanently), Contractor, at Contractor's cost and expense, shall promptly (a) secure for RMTA and RMTA's representatives, agents, and designees the right to continue using the infringing item by suspension or removal of the injunction, or by procuring a perpetual, non-revocable, paid-up, royalty-free, assignable, non-exclusive license(s) to reproduce, publish, or otherwise use for RMTA's direct purposes; or (b) replace the infringing item with a non-infringing substitute that meets or exceeds the requirements of the Contract Documents; or (c) modify the infringing item so that it becomes non-infringing provided the resulting Equipment meets or exceeds the requirements of the Contract Documents. If the amount of time necessary to proceed with one of these options is deemed excessive by RMTA, RMTA may direct Contractor to select another option or risk default. Nothing in this provision shall be deemed to limit or condition RMTA's rights otherwise set forth in this Agreement, including termination. This

intellectual property infringement provision shall not apply to any infringement or alleged infringement arising solely from RMTA (a) modifying or altering Equipment, except as consented to by Contractor, or (b) using the Toll Equipment in any way not permitted by the Contract Documents or otherwise as permitted by Contractor, unless such infringement or alleged infringement arose against the Toll Equipment wholly independent of the above two exceptions.

19.3    General.  Contractor's obligations under this **Section 19** are in addition to Contractor's insurance obligations.

20.    **Limitation of Liability**.  In no event shall either Contractor or RMTA be liable to the other for any special, indirect, incidental or consequential damages (including, but not limited to lost revenues, loss of transactions, profits and lost business opportunity), regardless of the legal theory under which such damages are sought, and even if the parties have been advised of the possibility of such damages.  Contractor's total liability to RMTA and its officers, employees, representatives, and members of RMTA's board for any and all liabilities arising out of or related to this Agreement, from any cause or causes, and regardless of the legal theory, including breach of contract, warranty, negligence, strict liability, statutory liability, or any indemnification obligations, shall not in the aggregate exceed two times the value of this Agreement, provided, however, that such limitation shall not be inclusive of any amount assessed against or paid by Contractor for liquidated damages or price adjustments under Section 17.

21.    **Insurance**.

21.1    Insurance Certificates.  Contractor shall procure the insurance coverages identified below at Contractor's expense and shall furnish RMTA an insurance certificate listing RMTA as the certificate holder and an endorsement listing RMTA as an additional insured no less often than annually and on such other occasions as RMTA may demand.  Evidence of insurance coverages shall be provided on the form acceptable to RMTA.  The insurance certificate must provide the following:

21.1.1    Name and address of authorized agent
21.1.2    Name and address of insured
21.1.3    Name of insurance company(ies)
21.1.4    Description of policies
21.1.5    Policy Number(s)
21.1.6    Policy Period(s)
21.1.7    Limits of liability
21.1.8    Name and address of RMTA as certificate holder
21.1.9    Project Name and Number
21.1.10    Signature of authorized agent
21.1.11    Telephone number of authorized agent

21.2 <u>Insurer Qualifications, Insurance Requirements</u>. Each of the insurance coverages required below (i) shall be issued by a company licensed by the Insurance Commissioner to transact the business of insurance in the Commonwealth of Virginia for the applicable line of insurance, and (ii) shall be an insurer (or, for qualified self-insureds or group self-insureds, a specific excess insurer providing statutory limits) with an A.M. Best Policyholders Rating of "A-" or better and with a financial size rating of Class V or larger.

Contractor agrees that the policy shall not be canceled or allowed to lapse or allowed to expire until thirty (30) Days after RMTA has received written notice thereof, or until such time as other insurance coverage providing protection equal to protection called for in this Agreement shall have been received, accepted and acknowledged by RMTA. Such notice shall be valid only as to the Project as shall have been designated by Project Number and Name in such notice. Contractor shall provide written notice of any changes to the policy to RMTA within three (3) Business Days of Contractor's receipt of notice of any changes or proposed changes from the insurance company.

Each such policy shall contain the following provisions:

21.2.1 The policy shall not be subject to invalidation as to any insured by reason of any act or omission of another insured or any of its officers, employees, agents or other representatives ("*Separation of Insureds*").

21.2.2 All deductibles shall be paid for by Contractor.

21.2.3 Self-insured retention, except for qualified self-insurers or group self-insurers, in any policy shall not exceed $250,000.00.

21.3 <u>Required Insurance Coverages</u>. Contractor also agrees to purchase insurance and have the authorized agent state on the insurance certificate that Contractor has purchased the following types of insurance coverages, consistent with the policies and requirements of applicable Virginia law. The minimum required coverages and liability limits are as follows:

21.3.1 Workers' Compensation Insurance. Contractor agrees to provide at a minimum Workers' Compensation coverage in accordance with statutory limits. A group insurer must submit a certificate of authority from the Insurance Commissioner approving the group insurance plan. A self-insurer must submit a certificate from the Virginia Workers' Compensation Commission stating Contractor qualifies to pay its own workers' compensation claims. Contractor shall require all subcontractors performing work under this Agreement to obtain an insurance certificate showing proof of Workers' Compensation Coverage and shall submit a certificate on the letterhead of Contractor in the following language:

*This is to certify that all subcontractors performing work on this Project are covered by their own workers' compensation insurance or are covered by Contractor's workers' compensation insurance.*

21.3.2    Employers' Liability Insurance.    Contractor shall also maintain Employer's Liability Insurance Coverage with limits of at least:

| Coverage | Limits |
|---|---|
| Bodily Injury by Accident | $1,000,000 each accident; and |
| Bodily Injury by Disease | $1,000,000 each employee. |

Contractor shall require all subcontractors performing work under this Agreement to obtain an insurance certificate showing proof of Employers Liability Insurance Coverage and shall submit a certificate on the letterhead of Contractor in the following language:

*This is to certify that all subcontractors performing work on this Project are covered by their own Employers Liability Insurance Coverage or are covered by Contractor's Employers Liability Insurance Coverage.*

21.3.3    Commercial General Liability Insurance.    Contractor shall provide Commercial General Liability Insurance (2001 ISO Occurrence Form or equivalent) that shall include, but need not be limited to, coverage for bodily injury and property damage arising from premises and operations liability, products and completed operations liability, blasting and explosion, collapse of structures, underground damage, personal injury liability and contractual liability.    The CGL policy must include separate aggregate limits per Project and shall provide at a minimum the following limits:

| Coverage | Limit |
|---|---|
| Premises and Operations | $ 1,000,000.00 per Occurrence |
| Products and Completed Operations | $ 1,000,000.00 per Occurrence |
| Personal Injury | $ 1,000,000.00 per Occurrence |
| Contractual | $ 1,000,000.00 per Occurrence |
| General Aggregate | $ 2,000,000.00 per Project |

Additional Requirements for Commercial General Liability Insurance are shown below.

21.3.4    Commercial Business Automobile Liability Insurance.    Contractor shall provide Commercial Business Automobile Liability Insurance that shall include coverage for bodily injury and property damage arising from the operation of any owned, non-owned, or hired

automobile. The Commercial Business Automobile Liability Insurance Policy shall provide not less than $1,000,000 Combined Single Limits for each occurrence.

21.3.5 Commercial Umbrella Liability Insurance. Contractor shall provide a Commercial Umbrella Liability Insurance to provide excess coverage above the Commercial General Liability, Commercial Business Automobile Liability and the Workers' Compensation and Employers' Liability to satisfy the minimum limits set forth herein. The umbrella coverage shall follow form with the Umbrella limits required as follows:

$2,000,000 per Occurrence/$10,000,000 Aggregate

21.3.6 The insurance provided in **Sections 21.3.3, 21.3.4, and 21.3.5** shall also meet the following additional requirements:

21.3.6.1 The policy shall include as additional insureds the officers, members, and employees of RMTA with respect to liability arising out of services performed hereunder.

21.3.6.2 The policy must be on an "occurrence" basis.

21.3.7 Disposition of Insurance Documents. One original certificate of insurance with all endorsements attached must be deposited with RMTA for each insurance policy required.

21.4 <u>Termination of Obligation to Insure</u>. Unless otherwise expressly provided to the contrary, the obligation to insure as provided herein shall not terminate until the expiration or other termination of this Agreement.

21.5 <u>Failure of Insurers</u>. Contractor is responsible for any delay resulting from the failure of his insurance carriers to furnish proof of proper coverage in the prescribed form.

21.6 <u>Ongoing Coverage</u>. Contractor is responsible for tracking insurance coverages for itself and its subcontractors, for ensuring that coverages remain in force throughout the duration of this Agreement, and for demonstrating to RMTA ongoing compliance with this **Section 21**. RMTA reserves the right to require, and receive within ten (10) days, complete, certified copies of all insurance policies and endorsements required by this Agreement at any time. RMTA shall not be obligated, however, to review any insurance policies or to advise Contractor of any deficiencies in such policies and endorsements. RMTA's receipt of Contractor's policies or endorsements shall not relieve Contractor from, or be deemed a waiver of, RMTA's right to insist on strict fulfillment of Contractor's obligations under this Agreement.

21.7 <u>General</u>. Contractor's obligations under this **Section 21** are in addition to Contractor's obligations under **Section 19 (Indemnification)**. Contractor's failure to maintain the insurance policies as required by this Agreement or to provide timely evidence of renewal will be considered a breach of this Agreement.

22. **Non-exclusivity.** This Agreement is entered into solely for the convenience of RMTA, and in no way precludes RMTA from obtaining like goods or services from other suppliers. Further, RMTA, at its discretion, may order Base Work or Maintenance Work as it deems necessary as provided herein and in conformity with **Attachment C (Pricing and Payment Schedules)** for any quantity desired. This Agreement is an optional-use contract that neither financially binds RMTA nor otherwise obligates RMTA to purchase any Base Work or Maintenance Work hereunder.

23. **Spare Parts.** Contractor shall purchase initial spare part quantities and furnish all replacement parts to fulfill the extended parts and labor warranty and all other requirements for the term of this Agreement. At the end of the maintenance term, all of these spare parts not yet installed in the System shall remain the property of Contractor, unless the Authority shall have agreed to purchase any such parts at a price equal to the lower of Contractor's book value for such part(s) or the market value of such part(s). Contractor shall be responsible for the maintenance of an adequate spare parts inventory during the term of this Agreement to maintain the required performance. Contractor's failure to purchase or replenish the spare parts or consumables to levels necessary to meet the performance requirements for the System can constitute an event of default and will not relieve Contractor from meeting all required performance requirements or any associated liquidated or actual damages resulting from the nonperformance.

*Additional Work Parts Inventory.* Thirty (30) days prior to placing the System in revenue collection, Contractor shall purchase, replenish and maintain additional quantities of spare parts for the additional work parts inventory. The additional work parts inventory shall be purchased by Contractor, as directed by RMTA and at RMTA's expense, on behalf of RMTA. Unless otherwise specified by RMTA, spare parts shall be purchased on behalf of RMTA and in a manner to ensure that RMTA obtains the benefit of all warranties associated with such spares. At the end of the maintenance term, the additional work parts inventory shall remain the property of RMTA. Any additional work parts inventory that is lost or damaged due to the negligence, intentional act, or omission of Contractor or its employees, subcontractors, agents, or invitees shall be replaced by Contractor at its sole cost. Contractor shall be responsible for the additional work parts inventory and shall be insured in this regard as set forth in this Agreement. Contractor will maintain and track the inventory of all additional work parts inventory for RMTA and shall provide RMTA with a list itemizing the additional work parts inventory as reasonably requested, but not more frequently than once a month.

All of the additional work parts inventory shall be maintained by Contractor free and clear of all liens and encumbrances of any kind whatsoever at locations to be agreed upon

between RMTA and Contractor, which shall provide safeguards against theft, damage, or loss of the spare parts. The Authority shall have the right to inspect the additional work parts inventory at any time and shall give Contractor written notice any time RMTA removes any item from the additional work parts inventory. Contractor will provide no less frequently than annually a list of recommended quantities of spare parts.

The Authority may elect to assume responsibility at any time for storage of the additional work parts inventory and Contractor shall deliver all of the additional work parts inventory to RMTA for storage after receipt of reasonable notice.

*General.* The Contractor shall be responsible for providing all miscellaneous repair parts and materials costing less than $15.00 per item, at its own expense, which shall include, but not be limited to, fuses, touch-up paint, screws and nuts, wire, connectors, cables, labels, and insulating tape, as required, to comply with the requirements of these specifications. Contractor will provide normal shop consumables (e.g., solder, lubricants, cleaning rags, etc.) and spares costing less than $15 per item, excluding toll system consumables (e.g., magnetic media, batteries, receipt printer paper, light bulbs, etc.), at no additional cost to RMTA.

24. **RESERVED.**

25. **Dispute Resolution.** In the event of any dispute whatsoever arising out of or relating to the Contract Documents or the Toll Equipment Work, the disputing Party must furnish a written notice to the other Party, setting forth in detail the dispute. Such notice must be addressed to RMTA's Director of Operations or Contractor's Project Manager, as applicable. Within five (5) Days after the receipt of the notice by the receiving Party, the Director of Operations and the Project Manager shall meet in RMTA's offices to attempt to resolve the dispute. If the Director of Operations and the Project Manager cannot resolve the dispute then, within five (5) Days after the date of written notice by either individual to the CEO of RMTA and Executive Vice President of Contractor, the CEO of RMTA and the Executive Vice President shall meet in RMTA's offices to attempt to resolve the dispute. If the CEO of RMTA and the Executive Vice President cannot resolve the dispute or otherwise agree to extend the time within which to attempt to resolve the dispute, then either Party may pursue those remedies only as allowed under this Agreement.

26. **Adequate Assurances.** If RMTA become insecure about the prospect of Contractor being able to comply with the terms of this Agreement or that the Toll Equipment proposed by Contractor under this Agreement will not perform as set forth in the Contract Documents, then where there are reasonable grounds for such insecurity, RMTA shall have a right to demand and receive from Contractor adequate assurance of performance. In such an event, Contractor shall respond to RMTA's demand for adequate assurances no later than five (5) Business Days from Contractor's receipt of RMTA's demand.

27. **Event of Default; Damages/Remedies.**

27.1 <u>Event of Default</u>. The following shall constitute an Event of Default on the part of Contractor:

    27.1.1 Contractor withheld, disrupted or delayed Toll Equipment Work or any Equipment due to non-payment by RMTA, as a result of the procedure set forth in **Section 7.12 (Disputed Invoices)** and the continuance thereof for a period of two (2) Business Days after notice is given to Contractor by RMTA;

    27.1.2 Contractor has failed to deliver the Toll Equipment Work or a component thereof on a timely basis, except to the extent of an excusable delay in accordance with **Section 16 (Delays and Extension of Time)** and the continuance thereof for a period of five (5) Days after notice is given to Contractor by RMTA;

    27.1.3 The Toll Equipment Work or any component thereof has failed to meet the criteria set forth in the Contract Documents and the continuance thereof for a period of five (5) Days after notice is given to Contractor by RMTA;

    27.1.4 Contractor failed to remedy Toll Equipment Work that does not comply with the performance standards or the terms of the Contract Documents and the continuance thereof for a period of five (5) Business Days after notice is given to Contractor by RMTA, or the failure to remedy a "Pervasive Defect" in accordance with the resolution plan as provided in Section 6.16 hereof for a period of five (5) Business Days after notice is given to Contractor by RMTA;

    27.1.5 Any portion of the Toll Equipment Work does not meet the performance standards listed in the RFP, and the performance measurement will be based upon controlled test vehicles as determined by RMTA in a live lane environment so that the confidence level meets or exceeds the confidence level indicated by the results of the testing required in the RFP, and the continuance thereof for a period of fifteen (15) days after written notice to Contractor;

    27.1.6 Contractor has failed to maintain the contract bonds, as required by **Section 6.15**, and insurance policies and coverages or fails to provide proof of insurance or copies of insurance policies, as required by **Section 21 (Insurance)** and the continuance thereof for a period of ten (10) Business Days after notice is given to Contractor by RMTA;

    27.1.7 Contractor becomes insolvent, or has assigned the proceeds of this Agreement for the benefit of Contractor's creditors (except any

assignment of proceeds as collateral for any loan), or Contractor has taken advantage of any insolvency statute or debtor/creditor law or Contractor's property or affairs have voluntarily been put in the hands of a receiver; or any case, proceeding or other action against Contractor is commenced in bankruptcy, or seeking reorganization, liquidation or any relief under any bankruptcy, insolvency, reorganization, liquidation, dissolution or other similar act or law of any jurisdiction, which case, proceeding or other action remains undismissed, undischarged or unbonded for a period of thirty (30) Days;

27.1.8    Contractor failed to provide "adequate assurances" within five (5) Business Days of RMTA's notice, when, in the opinion of RMTA, reasonable grounds for uncertainty exist or a material adverse change or effect has occurred with respect to Contractor's ability to perform any of its obligations under this Agreement;

27.1.9    The suspension or revocation of any license, permit, or registration necessary for the performance of Contractor's obligations under this Agreement and the continuance thereof for a period of ten (10) Days after notice is given to Contractor by RMTA;

27.1.10   Contractor suspended or failed to proceed with any part of the Toll Equipment Work and the continuance thereof for a period of seven (7) Days after notice is given to Contractor by RMTA;

27.1.11   The default in the performance or observance of any of Contractor's other obligations under this Agreement or the Contract Documents and the continuance thereof for a period of ten (10) Days after notice is given to Contractor by RMTA.

27.1.12   Contractor shall have made any material misrepresentation or omission in any written materials furnished in connection with any of the Contract Documents, including but not limited to its proposal, acceptance of or agreement with RFP or contract requirements, best and final offer, or its performance hereunder.

27.2    <u>RMTA Damages/Remedies</u>. Upon the occurrence of an Event of Default, RMTA may, in addition to and without prejudice to all other contractual remedies and/or remedies allowed at law or in equity, proceed to take any or all of the following actions:

27.2.1    Withhold any money then due and/or thereafter due to Contractor;

27.2.2    Perform or cause to be performed for the account of Contractor any contractual covenant in the performance of which Contractor is in default or make any payment for which Contractor is in default. Contractor shall pay to RMTA upon demand any amount paid or incurred by RMTA in the performance of such covenant. Any amounts which have been paid or incurred by reason of failure of Contractor to comply with any covenant or provision of this Agreement shall bear interest at the Default Rate, which shall be defined as the Prime Rate plus five (5) percent (but in no case higher than the highest rate permitted by law) from the date of payment by RMTA until such amount is fully paid by Contractor;

27.2.3    RMTA shall have the right to immediately find Contractor in default and/or take any other action contemplated in **Section 29.2 (Transition)**, and/or procure other Toll Equipment Work from third parties and charge Contractor for and Contractor shall be liable to RMTA for the expense of such procurement, Toll Equipment Work and any other costs and expenses, including lost profits and revenues, incurred by RMTA as a result of the termination; and

27.2.4    Obtain the Toll Equipment Work, or a portion thereof, from a third party under substantially similar terms of this Agreement, and recover from Contractor all additional costs and expenses paid or incurred by RMTA as a result of the Event of Default, plus all additional costs paid or incurred by RMTA to obtain the replacement Toll Equipment Work as set forth in this Section.

27.2.5    Exercise any other rights and remedies available to RMTA under this Agreement, including the attachments hereto, or the Contract Documents, or available to RMTA at law or in equity, based on any applicable theory, including but not limited to the exercise of any rights as an intended third party beneficiary and the recovery of any and all damages of any kind to the extent provided or permitted by applicable law.

28.    **Cover**.  If Contractor fails to timely perform any or all of its obligations under this Agreement, RMTA may, in addition to all other contractual, legal or equitable remedies (but not in addition to liquidated damages set forth in **Section 17**), proceed to take either or both of the following actions after five Days written notice to Contractor:

28.1    Withhold Payment. Withhold any money then due and/or thereafter due to Contractor; and

28.2    Replacements. Obtain replacements identical or substantially similar to the Toll Equipment and/or Maintenance Work and support services, or a portion of either thereof, under substantially similar terms of this Agreement, from a third party,

and recover from Contractor all additional costs and expenses paid or incurred by RMTA as a direct result of Contractor's failure to perform under this Agreement, plus all additional costs paid or incurred by RMTA to obtain the replacements as set forth in this **Section 28.2.**

29. **Cooperation, Transition of Equipment, and End of Contract Responsibilities.**

29.1 Cooperation. In the event that RMTA enters into any agreement at any time with any other vendor(s) for additional work related to Equipment, Contractor agrees to cooperate fully with such other vendors in order to facilitate the performance of work and/or provision of deliverables by such other vendors and to refrain from any activity which would interfere with performance of work and/or provision of deliverables by such other vendor.

29.2 Transition. Upon expiration or earlier termination of this Agreement or any Equipment provided hereunder, Contractor shall accomplish a complete transition of the Toll Equipment Work from Contractor to RMTA, or to any replacement provider designated by RMTA, without any interruption of, or adverse impact on the Toll Equipment Work or any other work provided by third parties. Contractor shall cooperate fully with RMTA or such replacement provider and promptly take all reasonable steps required to assist in effecting a complete transition. All Equipment related to such transition shall be performed at no additional cost beyond what would be paid for the Toll Equipment Work hereunder.

29.3 End of Contract. Contractor shall perform the end of Contract responsibilities as specified in the Contract Documents or as otherwise specified by RMTA upon the expiration or earlier termination of this Agreement.

29.4 Contractor Obligations. Contractor shall, without limiting its obligations pursuant to any other clause or condition in this Agreement:

(i) subject to the terms of any third-party contracts, procure at no charge to RMTA any third-party authorizations necessary to grant RMTA the use and benefit of any third-party contracts between Contractor and third-party contractors used to provide Toll Equipment Work, pending their assignment to RMTA.

(ii) convey to RMTA all RMTA assets need for system maintenance in Contractor's possession. If applicable, at the election of RMTA, Contractor shall convey to RMTA from among those assets then held by Contractor for the provision of Toll Equipment Work to RMTA such assets as RMTA may select, at a price consisting of the net book value. Contractor shall promptly remove from RMTA premises any Contractor asset that RMTA, or its designee, chooses not to purchase.

(iii) at its expense, shall convey or assign to RMTA or its designee such leases, licenses and other contracts used by Contractor, RMTA, or any other person in connection with the Toll Equipment Work, as RMTA may select. Contractor's obligation described herein, shall include Contractor's performance of all obligations under such leases, licenses and other contracts to be performed by it with respect to periods prior to the date of conveyance or assignment and Contractor shall indemnity, defend and hold harmless RMTA for any losses or liability resulting from any claim that Contractor did not perform any such obligations.

(iv) deliver to RMTA or its designee, at RMTA's request, all documentation and data related to RMTA, including RMTA's data, held by Contractor, and upon Approval by RMTA, Contractor shall destroy all copies thereof not turned over to RMTA, all at no charge to RMTA. Notwithstanding the foregoing, Contractor may retain one (1) copy of the documentation and data, excluding RMTA data, for archival purposes or warranty support.

29.5 <u>Failure to Comply</u>. The Parties acknowledge and understand that Contractor's failure to comply with the terms and conditions as stated hereinabove shall adversely affect RMTA and result in monetary loss to RMTA. RMTA shall assess, audit, and certify to Contractor monetary losses resulting from Contractor's failure to comply with the provisions of this **Section 29**. RMTA's determination as to the amount of the monetary loss suffered shall be conclusive and Contractor shall compensate RMTA for such loss within thirty (30) Days of such a determination.

30. **Termination**.

30.1 <u>Termination for Cause</u>. Upon an Event of Default, RMTA may, in its sole discretion, terminate this Agreement in whole or in part. Termination shall take effect on the date set forth in RMTA's notice to Contractor. Upon such termination, RMTA will have the right to appropriate or use any or all materials as RMTA determines. Upon such termination RMTA shall not be required to pay Contractor any amounts for Toll Equipment Work performed prior to the date of termination for which payment may be due and owing but not yet paid ("*Remaining Payment*"). In the event RMTA's expenses incurred or anticipated to be incurred as a result of Contractor's breach are less than the Remaining Payment, RMTA shall remit such differential to Contractor. In the event RMTA's expenses incurred or anticipated to be incurred as a result of Contractor's breach exceed the Remaining Payment, including any costs of RMTA incurred by any delay (or from any reason attributable to the delay, including the payment of any penalties by RMTA to any third party under separate agreement) then Contractor shall within five (5) Days written notice from RMTA, make payment of the differential to RMTA. In addition to the rights and remedies in this **Section 30.1**, RMTA shall have all other rights and remedies against Contractor which are available at law or in equity. Contractor

acknowledges that the remedy set forth in this **Section 30.1** is Contractor's sole and exclusive remedy against RMTA for termination for cause and Contractor hereby waives all other rights and remedies it may have against RMTA under the Contract Documents, at law or in equity.

30.2    Termination for Convenience.  RMTA may terminate this Agreement upon sixty (60) calendar days written notice, which shall commence upon the date of such notice.  In the event of a termination for convenience, RMTA shall only pay Contractor for Toll Equipment Work performed through the termination date.  As used in the previous sentence, "performed" shall mean work that has been approved for payment, including with respect to any milestone basis for payment. RMTA shall not be responsible for any other costs, fees and expenses of any nature whatsoever, including but not limited to administrative fees, legal fees, costs to set up or shut down operations at the project site, salary, or any other cost or expense, whether direct or indirect, whether foreseen or unforeseen. Contractor acknowledges that the remedy set forth in this **Section 30.2** is Contractor's sole and exclusive remedy against RMTA for termination for convenience and Contractor hereby waives all other rights and remedies it may have against RMTA under the Contract Documents, at law or in equity.

31.    **Conflicts of Interest**.  Contractor represents and warrants that it, its principals, its employees, and all others in close association with it, have no conflict of interest or of time, directly or indirectly, that would prevent timely performance of the Toll Equipment in a manner that is free of appearance or fact of impropriety.  Contractor promises to allow no such conflict to arise and promises to disclose such a conflict in the event that, nevertheless, one develops.

32.    **Records Retention and Audit Rights**.  Contractor shall, and shall cause each of its subcontractors to, maintain accurate books, records, documents and other evidence concerning Contractor's performance of Toll Equipment Work under this Agreement (hereinafter referred to as the "*Records*").  Contractor agrees to make available, at all reasonable times during which this Agreement is in effect the Records for inspection or audit by any authorized representative of RMTA. Within no more than five (5) Days after the termination of this Agreement for any reason, copies of all Records shall be given by Contractor to RMTA.  Records that relate to appeals, litigation, or the settlements of claims arising out of the performance of this Agreement, or costs and expenses of any such agreement as to which exception has been taken by RMTA shall be retained by Contractor until such appeals, litigation, claims or exceptions have been disposed.

In addition to audit obligations as set forth in the RFP Contractor shall, and shall cause each of its subcontractors, agents and assigns to, maintain accurate books, records, documents and other evidence concerning Contractor's performance of Toll Equipment Work under this Agreement (hereinafter referred to as the "*Records*").  Records shall include all information, communications and data, whether in writing or stored on a computer, computer disks, microfilm, writings, working papers, drafts, computer printouts, notes, charts or any other data compilations, books of account, photographs,

videotapes and audiotapes supporting documents, any other papers or preserved data in whatever form, related to this Agreement or Contractor's performance of the Toll Equipment Work determined necessary or desirable by RMTA for any purpose. Contractor agrees to make available, at all reasonable times, the Records for inspection or audit by any authorized representative of RMTA. Within no more than five (5) Days after the termination of this Agreement for any reason, copies of all Records shall be given by Contractor to RMTA. Records that relate to appeals, litigation, or the settlements of claims arising out of the performance of this Agreement, or costs and expenses of any such agreement as to which exception has been taken by the Commonwealth Auditor or any of his or her duly authorized representatives, shall be retained by Contractor until such appeals, litigation, claims or exceptions have been disposed.

Notwithstanding the foregoing paragraphs in this Section 32, any such audit and examination of Records is limited to Toll Equipment Work under this Agreement, including subsequent Support Work, to the extent same is incorporated into this Agreement. Ownership in terms of work for hire under this Agreement will not apply to Contractor proprietary and confidential information incidental to contract management and administration, and are not deemed deliverables or work for hire under this Agreement.

33. **Attachments.** The following Attachments are incorporated by reference into and made a part of the Contract Documents:

> Attachment A - Request for Proposals (and addenda thereto)
> Attachment B - Contractor's Proposal

The following Attachments are attached hereto and incorporated into the Contract Documents:

> Attachment C – Pricing and Payment Schedule(s)
> Attachment D – Project Schedule(s)

34. **Cooperative Purchasing**. As provided in the RFP and pursuant to Va. Code § 2.2-4304, Contractor agrees that, upon RMTA's written approval, other tolling entities in the Commonwealth, including but not limited to public and private members of the Virginia Toll Facilities group that operate toll roads in the Commonwealth of Virginia and other third parties (individually, "*Third Party*" and collectively, "*Third Parties*") may purchase or contract for any good or item of toll equipment work or service under this Agreement. In such a case, Contractor shall look solely to the Third Party placing such order for all obligations and liabilities due to Contractor under the Contract Documents for such purchase. By way of example and not limitation, RMTA shall have no liability whatsoever to Contractor for payment for such ordered good or item of toll equipment work or service. The specific pricing, contract terms and conditions and the like shall be as mutually agreed upon between Contractor and any such Third Party, based upon the scope, timing, and other factors related to any contemplated transaction.

35. **Miscellaneous Provisions**.

35.1. <u>Compliance with Laws</u>. Contractor shall perform its obligations hereunder in accordance with all applicable federal, state, and local government laws, rules, regulations, orders and approvals including, but not limited, to procedures and requirements relating to labor standards, equal employment opportunity, nondiscrimination, compliance with the Americans with Disabilities Act, anti-solicitation, and auditing and reporting provisions, now or hereafter in effect, and any rules required by any federal grant funding payment by RMTA. Any changes to applicable laws, rules, or regulations that are enacted after contract award may be the subject of a Change Order only if a change to applicable laws, rules, or regulations results in an actual and direct increase in cost to Contractor to comply with such changes. In such an event, the increased cost shall reflect the unit prices set forth in Contractor's Proposal, and if a unit price is not included in Contractor's Proposal, then the Change Order shall reflect an increase in price of Contractor's actual cost plus a markup as RMTA may reasonably approve.

35.2 <u>Parties Bound</u>. This Agreement will bind the respective heirs, executors, administrators, legal representatives, successors, and assigns of each Party.

35.3 <u>Time of the Essence; Force Majeure</u>. Time is of the Essence in the performance of this Agreement. However, neither Party shall be liable to the other Party for any delay or failure of performance due to fire, act of war, hostile foreign action, nuclear explosion, riot, strikes or failures or refusals to perform under subcontracts, civil insurrection, earthquake, hurricane, tornado, or other catastrophic natural event or act of God (collectively, "*Force Majeure*"). Contractor's exclusive remedies for Force Majeure events are set forth in **Section 16 (Delays and Extension of Time)**.

35.4 <u>Non-disparagement</u>. Each Party agrees not to make any statement, written or oral, to any third party which disparages or criticizes the other Party or the other Party's respective officers, directors, agents or management and business practices, in each case in connection with the performance or administration of the Toll Equipment Work, this Agreement, any other work/relationship between the other Parties under separate agreement, or any matter related thereto. The provisions of this **Section 35.4** shall not apply to any truthful statement required to be made by either Party, or such Party's officers, directors or agents, as the case may be, in any legal proceeding or governmental or regulatory investigation or to any internal discussions or communications between the Parties, or if the Authority is contacted for reference or similar information by a party to whom Contractor has applied for or submitted a proposal for toll work.

35.5 <u>Federal Intellectual Property Bankruptcy Protection Act</u>. RMTA shall be entitled to all rights and benefits of the Federal Intellectual Property Bankruptcy Protection Act, Public Law 100-506, codified at 11 § U.S.C. 355(n) and any amendments thereto.

35.6    Governing Law.  This Agreement is a Virginia agreement made under the laws of the Commonwealth.  It will be enforced according to Virginia law without regard to its conflict of laws rules or any other rules directing referral to foreign law or forums.  Any action related to this Agreement in any way shall be brought exclusively in the Circuit Court of the City of Richmond, Virginia, or the Federal District Court of the Eastern District of Virginia, Richmond Division, and each Party hereby consents to the jurisdiction and venue of such courts and the appropriate appellate courts therefrom in any such action and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the personal jurisdiction and venue of such court and to any claim of inconvenient forum.  Each Party hereby agrees to execute an acknowledgment of service of process at the request of the other Party in any litigation related to this agreement.  In the event that a Party does not provide an acknowledgment of service as agreed, each Party consents to service of process at that Party's address set forth in **Section 35.8 (Notices)**.

35.7    Notices.  All notices, notifications, Approvals, Acceptances, requests, permission, waivers or other communications (excluding invoices that will be handled as set forth in **Section 7 (Payment Terms)** hereunder shall be in writing and transmitted via hand delivery, overnight courier, or certified mail to the Parties at the respective addresses set forth below.  Invoices may also be sent by U.S. Mail, postage prepaid.  Notices will be deemed to have been given when received, unless otherwise noted in this Agreement.  If a Party refuses to accept delivery or fails to take delivery, notice shall be deemed given on the day delivery is first attempted.  Notice may also be given by email, provided a hard copy of the notice is also transmitted via hand delivery, overnight courier, or certified mail to the Parties at the respective addresses set forth below.

> *For RMTA:*
>
> 901East Byrd Street, Suite 1120
> Richmond, Virginia   23219
> Attention:  Chief Executive Officer
>
> *For Contractor:*
>
> TransCore, LP
> 3721 TecPort Drive
> Suite 102
> Harrisburg, PA 17111
> Attention: Ann Bryant

35.8    Compliance with Laws; Taxes. Contractor will pay all taxes lawfully imposed upon it that may arise with respect to this Agreement.

35.9 <u>Publicity</u>. Contractor shall not communicate with the media or press concerning this Agreement or the Toll Equipment Work, or issue a press release or otherwise publicize the Toll Equipment Work or this Agreement without the prior written permission of the Authority.

35.10 <u>Reserved.</u>

35.11 <u>Remedies Cumulative</u>. The rights and remedies of RMTA under this Agreement are cumulative of one another and with those otherwise provided by law or in equity.

35.12 <u>Waiver and Severability</u>. The waiver by RMTA of a breach of any provision of this Agreement shall not be deemed to be a waiver of such provision on any subsequent breach of the same or any other provision of this Agreement. Any such waiver must be in writing in order to be effective, and no such waiver shall establish a course of performance between the Parties contradictory to the terms hereof. All provisions of this Agreement are severable, and the unenforceability or invalidity of any of the provisions will not affect the validity or enforceability of the remaining provisions. The remaining provisions will be construed so as to carry out the full intention of the Parties.

35.13 <u>No Third Party Beneficiaries</u>. It is specifically agreed between the parties executing the Agreement that it is not intended by any of the provisions of any part of the Agreement to create in the public or any member thereof, a third party beneficiary hereunder, or to authorize anyone not a party to the Agreement to maintain a suit for personal injuries or property damage or other cause of action pursuant to the terms or provisions of the Agreement.

Nothing contained in the Contract Documents shall be construed as conferring upon or giving to any person, other than the Parties hereto, any rights or benefits under or by reason of this Agreement.

35.14 <u>Interpretation</u>.

35.14.1 The captions in this Agreement are solely for convenience, and will not affect the interpretation of any terms of this Agreement.

35.14.2 Wherever the word *"including" "includes"* or *"include"* is used in this Agreement, it shall be deemed to be followed by the words *"without limitation."*

35.14.3 The appropriate reasonable and professional standards as *"in the opinion of"* or *"satisfaction of"* or *"in the judgment of"* mean "the generally accepted practices in the toll systems industry," and that RMTA's approval or acceptance of such practices and the items supplied and work performed hereunder shall not be unreasonably

withheld, hindered, or delayed, or require performance beyond the specifications and scope of work.

35.14.4     Any provision or statement containing the words "*must*", "*shall*", or "*will*" is and shall be interpreted by the Parties as mandatory.

35.15   Counterparts. The Parties may execute this Agreement in counterparts.

35.16   Construction of Contract. In the event this Agreement must be interpreted by a court of competent jurisdiction as defined in **Section 35.6 (Governing Law)**, the Parties expressly agree that this is a negotiated contract that will not be construed against one Party over the other because such Party drafted this Agreement.

35.17   Survival. In addition to those provisions, which by their terms would naturally survive termination of this Agreement, **Sections 7 (Payment Terms), 9 (Warranties), 12.4 (Risk of Loss), 15 (Delivery of Software), 27 (Liquidated Damages), 18 (Confidentiality), 19 (Indemnification), 20 (Limitation of Liability of RMTA), 21 (Insurance), 27 (Event of Default; Damages/Remedies), 28 (Cover), 29 (Cooperation, Transition of Toll Equipment Work and End of Contract Responsibilities), 30 (Termination), 31 (Conflicts of Interest), 32 (Records Retention and Audit Rights, and 35 (Miscellaneous Provisions** shall survive the termination for whatever reason of this Agreement.

35.18   Non-exclusivity. This Agreement is entered into solely for the convenience of RMTA, and in no way precludes RMTA from obtaining like goods or services from other vendors at RMTA's sole discretion.

35.19   Entire Contract; Amendment. This Agreement contains the entire agreement between the Parties with respect to its subject matter and supersedes all other prior and contemporaneous contracts and understandings between the Parties, whether oral or written. RMTA shall not be bound by any terms and conditions included in any packaging, Invoice, catalog, brochure, technical data sheet, or other document prepared by Contractor which attempts to impose any condition in variance with or in addition to the terms and conditions contained herein, and any such terms and conditions shall be automatically null and void. No amendment to this Agreement shall be valid unless made in writing and signed by both Parties.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;*
*SIGNATURE PAGE FOLLOWS]*

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed effective as of the day and year first above mentioned.

**RICHMOND METROPOLITAN
TRANSPORTATION AUTHORITY**, a political
subdivision of the Commonwealth of Virginia

By: _____
Chief Executive Officer

**TRANSCORE, LP**, a Delaware limited partnership

By: _____

Its: _Senior Vice President_____

# REQUEST FOR PROPOSALS

*[INCORPORATED BY REFERENCE]*

# CONTRACTOR'S PROPOSAL

*[INCORPORATED BY REFERENCE;*
*INCLUDES ORAL INTERVIEW, NEGOTIATION RESPONSES & BEST AND FINAL OFFER]*

**PRICING AND PAYMENT SCHEDULES**

**A.    Base Work**.  The total compensation that RMTA shall pay to Contractor for the Base Work is a lump sum fixed price of $18,198,309.    Following Notice to Proceed, such compensation shall be invoiced and paid as provided in Section 7 upon Contractor's satisfaction of the applicable milestone(s) as set forth below, and at the specified percentage of the lump sum fixed price for successful completion of the applicable milestone, less applicable retainage.  No payment shall be due and owing to Contractor with respect to any such milestone unless and until Contractor has satisfied all conditions and requirements with respect to such milestone, and RMTA has accepted and approved same.    The "Initial Extra Work" for certain network provisioning as described in (C) below shall not be considered part of the Base Work or of the milestone payment process.

| Item | Milestone (as described in Tolling Specification #01) | Percent of Lump Sum Amount To Be Invoiced By Contractor |
|---|---|---|
| 1 | Successful completion of the Baseline Schedule Agreement Milestone | 5% |
| 2 | Successful completion of the Management Plan Review Milestone | 5% |
| 3 | Successful completion of the Initial Design Review Milestone | 5% |
| 4 | Successful completion of the Midpoint Design Review Milestone | 5% |
| 5 | Successful completion of the 100% Design Review Milestone | 5% |
| 6 | Successful completion of the Factory Acceptance Test Milestone | 15% |
| 7 | Successful completion of the Installation-Ready Design Review Milestone | 5% |
| 8 | Successful completion of the Revenue Service Acceptance Test Milestone of the Host Subsystem and: | 5% |
|  | a. All three (3) ORT Zones (on the Powhite Parkway and the Downtown Expressway mainlines) | 10% |
|  | b. All traditional lanes on the Powhite Parkway and the Downtown Expressway mainlines | 10% |
|  | c. All other traditional lanes (*i.e.*, Boulevard Bridge, Forest Hill ramps, Douglasdale ramps, 2nd Street ramps and 11th Street ramps) | 10% |
| 9 | Successful completion of the Project Acceptance Test Milestone | 10% |
| 10 | Successful completion of the As-Built Review Milestone | 5% |
| 11 | Successful completion of the Capital Project Close-out Milestone and release of Retainage | 5% |

## PRICING AND PAYMENT SCHEDULES (continued)

**B.** **Maintenance Work**. Following successful completion of the Project Acceptance Test and compliance with Section 6.15 regarding the Contract Bond for Maintenance Work, Maintenance Work shall be invoiced on a fixed monthly fee as provided in Section 7.2. The fixed monthly fee during the Initial Term shall be as set forth in the following table:

| Contract Year of Initial Term | Maintenance Payment (Monthly) |
|---|---|
| Year 1 | $ 136,324 |
| Year 2 | 141,777 |
| Year 3 | 147,448 |
| Year 4 | 153,346 |
| Year 5 | 159,480 |

The fixed monthly fee is subject to adjustment during the Renewal Term, if any, as provided in Section 7.1.

**C.** **Extra Work**. RMTA has requested that Contractor provide an allowance in an amount not to exceed $250,000 for certain network provisioning work in respect of the toll equipment, which shall be considered Extra Work and referred to below as the "Initial Extra Work."

The Initial Extra Work is not part of the Base Work described in (A) above but is considered part of the overall contract value. The Initial Extra Work will be the subject of a separate work order between RMTA and Contractor that sets forth the details of its scope, pricing, work schedule, and other deliverables, and it shall be subject to a separate Notice to Proceed than that for the Base Work. Invoicing for the Initial Extra Work shall be as provided in Section 7 unless otherwise set forth in the applicable work order. Subject to the provisions of the applicable work order, all terms and conditions of this Agreement shall apply to the Initial Extra Work.

The decision of RMTA to proceed with the Initial Extra Work, or any portion thereof, shall be in its sole discretion.

# WORK SCHEDULES

*[INCORPORATED BY REFERENCE;*
*PROVIDED WITH PROPOSAL]*

# FORM OF BOND(S)

*[INCORPORATED BY REFERENCE]*